# Supreme Court of Florida

_____

No. SC14-1905
_____

**THE LEAGUE OF WOMEN VOTERS OF FLORIDA, etc., et al.,**
Appellants/Cross–Appellees,

vs.

**KEN DETZNER, et al.,**
Appellees/Cross–Appellants.

[July 9, 2015]

PARIENTE, J.

In this appeal involving legal issues of first impression, we review a trial

court's finding that the 2012 "redistricting process" and the "resulting map"

apportioning Florida's twenty-seven congressional districts were "taint[ed]" by

unconstitutional intent to favor the Republican Party and incumbent lawmakers.[1]

_____

1. This Court previously considered two issues arising out of the pre-trial discovery process—one concerning the legislative privilege and the other concerning the discovery of documents in the possession of non-party political consultants—and released three opinions while the litigation was pending. See League of Women Voters of Fla. v. Fla. House of Representatives (Apportionment IV), 132 So. 3d 135, 138 (Fla. 2013) (addressing and largely rejecting claims of legislative privilege); League of Women Voters of Fla. v. Data Targeting, Inc. (Apportionment V), 140 So. 3d 510, 514 (Fla. 2014) (permitting the use during trial of evidence obtained from non-party political consultants, pending further

Cognizant that this Court's role is not to select a redistricting map that performs better for one political party or another, but is instead to uphold the purposes of the constitutional provision approved by Florida voters to outlaw partisan intent in redistricting, the crux of what we must decide is whether the trial court gave the appropriate legal effect to its finding that the Florida Legislature drew the state's congressional districts in violation of the Florida Constitution.

Added to the Florida Constitution in 2010, the Fair Districts Amendment sought to eliminate the age-old practice of partisan political gerrymandering— where the political party and representatives in power manipulate the district boundaries to their advantage—by forbidding the Florida Legislature from drawing a redistricting plan or an individual district with the "intent to favor or disfavor a political party or an incumbent." Art. III, § 20(a), Fla. Const. "The desire of a political party to provide its representatives with an advantage in reapportionment is not a Republican or Democratic tenet, but applies equally to both parties." In re Senate Joint Resolution of Legislative Apportionment 1176 (Apportionment I), 83 So. 3d 597, 615 (Fla. 2012). As observed when a three-judge panel of a federal district court examined Florida's last decennial congressional redistricting plan in

appellate review); Bainter v. League of Women Voters of Fla. (Apportionment VI), 150 So. 3d 1115, 1117 (Fla. 2014) (upholding trial court ruling ordering production of documents in the possession of non-party political consultants).

2002, the "raw exercise of majority legislative power does not seem to be the best way of conducting a critical task like redistricting, but it does seem to be an unfortunate fact of political life around the country." Martinez v. Bush, 234 F. Supp. 2d 1275, 1297 (S.D. Fla. 2002).

With the voters' approval of the Fair Districts Amendment, that unfortunate fact of political life was banned in Florida. Our citizens declared that the Legislature must "redistrict in a manner that prohibits favoritism or discrimination." Apportionment I, 83 So. 3d at 632. And the Eleventh Circuit Court of Appeals similarly declared that "[f]ar from dictat[ing] electoral outcomes, the provision seeks to maximize electoral possibilities by leveling the playing field." Brown v. Sec'y of State of Fla., 668 F.3d 1271, 1285 (11th Cir. 2012) (internal quotation marks omitted).

Like the voters of Arizona, who adopted an independent redistricting commission recently upheld by the United States Supreme Court as consistent with the "fundamental premise that all political power flows from the people," the Florida voters endeavored "to address the problem of partisan gerrymandering—the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power." Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, No. 13-1314, 2015 WL 2473452, at *4, 21 (U.S. June 29, 2015). As the United States Supreme Court has recognized, "partisan

gerrymanders . . . [are incompatible] with democratic principles." Id. at *4 (alteration in original) (quoting Vieth v. Jubelirer, 541 U.S. 267, 292 (2004) (plurality opinion)).  In short, the Fair Districts Amendment was designed "to restore 'the core principle of republican government,' namely, 'that the voters should choose their representatives, not the other way around.' " Id. at *21 (quoting Mitchell N. Berman, Managing Gerrymandering, 83 Texas L. Rev. 781, 781 (2005)).[2]

Presented in this case with a first-of-its-kind challenge under the Fair Districts Amendment, the trial court found that the Legislature's 2012 congressional redistricting plan was drawn in violation of the Florida Constitution's prohibition on partisan intent.  We affirm that finding.  We

---

2. We reject the Legislature's federal constitutional challenge to the Fair Districts Amendment.  The Supreme Court's recent opinion in the Arizona case confirms that neither the "Elections Clause" of the United States Constitution, U.S. Const. art. I, § 4, cl. 1, nor federal law, 2 U.S.C. § 2a(c), prohibits the people of a state, through the citizen initiative process, from directing the way in which its congressional district boundaries are drawn.  As the Supreme Court explained, "[b]anning lawmaking by initiative to direct a State's method of apportioning congressional districts" would "stymie attempts to curb partisan gerrymandering, by which the majority in the legislature draws district lines to their party's advantage." Ariz. State Legislature, 2015 WL 2473452, at *20; see also Brown, 668 F.3d at 1280 (rejecting a federal constitutional challenge to the Fair Districts Amendment based on reasoning wholly consistent with the Supreme Court's reasoning in Arizona State Legislature).

conclude, however, that the trial court failed to give proper legal effect to its determination that the Fair Districts Amendment was violated.

In reaching this conclusion, we recognize that the trial court had scant precedent to guide it in approaching the legal issues presented. And, we commend the trial court for the tremendous effort that was expended in deciding this novel challenge under the Fair Districts Amendment.

Nevertheless, we conclude that two legal errors significantly affected the trial court's determination of the appropriate legal effect of its finding of unconstitutional intent. First, the trial court erred in determining that there was no distinction between a challenge to the "plan as a whole"—a challenge, in effect, to the map produced from the unconstitutional "process"—and a challenge to individual districts. Second, the trial court erred in the standard of review it applied, which was improperly deferential to the Legislature's decisions after finding a violation of the Fair Districts Amendment's prohibition on partisan intent. Although it found the existence of unconstitutional intent, the trial court relied solely on objective "tier-two" constitutional indicators, such as compactness and the use of political or geographical boundaries, rather than on the direct and circumstantial evidence of "tier-one" unconstitutional intent presented at trial.

In other words, the trial court analyzed the Legislature's map as if it had not found the existence of unconstitutional intent, affording deference to the

Legislature where no deference was due. Once a direct violation of the Florida Constitution's prohibition on partisan intent in redistricting was found, the burden should have shifted to the Legislature to justify its decisions in drawing the congressional district lines.

Relying on the finding of unconstitutional intent, the challengers have urged that the entire plan should be redrawn. Certain factors support this approach, which would require the Legislature to begin the redistricting process anew on a blank slate. For example, we are aware that the starting point for drawing the 2012 congressional redistricting map was the 2002 map, which was drawn prior to the Fair Districts Amendment with, at that time, legally permissible partisan intent. In fact, the Legislature itself had, in defending against a racial gerrymandering claim directed at the 2002 map, "stipulated" that its intent "was to draw the congressional districts in a way that advantages Republican incumbents and potential candidates." Martinez, 234 F. Supp. 2d at 1340. We also acknowledge that a three-judge federal district court panel concluded that the Florida Legislature's "overriding goal with respect to congressional reapportionment" in 2002 was to "maximize the number of districts likely to perform for Republicans." Id. at 1300-01. These are considerations now explicitly outlawed by the Florida Constitution's prohibition on partisan political gerrymandering.

Based on the findings and evidence in this case, however, we ultimately reject the challengers' request that the entire plan must be redrawn or that this Court should, at this time, perform the task of redrawing the districts. Although we conclude that the trial court's finding of unconstitutional intent required the burden to shift to the Legislature to justify its decisions regarding where to draw the lines, we also conclude that the challengers still must identify some problem with the Legislature's chosen configuration. They did so in this case with respect to Districts 5, 13, 14, 26, and 27—showing a nexus between the unconstitutional intent and the district—as well as for Districts 21, 22, and 25, which they contended were problematic either for "tier-two" reasons or because the Legislature unjustifiably rejected a less favorable configuration.

Accordingly, while we affirm the trial court's finding that the Legislature's enacted map was "taint[ed]" by unconstitutional intent, we reverse the trial court's order upholding the Legislature's remedial redistricting plan. We relinquish this case to the trial court for a period of 100 days from the date of this opinion, with directions that it require the Legislature to redraw, on an expedited basis, Congressional Districts 5, 13, 14, 21, 22, 25, 26, 27, and all other districts affected by the redrawing, pursuant to the guidelines set forth in this opinion. We emphasize the time-sensitive nature of these proceedings, with candidate qualifying for the 2016 congressional elections now less than a year away, and

make clear that we take seriously our obligation to provide certainty to candidates and voters regarding the legality of the state's congressional districts. Upon the completion of the redrawing of the map, the trial court shall hold a hearing where both sides shall have an opportunity to present their arguments and any evidence for or against the redrawn map, and the trial court shall then enter an order either recommending approval or disapproval of the redrawn map.

We commend both parties for their professionalism in presenting the case to this Court and now proceed to discuss in detail the legal issues that have been raised on appeal, the background of this case, the evidence presented, and our legal reasoning.

## I. CHALLENGE TO TRIAL COURT'S FINDINGS

On appeal in this Court, the challengers seek affirmance of the trial court's finding of unconstitutional partisan intent in drawing the state's congressional districts—a finding that was based on both direct and circumstantial evidence. Their primary contention of error, however, is that the trial court applied an unduly deferential standard of review, thereby precluding it from imposing a more meaningful remedy for its finding of unconstitutional intent to favor the Republican Party and incumbents.[3]

---

3. The issues raised on appeal by the challengers are: (1) the trial court erred in requiring only two districts to be redrawn after finding constitutionally improper intent in the enacted congressional redistricting plan; (2) Congressional Districts 5,

The Legislature, while seeking affirmance of the trial court's approval of the remedial redistricting plan, nevertheless takes issue with the trial court's finding of unconstitutional intent.[4] In particular, the Legislature contests, first, the trial court's finding of a connection between the evidence and the Legislature itself,

13, 14, 21, 22, 25, 26, and 27 are independently unconstitutional; (3) this Court should craft a meaningful remedy, either by adopting a constitutionally valid plan or assisting the Legislature so that it can adopt a plan that complies with the Florida Constitution; and (4) the trial court erred in rejecting the challengers' attempt to re-open the evidence to introduce additional allegations of improper partisan intent.

We summarily reject the challengers' claim regarding the trial court's denial of their motion to re-open the evidence. Although the e-mail the challengers sought to introduce after the close of evidence did provide some additional circumstantial support for their claim of improper intent, the challengers themselves have conceded that it was cumulative to other evidence. Thus, while it may have been relevant evidence and properly introduced during the trial if the challengers had been able to obtain it sooner, the trial court did not abuse its discretion in denying the motion to re-open the case, and the challengers were not, in any event, prejudiced since the trial court found the existence of unconstitutional intent.

4. The Legislature also raises the following three issues on cross-appeal: (1) the trial court's order improperly discourages public participation in the redistricting process; (2) under the Florida Constitution, the controlling intent is the intent of the Legislature as a collective body; and (3) article III, section 20, of the Florida Constitution is invalid because it violates the United States Constitution.

As to the claim regarding public participation, we clarify that we do not read the trial court's order as discouraging public input in redistricting. There is nothing inherently in violation of the law or the Florida Constitution for an individual to anonymously submit a map to the Legislature for consideration or to submit a map through a third party. We conclude that any comments by the trial court to the contrary were made in the specific context of the facts and circumstances of this case and do not amount to error.

including the trial court's decision to ascribe the intent of a few individuals to the Legislature as a collective body. Second, the Legislature asserts that, even assuming the existence of unconstitutional intent, the trial court's finding pertains solely to the two invalidated districts and not to the broader process or map as a whole. Accordingly, the Legislature argues that any remedy that may have been necessary has already been provided through the enactment of the remedial redistricting plan.

We address these issues in the following way. After setting forth a comprehensive overview of the factual and legal background of the case, including a review of the evidence relied on by the trial court in finding unconstitutional intent, our analysis begins by considering the "intent" standard and the trial court's application of that standard in this case. Upon determining that the trial court appropriately framed the "intent" inquiry, we turn to the legal sufficiency of the trial court's finding of unconstitutional intent. We conclude that competent, substantial evidence supports the trial court's finding and that this finding pertains to the plan as a whole and not solely to the two invalidated districts. We then proceed to consider the proper legal effect of this finding as we review each challenged district. Finally, we address the remedy.[5]

_____

5. We conclude—as agreed by both parties—that amici curiae LatinoJustice PRLDEF, Florida New Majority, and Mi Familia Vota lack standing to challenge the validity of Congressional District 9. Amici curiae did not appear in the trial

## II. THE FLORIDA CONSTITUTION'S PROHIBITION ON PARTISAN POLITICAL GERRYMANDERING

In February 2012, "the Florida Legislature approved the decennial plan apportioning Florida's twenty-seven congressional districts, based on population data derived from the 2010 United States Census." League of Women Voters of Fla. v. Fla. House of Representatives (Apportionment IV), 132 So. 3d 135, 139 (Fla. 2013). After the adoption of the Legislature's 2012 congressional redistricting plan, two separate groups of plaintiffs ("the challengers")[6] filed civil complaints in the Second Judicial Circuit Court in and for Leon County, challenging the validity of the plan under new state constitutional redistricting

---

court to raise this claim, and it is well-settled that amici are not permitted to raise new issues. See Riechmann v. State, 966 So. 2d 298, 304 n.8 (Fla. 2007).

6. We use the term "challengers," which has been used by this Court in prior opinions during the course of this litigation, to refer collectively to the plaintiffs in the trial court, who are the Appellants/Cross–Appellees in this Court. These litigants that challenged the constitutionality of the congressional redistricting plan enacted in 2012 include two separate groups, which have described themselves as the "Coalition plaintiffs" and the "Romo plaintiffs." The "Coalition plaintiffs" consist of the League of Women Voters of Florida, Common Cause, and four individually named parties. The National Council of La Raza was formerly a member of the "Coalition plaintiffs" but later voluntarily dismissed all claims and withdrew as a party in the case prior to the trial. The "Romo plaintiffs" consist of lead plaintiff Rene Romo and six other individually named parties. There has rarely been a need to distinguish between the two groups for purposes of the issues to come before this Court, and the circuit court consolidated the two lawsuits filed by these groups that challenged the Legislature's 2012 congressional redistricting plan.

standards approved by the Florida voters in 2010 and now enumerated in article III, section 20, of the Florida Constitution. "Those standards, governing the congressional reapportionment process, appeared on the 2010 general election ballot as 'Amendment 6' and, together with their identical counterparts that apply to legislative reapportionment ('Amendment 5'), were generally referred to as the 'Fair Districts' amendments." Id.[7] As this Court has previously noted, "[t]here is no question that the goal of minimizing opportunities for political favoritism was the driving force behind the passage of the Fair Districts Amendment." Apportionment I, 83 So. 3d at 639.

In Apportionment I, during this Court's first review involving the new constitutional standards, we commended the Legislature for what it claimed at that time to be an unprecedented transparent redistricting process, in which the Legislature engaged in twenty-six public hearings around the state and obtained public input as it went about its task of redistricting. See 83 So. 3d at 637 n.35, 664. In truth, public input in redistricting was not unique to the 2012 process. The Legislature held thirty-three public hearings during the 1992 redistricting and

---

7. "Amendment 5 is now codified in article III, section 21, of the Florida Constitution. The standards in article III, section 20—governing congressional reapportionment—and those in article III, section 21—governing legislative reapportionment—are identical." Id. at 139 n.1.

twenty-four public hearings prior to the enactment of the 2002 map.  See Martinez,

234 F. Supp. 2d at 1288.

Based on the new constitutional standards that applied for the first time to

the 2012 process, transparency became legally significant under the Florida

Constitution.  This Court explained that "if evidence exists to demonstrate that

there was an entirely different, separate process that was undertaken contrary to the

transparent effort in an attempt to favor a political party or an incumbent in

violation of the Florida Constitution, clearly that would be important evidence in

support of the claim that the Legislature thwarted the constitutional mandate."

Apportionment IV, 132 So. 3d at 149.  Indeed, the challengers' principal claim in

this litigation challenging the constitutional validity of the Legislature's 2012

congressional redistricting plan involved evidence of the type of "entirely different,

separate process" this Court warned would be "important evidence" of a

constitutional violation.

Specifically, the challengers argued that the Legislature cooperated and

collaborated with partisan political operatives aligned with the Republican Party to

produce a redistricting plan that was drawn in contravention of article III, section

20, with the intent to favor incumbents and the Republican Party, which was the

controlling political party in the Legislature at the time of the 2012 redistricting.

Before the approval of the Fair Districts Amendment, this Court had previously

acknowledged, in 1992, that there was "little doubt that politics played a large part" in the adoption of prior redistricting plans in this state, explaining that the protection of incumbents and favoritism of one party over another was inevitable—and certainly "not illegal." In re Senate Joint Resolution 2G, Special Apportionment Session 1992 (In re Apportionment Law—1992), 597 So. 2d 276, 285 (Fla. 1992). But at that time, such partisan intent was not legally prohibited.

The acceptability of partisan political gerrymandering in this state dramatically changed in 2010. With "fairness" as its "focus," the Fair Districts Amendment now "expressly prohibits" redistricting "practices that have been acceptable in the past, such as crafting a plan or district with the intent to favor a political party or an incumbent." Apportionment I, 83 So. 3d at 605, 607, 616. These "express new standards" thus afford Florida citizens "explicit constitutional protection" under article III, section 20, of the Florida Constitution, "against partisan political gerrymandering." Apportionment IV, 132 So. 3d at 138-39.

Specifically, article III, section 20, of the Florida Constitution, provides in its entirety as follows:

> In establishing congressional district boundaries:
> (a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.

- 14 -

(b)  Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c)  The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

Art. III, § 20, Fla. Const.

Under article III, section 20, "there is no acceptable level of improper intent." Apportionment I, 83 So. 3d at 617.  The prohibition on improper partisan intent in redistricting applies, "by its express terms," to "both the apportionment plan as a whole and to each district individually" and does not "require a showing of malevolent or evil purpose."  Id.  A finding of partisan intent therefore renders the Legislature's redistricting plan constitutionally invalid, as the Florida Constitution expressly "outlaw[s] partisan political gerrymandering." Apportionment IV, 132 So. 3d at 137.  As we explained in Apportionment I:

> The Florida Constitution now expressly prohibits what the United States Supreme Court has in the past termed a proper, and inevitable, consideration in the apportionment process.
> Florida's express constitutional standard, however, differs from equal protection political gerrymandering claims under either the United States or Florida Constitutions.  Political gerrymandering claims under the Equal Protection Clause of the United States Constitution focus on determining when partisan districting as a permissible exercise "has gone too far," so as to "degrade a voter's or a group of voters' influence on the political process as a whole."
> In contrast to the federal equal protection standard applied to political gerrymandering, the Florida Constitution prohibits drawing a plan or district with the intent to favor or disfavor a political party or

- 15 -

incumbent; there is no acceptable level of improper intent. It does not reference the word "invidious" as the term has been used by the United States Supreme Court in equal protection discrimination cases, and Florida's provision should not be read to require a showing of malevolent or evil purpose.

83 So. 3d at 616-17 (citations omitted).

"Florida's constitutional provision prohibits intent, not effect," which is to say that a map that has the effect or result of favoring one political party over another is not per se unconstitutional in the absence of improper intent. Id. at 617. "Thus, the focus of the analysis must be on both direct and circumstantial evidence of intent." Id. "One piece of evidence in isolation may not indicate intent, but a review of all of the evidence together may lead this Court to the conclusion that the plan was drawn for a prohibited purpose." Id. at 618. The relevant inquiry for discerning improper partisan intent "focuses on whether the plan or district was drawn with this purpose in mind." Id.

## A. TRIAL COURT'S FINDING OF UNCONSTITUTIONAL INTENT

The challengers' claim of unconstitutional intent in the enacted congressional redistricting plan was that the Legislature communicated and collaborated with partisan political operatives, in the shadow of the Legislature's purportedly open and transparent redistricting process, to produce a map favoring Republicans and incumbents. After hearing all the evidence presented during a twelve-day bench trial held from late May to early June 2014, and evaluating the

- 16 -

credibility of all the witnesses, the trial court found that the challengers had proven their case and concluded that the Florida Legislature's enacted 2012 congressional redistricting plan was drawn in violation of article III, section 20.

The introductory paragraph of the trial court's judgment stated that "districts 5 and 10 were drawn in contravention of the constitutional mandates of Article III, Section 20," but, in its discussion throughout the course of its forty-one-page order, the trial court more generally referred to and found that a group of partisan political operatives "conspire[d] to manipulate and influence the redistricting process" and succeeded in "infiltrat[ing] and influenc[ing] the Legislature, to obtain the necessary cooperation and collaboration" to "taint the redistricting process and the resulting map with improper partisan intent." (Emphasis supplied.)

Specifically, the trial court stated, in pertinent part, as follows:

> [The challengers'] theory of the case regarding improper intent is that Republican leadership in the House and the Senate, their key staff members, and a small group of Republican political consultants conspired to avoid the effective application of the Fair District Amendments to the redistricting process and thereby successfully fashioned a congressional map that favors the Republican Party and its incumbents. The strategy they came up with, according to the [challengers], was to present to the public a redistricting process that was transparent and open to the public, and free from partisan influences, but to hide from the public another secretive process. In this secretive process, the political consultants would make suggestions and submit their own partisan maps to the Legislature through that public process, but conceal their actions by using proxies, third persons who would be viewed as "concerned citizens," to speak at public forums from scripts written by the consultants and to submit

proposed maps in their names to the Legislature, which were drawn by the consultants.

What is clear to me from the evidence, as described in more detail below, is that this group of Republican political consultants or operatives did in fact conspire to manipulate and influence the redistricting process. They accomplished this by writing scripts for and organizing groups of people to attend the public hearings to advocate for adoption of certain components or characteristics in the maps, and by submitting maps and partial maps through the public process, all with the intention of obtaining enacted maps for the State House and Senate and for Congress that would favor the Republican Party.

They made a mockery of the Legislature's proclaimed transparent and open process of redistricting by doing all of this in the shadow of that process, utilizing the access it gave them to the decision makers, but going to great lengths to conceal from the public their plan and their participation in it. They were successful in their efforts to influence the redistricting process and the congressional plan under review here. And they might have successfully concealed their scheme and their actions from the public had it not been for the [challengers'] determined efforts to uncover it in this case.

The closer question is whether the Legislature in general, or the leadership and staff principally involved in drawing the maps, knowingly joined in this plan, or were duped by the operatives in the same way as the general public. The Defendants argue that if such a conspiracy existed, there is no proof that anyone in the Legislature was a part of it. If portions of the operatives' maps found their way into the enacted maps, they say, it was not because leadership or staff were told or knew they came from this group, but rather because the staff, unaware of their origins, saw the proposals as improving the draft maps they were working on.

The most compelling evidence in support of this contention of the Defendants is the testimony of the staff members who did the bulk of the actual map drawing for the Legislature. I had the ability to judge the demeanor of Alex Kelly, John Guthrie and Jason Poreda at trial and found each to be frank, straightforward and credible. I conclude that they were not a part of the conspiracy, nor directly aware of it, and that significant efforts were made by them and their bosses to insulate them from direct partisan influence. I accept that their motivation in drawing draft maps for consideration of the

Legislature was to produce a final map which would comply with all the requirements of the Fair District Amendments, as their superiors had directed them.

That being said, the circumstantial evidence introduced at trial convinces me that the political operatives managed to find other avenues, other ways to infiltrate and influence the Legislature, to obtain the necessary cooperation and collaboration to ensure that their plan was realized, at least in part. They managed to taint the redistricting process and the resulting map with improper partisan intent. There is just too much circumstantial evidence of it, too many coincidences, for me to conclude otherwise.

(Emphasis supplied.)

Having reviewed the trial court's factual findings and the record, and viewing the evidence in the light most favorable to the trial court's finding of unconstitutional intent, we set forth the following relevant factual background of the case. See Berges v. Infinity Ins. Co., 896 So. 2d 665, 676 (Fla. 2004) (explaining that it "is not the function of this Court to substitute its judgment for that of the trier of fact"); Markham v. Fogg, 458 So. 2d 1122, 1126 (Fla. 1984) (stating that an appellate court "should not substitute its judgment for that of the trier of fact" as long as there is competent, substantial evidence to support the findings, and concluding upon review of conflicting evidence that there was "ample credible evidence adduced at the trial to sustain the trial judge's findings"); see also Hausdorff v. Hausdorff, 913 So. 2d 1267, 1268 (Fla. 4th DCA 2005) (viewing the evidence in the light most favorable to the challenged judgment in evaluating whether competent, substantial evidence supported the trial court's

rulings); Mesick v. Loeser, 311 So. 2d 132, 136 (Fla. 2d DCA 1975) (findings by the lower court as a trier of fact come to the appellate court "clothed with a heavy presumption of correctness and where there is substantial competent evidence to sustain the actions of the trial court," the appellate court cannot substitute its own opinion on the evidence but "must indulge every fact and inference in support of that judgment," which is the equivalent of a jury verdict). We note, given the nature of the challengers' claim, that circumstantial evidence is often essential in proving a conspiracy—and indeed may be the only type of evidence available. See Anheuser-Busch, Inc. v. Campbell, 306 So. 2d 198, 199 (Fla. 1st DCA 1975) ("It is a well settled rule that circumstantial evidence is admissible in civil conspiracy cases."); see also Resnick v. State, 287 So. 2d 24, 26 (Fla. 1973) (holding that a criminal conspiracy need not be proved by only direct evidence).

As we recount the facts, we emphasize that not every meeting held or every communication made was improper, illegal, or even violative of the letter of the Fair Districts Amendment. We set forth the pertinent facts in the record because, collectively, the evidence that the challengers were able to uncover after a protracted discovery process demonstrates a different scenario than the entirely open and transparent process touted by the Legislature when this Court considered the original apportionment challenges to the state Senate and House maps in

- 20 -

Apportionment I.  This is, indeed, what the trial court—which heard and considered all this evidence—found.

We also emphasize that since many of the e-mails were deleted or destroyed, we still may have only a partial picture of the behind-the-scenes political tactics. As the trial court found, "the Legislators and the political operatives systematically deleted almost all of their e-mails and other documentation relating to redistricting."  The Legislature did so even though it had acknowledged that litigation over the redistricting plan was "a moral certainty."  Indeed, if not for the production of some documents from the political consultants, including Marc Reichelderfer and Pat Bainter, there would be no record of the separate process undertaken by the consultants and no way to establish whether or not this process involved the collusion of the Legislature and ultimately affected the enacted map, as the trial court concluded.

We further understand that "taking the politics out of politics" is itself a difficult challenge, considering that partisan political gerrymandering was the norm for both political parties during prior redistricting processes in this state. Nevertheless, the facts that we recount provide the backdrop as to why we reject the Legislature's defense—which focuses on the political consultants' efforts to "influence the redistricting process" and "make themselves relevant" despite their "exclusion from the decision-making process"—that depicts the political

consultants and a few errant staffers as independent, self-motivated culprits, individuals who did not have the ability to and did not, in fact, influence the Legislature's decisions regarding where to draw the lines. And, finally, we emphasize that a finding of unconstitutional intent to favor a political party or incumbent does not necessarily mean that those who made the decisions acted with "malevolent or evil purpose," which is not required for a finding of unconstitutional intent under the Fair Districts Amendment. Apportionment I, 83 So. 3d at 617.

## B. EVIDENCE OF UNCONSTITUTIONAL INTENT

A month after the Florida voters approved the Fair Districts Amendment during the November 2010 general election, then-Speaker of the House Dean Cannon authorized a meeting in December 2010 at the headquarters of the Republican Party of Florida, involving Republican political consultants and legislative staffers, to discuss the upcoming redistricting process. This gathering was described by one of the consultants at trial as a meeting of "people that, prior to passage of the [new constitutional standards], would have generally been involved in the redistricting process."

The four key political consultants in attendance, who became major figures in the redistricting trial, were (1) Rich Heffley, (2) Frank Terraferma, (3) Marc Reichelderfer, and (4) Pat Bainter. Heffley is a consultant who has worked with

many Republican legislators and candidates for public office, including Senator Don Gaetz, the Chairman of the 2012 Senate Committee on Reapportionment. Heffley had been involved in prior redistricting processes in Florida in 1992 and 2002 and, by the summer of 2011, was being paid $10,000 per month by the Republican Party of Florida for unspecified redistricting services. Terraferma is also a consultant who has worked for a number of Republican legislators and candidates, including Representative Will Weatherford, the Chairman of the 2012 House Redistricting Committee. Terraferma had previously been hired by Heffley to work for the Republican Party of Florida and went back to work for the party as Director of House campaigns in 2011. He was described by employees of a national Republican organization, in an invitation for a meeting held in Washington, D.C., in June 2011 with key individuals involved in the redistricting process, as a "genius map drawer." Reichelderfer is another consultant who has worked with several Republican legislators and candidates, including former Speaker Dean Cannon. Reichelderfer is also one of Cannon's longtime personal friends, dating back over twenty years to their days together as Young Republicans. He was, at the time of the 2012 redistricting, considered part of Cannon's "inner circle," and he had a good working relationship with Heffley. Bainter is the owner of a Gainesville, Florida, based political consulting firm known as Data Targeting, Inc., which has as one of its largest clients the

Republican Party of Florida. Between January of 2011 and November of 2012, the Republican Party of Florida paid Data Targeting, Inc., almost $3 million for consulting, polling, and direct mail services.

These four consultants, along with employees of the Republican Party of Florida, met in the initial December 2010 meeting with Alex Kelly, the staff director for the House Redistricting Committee; Chris Clark, the chief legislative aide for Senator Gaetz; and attorneys for the Legislature. At a second meeting the following month, in January 2011, the consultants met with Senator Gaetz, Representative Weatherford, Alex Kelly, and Kelly's Senate counterpart, John Guthrie.

These meetings were not open to the public and there is no record of what was discussed. As the trial court stated, "[n]o one who testified at trial about [the meetings] seemed to be able to remember much about what was discussed, though all seemed to agree that the political consultants were told that they would not have a 'seat at the table' in the redistricting process," as they had during redistricting in years past. According to the trial court, "[n]o one clearly articulated what that meant exactly, but there was testimony that they were told that they could still participate in redistricting through the public process 'just like any other citizen.' "

Reichelderfer, the consultant who has worked with then-Speaker Cannon, testified that one topic of discussion at the meetings, as the trial court noted, was

"whether a privilege could be identified to prevent disclosure of redistricting-related communications among political consultants, legislators, and legislative staff members." The conclusion reached at the meetings, according to the trial court, was "that no privilege would apply." After the first meeting, in December 2010, Reichelderfer prepared a memorandum that included the following question: "Communication with outside non-lawyers—how can we make that work?"

Another question included in the Reichelderfer memorandum was, "Evolution of maps—Should they start less compliant and evolve through the process—or—should the first map be as near as compliant as possible and change very little?" Reichelderfer acknowledged at trial that it was "possible" he discussed with Speaker Cannon the issues identified in this initial memo he prepared. The trial court would later reference Reichelderfer's memo in rejecting part of the Legislature's argument that there could be "no improper partisan intent in the drafting of the maps" because, the Legislature asserted, "as things progressed, each succeeding map that was drawn was an improvement over the one before it in terms of compactness, leaving cities and counties intact and following geographical boundaries." "Coincidentally," the trial court stated, "that corresponds with a strategy suggested from Reichelderfer's notes, i.e., start with less compliant maps and work toward a more compliant map."

The trial court found that there was "no reason to convene two meetings just to tell active political partisans of the Republican Party that they would not 'have a seat at the table.' " The trial court also noted "a few curious things about these meetings and their connection to subsequent events that are troubling."

Specifically, even though the consultants supposedly had no "seat at the table," the trial court found that they continued to be involved in the process. In June 2011, an e-mail was sent from Senator Gaetz's e-mail address to legislators to provide information about upcoming public hearings regarding redistricting. A "blind copy" of this e-mail was sent to Heffley, the consultant under contract with the Republican Party of Florida, and to Terraferma, the "genius map drawer." The trial court found that this was evidence that either Senator Gaetz or "someone in his office" was "keeping these operatives in the loop."

Another e-mail, sent in October 2011 from Terraferma to Representative Weatherford, reported that Kirk Pepper, the Deputy Chief of Staff for then-Speaker Cannon, was "huddled on a computer" at the Republican Party of Florida's headquarters, working with consultant Heffley on "[c]ongressional redistricting if I had to guess?" Pepper acknowledged at trial that he must have been speaking with Heffley at the Republican Party of Florida's headquarters at the time, but stated that he "never met with Rich Heffley about redistricting." He had no explanation as to why Terraferma, whom Pepper had previously worked with at the Republican

Party of Florida, would have thought otherwise. The trial court found that it was "possible that Terraferma was mistaken or simply speculating without any basis," but this communication caused the trial court to "wonder why [Terraferma] would make this assumption if Pepper really had nothing to do with the redistricting process."

As it turned out, Pepper acted as a conduit between the consultants and the Legislature. According to testimony relied on by the trial court, Cannon staffer Pepper "regularly" provided advance, non-public copies of draft redistricting maps to consultant Reichelderfer. The evidence, which came from document production by Reichelderfer since, as the trial court noted, neither Pepper nor Speaker Cannon preserved any records, demonstrated that between November 2011 and January 2012, Pepper transmitted to Reichelderfer—through his personal e-mail account, a "Dropbox" account he later deleted, and a thumb drive—at least twenty-four draft congressional redistricting maps prepared by the Legislature, mostly before they were released to the public. In some instances, Pepper sent Reichelderfer maps the Legislature prepared but never released to the public.

Although Pepper testified at trial that he acted "without Speaker Cannon's approval" and, in retrospect, considered his decision to provide Reichelderfer with maps to have been "a mistake," Pepper was later hired by Cannon's private firm after Cannon left office. Cannon described Pepper as "a loyal employee," but

testified that he did not know about Pepper's transmission of maps to Reichelderfer until it was reported in the media during the litigation in this case.

While they denied doing so, the trial court found that Pepper and Reichelderfer "communicate[d] about the political performance of the maps." In one instance, after Reichelderfer expressed concerns that the draft of a Central Florida district occupied by incumbent Republican Representative Daniel Webster was "a bit messed up," Pepper asked Reichelderfer, "[p]erformance or geography?" Reichelderfer acknowledged during testimony at trial that "performance" in that context would "[g]enerally" refer to the political performance of the district, although there is no record of his response to Pepper. Reichelderfer testified that he could not recall whether or how he answered that question. He spoke on the phone "regularly" with Pepper but denied having "specific conversations about political performance."

Despite asking, "[p]erformance or geography?" Pepper testified at trial that he did not want to know from Reichelderfer if there was a problem with the political performance of that particular district. Instead, he provided a lengthy explanation that his question was a "sarcastic" response to remind Reichelderfer "to be quiet," because they were not supposed to talk about redistricting or the political implications of certain maps. Pepper stated of his question, "[i]t's like if you were talking to someone that you knew very well and had known for a long

period of time, you could say something in writing that other people might take differently than you meant it." The trial court discredited Pepper's explanation as "very unusual and illogical."

After receiving maps from Cannon staffer Pepper, Reichelderfer modified the maps to increase the Republican performance of the districts, and he and the other consultants traded numerous maps back and forth with each other. Of significance, the trial court found that some of Reichelderfer's modifications corresponded to the actual decisions the Legislature ultimately made.

In one graphic example, cited by the trial court, Reichelderfer's revisions changed the performance of Districts 5, 7, 9, and 10 from four Democratic performing or leaning seats to two Democratic and two Republican performing seats, as eventually reflected in the actual map enacted by the Legislature. Another map, which was known to have been drawn by Terraferma, shared eleven identical districts with a map submitted through the public process by an individual named Alex Posada, who denied ever creating or submitting the map and stated that he had not authorized anyone to submit a map using his name.

For his part, Reichelderfer described his interest in the Legislature's maps as important to him "professionally" to "know the lay of the land," similar to Bainter's explanation that his interest was an "after-the-fact" one merely for the sake of his own "[k]nowledge"—even though the evidence presented at trial

demonstrated that the consultants spent considerable time, including weekends, early mornings, and late nights, making revisions to draft maps, and even though communications between these consultants regarding the maps referred to having "a job to do," wanting to "spread" the maps "around," and "[h]ead[ing] up" to Tallahassee to "[t]ell[] folks to look at" certain maps.

The trial court found that the consultants "did their best to evade answering direct questions" at trial, "often using semantic distinctions to avoid admitting what they had done." As this Court previously noted with respect to documents produced by Bainter that included communications among the consultants regarding maps, "the documents support[ed] the challengers' claim that Bainter was not just drawing maps out of casual 'after-the-fact interest,' but was actively engaged in an extensive process to draw maps favorable to a particular political party or incumbent and facilitate the submission of those maps to the Legislature through 'shell people' without any indication that the maps were drawn by the political consultants." Apportionment VI, 150 So. 3d at 1129. For instance, one e-mail produced by Bainter stated that a Republican activist in Gainesville was "getting" him "10 more people at least," while another e-mail indicated that if one of the consultants could "think of a more secure and failsafe way to engage our people, please do it."

The trial court found that the Bainter documents "evidenced a conspiracy to influence and manipulate the Legislature into a violation of its constitutional duty" to redistrict in a neutral, non-partisan fashion, and explained that those documents were "very helpful" in demonstrating not only that the consultants "were submitting maps to the legislature" through third parties, but "how extensive and organized that effort was, and what lengths they went to in order to conceal what they were doing." The trial court also found it "hard to imagine" that the legislative leaders and staffers who allegedly told these consultants that they could not be involved, other than through the public process, "would not have expected active participation in the public redistricting process by those political consultants at the meetings" and would not have questioned both why the consultants were not in attendance at the public hearings and why none of the maps coming from the public had any of the consultants' names on them. "I would think," the trial court opined, "that the staff and legislative leaders would find [this lack of public participation by the consultants] extremely strange, that they might even ask why not. But they didn't."

According to the trial court, however, the consultants had no need to publicly participate in order to influence the Legislature's redistricting plan. Throughout the process, Reichelderfer was in direct contact with Speaker Cannon. In one late November 2011 e-mail from Cannon to Reichelderfer, which copied

Pepper, Cannon commented that "we are in fine shape" as long as "the Senate accommodates the concerns that you [Reichelderfer] and Rich [Heffley] identified in the map that they put out tomorrow."

Cannon testified at trial that these "concerns" he was referring to were that the House and Senate "not roll out maps that were either completely inconsistent with one another or designed to show some inadequacy in terms of either minority representation or defect in [the House's] maps," so that reconciliation between the two chambers would be difficult. The trial court found Cannon's explanation to be "a stretch given the language used."

The evidence also revealed that Cannon asked Reichelderfer and Heffley, who was described as being "close" to Senator Gaetz, to serve, as the trial court put it, "as go betweens for leadership of the two chambers regarding the redistricting process." According to testimony relied on by the trial court, the asserted reason for Reichelderfer's and Heffley's involvement was "purportedly because of a lack of a good working relationship between the Speaker of the House and the President of the Senate."

The trial court was skeptical of that explanation, however, stating that "by all accounts, the actual staff members of each chamber who were working on the maps got along well with each other, as did the chairmen of the redistricting committees." The trial court actually found the staff members who testified at trial

- 32 -

to be "straightforward and credible" and "not a part of the conspiracy." In any event, the trial court specifically found that "in their insider roles, Heffley and Reichelderfer did not have to speak directly to staff map drawers, or even leadership, to infect and manipulate the map drawing and adoption process."

At trial, Reichelderfer admitted to discussing "global" redistricting concerns with Speaker Cannon, but denied talking to Cannon "specifically about individual maps." Reichelderfer lived near Cannon, their families spent time together, Reichelderfer saw Cannon on the weekends, and Reichelderfer met with Cannon to discuss issues he was dealing with as Speaker.

Reichelderfer also correctly informed other consultants about which of the Legislature's draft maps was most "relevant," meaning which was most likely to advance in the process. Among the seven congressional maps released to the public by the House on December 6, 2011, the map identified by Reichelderfer as the map most likely to advance was the map that was revised to become the House's final proposed congressional map. At trial, Reichelderfer could not "recall specifically" how he knew that map to be the most likely to advance in the process, simply stating that if he "had that information for sure," he wouldn't have used the qualifier "I think" in his response. He testified that he "could have" just thought it "was the easiest to pair up with the Senate version of the map."

- 33 -

Communications among the consultants revealed particular emphasis on certain areas of the map. For instance, in one e-mail referencing a configuration in a draft map that kept District 14 contained entirely within Hillsborough County—a configuration less favorable to Republicans than the configuration ultimately enacted, which crossed Tampa Bay to pick up voters from Pinellas County in District 14—Terraferma noted to Heffley that "Tampa is far from perfect." The enacted configuration of Districts 13 and 14—where District 14 includes a portion of Pinellas County, rather than being strictly within Hillsborough—produced one safe Democratic seat and one seat that either party could win, rather than two naturally-occurring seats favorable to Democrats. This was the configuration preferred by the consultants.

In another e-mail between Terraferma, Heffley, and Reichelderfer sent on the same day the Senate released a public map that did not divide the City of Homestead—a division considered by the consultants to be important to favor Republicans—Terraferma noted that District 26 was "pretty weak." Heffley responded, "The [H]ouse needs to fix a few of these," and Terraferma, copying Reichelderfer, responded, "yes." The enacted configuration did, indeed, split the City of Homestead between Districts 26 and 27, which turned one Republican district and one Democratic district into two Republican-leaning districts.

The decision to split Homestead was one of several key decisions made in a non-public meeting between Senator Gaetz, Representative Weatherford, and the two staff directors of the respective redistricting committees. While the meeting of two legislators in private does not result in a violation of article III, section 4(e), of the Florida Constitution—which requires all meetings between "more than two members" of the Legislature to be open to the public—the lengths to which the legislators went to avoid triggering the requirements for a public meeting in the final stages of negotiating and making changes to the districts raises questions as to the motivation of the Republican leadership. It also stands in stark contrast to statements from that leadership proclaiming that the 2012 redistricting process would be the most open and transparent in Florida's history. And, it can be readily distinguished from other legislative decisions where private negotiations are undertaken, since redistricting involves "a constitutional restraint on the Legislature's actions." Apportionment IV, 132 So. 3d at 147.

Indeed, many final revisions that affected numerous districts in some way—such as the decision to push the Black Voting Age Population (BVAP) of District 5 over 50%, add an appendage to District 10, split Homestead, and increase the Hispanic Voting Age Population (HVAP) of Districts 9 and 14—were made in this non-public meeting that occurred after the House and Senate had each passed their versions of the congressional map. The decisions regarding District 5 and District

10 specifically contributed to the trial court's decision to invalidate those two districts.

There was, in general, either conflicting or vague testimony as to why certain decisions were made in this meeting, including that the decisions were necessary to comply with the federal Voting Rights Act or some other policy concern. Because the meeting was not public, however, there is no official record of the reason for these decisions, which ultimately benefitted the Republican Party.

One example of a key decision made during this non-public meeting was the decision to push the BVAP of District 5 over 50%. Although he could not recall specifics, Representative Weatherford testified that making District 5 a majority-minority district was "important to the Senate" and that the Senate made a "compelling case" for raising the BVAP of the district over 50%. The highest BVAP for District 5 in any of the House's draft maps was slightly over 48%. Senator Gaetz testified that the Senate believed it was important to increase the BVAP to over 50% to protect against a federal Voting Rights Act challenge, and that he also favored keeping the City of Sanford in the district, which the House's version of the map did not do.

Before Representative Weatherford met with Senator Gaetz, Speaker Cannon met separately with Representative Weatherford and staff in another non-public meeting. Speaker Cannon anticipated that the Senate would ask to make

District 5 a majority-minority district and apparently instructed the House during this non-public meeting to agree to the Senate's request. Ensuring that the BVAP of District 5 ended up over 50% was of particular concern to Reichelderfer, the consultant who was part of Speaker Cannon's "inner circle."

At trial, Reichelderfer testified, without specificity, that he believed pushing the BVAP of District 5 over 50% was important "to comply with the Federal Voters Rights Act," based on a general recollection of discussions with lawyers whose names he could not recall. He thought it would be "politically damaging" if the map was invalidated because of a successful Voting Rights Act challenge, even though the 2002 version of District 5 did not have a BVAP of over 50% and was not invalidated during Voting Rights Act litigation. See Martinez, 234 F. Supp. 2d at 1307 (noting that the BVAP of the 2002 version of District 5 was "only" 46.9%, but that the district "will afford black voters a reasonable opportunity to elect candidates of choice and probably will in fact perform for black candidates of choice"). At the same time, increasing the BVAP of District 5—as occurred from early versions of the Legislature's draft maps to the enacted version—decreased the Democratic performance of surrounding districts.

The trial court found the Legislature's justification for making District 5 a majority-minority district to be "not compelling" and invalidated the enacted version of District 5. The Legislature's decision—made in a non-public meeting,

after Cannon's instruction in a separate non-public meeting, consistent with a concern Reichelderfer had long expressed—is therefore circumstantial evidence of collusion between the Legislature and the consultants, particularly where the trial court found there to have been no showing that it was legally necessary to create a majority-minority district.

There is no record from the time many of these key decisions were made to explain the Legislature's reasoning. This is, of course, partly because the final decisions were made in a non-public meeting. But it is also because the Legislature, as the trial court found, deleted almost all e-mails and documentation related to redistricting.

Former Speaker Cannon testified that his e-mails were automatically deleted after six months unless specifically saved as having "significant archival or legal significance." If that were the case, then exchanges between Speaker Cannon and consultant Reichelderfer that occurred in late November 2011—discovered from document production by Reichelderfer—would not have been deleted until May 2012 unless they were intentionally deleted before that time. But May 2012 was several months after the lawsuit was filed in this case, naming Cannon as a party and making a reality what the Legislature itself had previously acknowledged, as far back as December 2012, to have been "a moral certainty" from "start to finish" during the redistricting process—that records related to redistricting would be

sought by the challengers and relevant to adjudicating the constitutionality of the Legislature's redistricting plan.

Ultimately, based on the evidence the challengers uncovered and presented at trial, the trial court found that there was "just too much circumstantial evidence" and "too many coincidences" to reach any conclusion other than that the political operatives had "infiltrate[d] and influence[d] the Legislature" in order to "obtain the necessary cooperation and collaboration" to "taint the redistricting process and the resulting map with improper partisan intent." While it is sometimes said that it is "hard to believe in coincidence," the trial court determined in this case that, as the saying goes, it was "even harder to believe in anything else." After reviewing all the evidence, both direct and circumstantial, the trial court thus concluded that the plan was drawn with improper partisan intent.

### C. STEPS AFTER FINDING UNCONSTITUTIONAL INTENT

Despite its finding of unconstitutional partisan intent, however, the trial court invalidated only Districts 5 and 10, rejecting challenges to seven other individual districts. The trial court determined that there was no "distinction" between a challenge to the plan as a whole and a challenge to specific districts, and therefore "focused on those portions of the map" that it found to be "in need of corrective action in order to bring the entire plan into compliance with the constitution."

- 39 -

Its finding of unconstitutional intent notwithstanding, the trial court applied a deferential standard of review in analyzing each challenged district, "deferring to the Legislature's decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements." Believing that the "more reliable" indicators of whether the plan was drawn with the intent to favor a political party or incumbent were the tier-two constitutional measures, the trial court "first examine[d] the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, then consider[ed] any additional evidence that supports the inference that such districts are also in violation of tier-one requirements."

Applying this analysis as to District 5, the trial court noted that the decision to increase the BVAP of District 5 over 50% was made at a non-public meeting at the end of the redistricting process and ultimately found that there was no showing "that it was legally necessary to create a majority-minority district." The trial court therefore concluded that the challengers had proved "that District 5 unnecessarily subjugates tier-two principles of compactness" and that "portions of District 5 were drawn to benefit the Republican Party, in violation of tier-one."

As to District 10, the trial court noted an "odd-shaped appendage" and found that the challengers had "shown that the district could be drawn in a more compact fashion, avoiding this appendage." The trial court therefore concluded, based in

part on an inference it drew from the existence of the odd-shaped appendage that had no legal justification, that District 10 was drawn to benefit the Republican Party and the incumbent.

Accordingly, the trial court required Districts 5, 10, and "any other districts affected thereby" to be redrawn. But the trial court rejected the challenges to Districts 13, 14, 21, 22, 25, 26, and 27, concluding that the challengers had not met their burden to demonstrate unconstitutionality and had not shown more than "de minimis" tier-two violations.

As a remedy, the challengers urged the trial court to adopt one of their remedial plans, draw its own remedial plan, or hire an independent expert to draw a remedial plan. After a hearing, the trial court declined the challengers' suggestions and determined that the Legislature should redraw the plan.

The Legislature held a special session in August 2014 to enact a remedial redistricting plan. During this session, the chairs of the respective redistricting committees again conducted non-public meetings with staff and counsel to negotiate the features of the revised plan. The Legislature made modest changes to correct the specific tier-two deficiencies identified in Districts 5 and 10,[8] and, after

_____

8. In redrawing Districts 5 and 10, the Legislature's remedial redistricting plan also slightly altered the boundaries of five other congressional districts— Districts 6, 7, 9, 11, and 17. All of the remaining districts were unchanged from the configuration enacted in the Legislature's 2012 redistricting plan.

the plan was signed into law, the trial court held another hearing to consider the validity of the revised plan and whether it could be implemented in time for the 2014 elections.

Concluding that the challengers' objections to the validity of the remedial plan were without merit, the trial court approved the Legislature's remedial redistricting plan and ordered the then-impending 2014 elections to proceed under the unconstitutional 2012 plan due to time constraints, with the remedial plan to take effect for the 2016 elections. The 2016 effective date for the remedial plan has not been challenged.

The challengers appealed the trial court's initial order containing its factual findings and legal conclusions, as well as its subsequent order approving the remedial redistricting plan, and the Legislature cross-appealed, attacking certain aspects of the trial court's judgment but ultimately seeking affirmance of the order approving the remedial plan. The First District Court of Appeal then certified the trial court's judgment for direct review by this Court. See League of Women Voters of Fla. v. Detzner, No. 1D14-3953, 2014 WL 4851707, at *2 (Fla. 1st DCA Oct. 1, 2014). We accepted jurisdiction under article V, section 3(b)(5), of the Florida Constitution, and heard oral argument. See League of Women Voters of Fla. v. Detzner, No. SC14-1905, 2014 WL 5502409, at *1 (Fla. Sup. Ct. order filed Oct. 23, 2014).

## III. ISSUES OF "INTENT"

Having set forth this comprehensive background, we now turn to the legal issues pertaining to the trial court's finding of unconstitutional intent. First, we consider the "intent" standard itself and whether the trial court correctly applied the standard in this case. Then, we review the legal sufficiency of the trial court's finding.

### A. THE "INTENT" STANDARD

Article III, section 20, of the Florida Constitution, prohibits an apportionment plan or individual district from being "drawn" with the "intent to favor or disfavor a political party or an incumbent." Art. III, § 20(a), Fla. Const. All parties in the litigation, the trial court stated, "agreed that it is the Legislature's intent"—not the intent of, for instance, one rogue "staff member charged with actually drawing the map," or of political consultants with no influence on the Legislature—"that is at issue." But how to determine the Legislature's intent in this unique context, where the Florida Constitution contains an explicit prohibition on certain improper legislative intent in "draw[ing]" the redistricting plan, is a much more difficult proposition.

In Apportionment I, 83 So. 3d at 617, this Court explained that "the Florida Constitution prohibits drawing a plan or district with the intent to favor or disfavor a political party or incumbent." (Emphasis supplied.) There is, this Court held,

- 43 -

"no acceptable level of improper intent." Id. The "intent" standard "applies to both the apportionment plan as a whole and to each district individually." Id. (emphasis supplied). This Court's precedent discussing the "intent" standard in the course of prior cases during this litigation has demonstrated this principle—that improper intent, particularly if "part of a broader process to develop portions of the map," may "directly relate to whether the plan as a whole or any specific districts were drawn with unconstitutional intent." Apportionment IV, 132 So. 3d at 150 (emphasis supplied).

In a traditional lawsuit involving a challenge to a statutory enactment, courts determine legislative intent through statutory construction, looking to the actual language used and any other tools—such as the history of legislative changes and any appropriate interpretive canons—to assist in discerning the Legislature's intent in enacting the law. See, e.g., Heart of Adoptions, Inc. v. J.A., 963 So. 2d 189, 198-99 (Fla. 2007) (setting forth the general principle of statutory interpretation that "legislative intent is determined primarily from the statute's text" and applying rules of statutory construction "to determine the legislative intent behind the provision," including reading related statutory provisions together to achieve a consistent whole and avoiding readings that would render part of a statute meaningless). As this Court has previously explained, however, determining whether the Legislature acted with the type of improper "intent" that is prohibited

by the "specific constitutional mandate of article III, section 20(a), is entirely different than a traditional lawsuit that seeks to determine legislative intent through statutory construction." Apportionment IV, 132 So. 3d at 150.

Specifically, this Court held in largely rejecting claims of legislative privilege in Apportionment IV that, because the decision-making process itself is the case, "the communications of individual legislators or legislative staff members, if part of a broader process to develop portions of the map, could directly relate to whether the plan as a whole or any specific districts were drawn with unconstitutional intent." Id. This Court further stated that the "existence of a separate process to draw the maps with the intent to favor or disfavor a political party or an incumbent is precisely what the Florida Constitution now prohibits," and that evidence of this separate process would "clearly" be "important" to help support a "claim that the Legislature thwarted the constitutional mandate." Id. at 149.

Following this Court's precedent, which "emphasize[s] that this case is wholly unlike the traditional lawsuit challenging a statutory enactment," id. at 151, the trial court framed the "intent" inquiry as determining "the motive in drawing" the districts. We agree that this was the correct approach. Under this framework, the trial court appropriately concluded that "the actions and statements of

legislators and staff, especially those directly involved in the map drawing process[,] would be relevant on the issue of intent."

Case law supports the trial court's conclusion, which is consistent with our decision in Apportionment IV, that the intent of individual legislators and legislative staff members involved in the drawing of the redistricting plan is relevant in evaluating legislative intent. The United States Supreme Court, for example, has recognized that the actions of individual legislators and staff members may be relevant in discerning legislative intent in the context of redistricting.

In Easley v. Cromartie, 532 U.S. 234, 254 (2001), the Supreme Court reviewed "direct" evidence, relied on by a federal district court evaluating a claim of racial predominance in North Carolina's congressional redistricting plan, involving an e-mail sent from "a legislative staff member responsible for drafting districting plans" to two state senators. The Supreme Court noted that the e-mail's "reference to race" offered "some support" for the district court's conclusion that the North Carolina Legislature used race as the "predominant factor" in drawing the boundaries of a particular district. Id.; see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977) (stating that the "specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes" and that "[d]epartures from the normal

procedural sequence also might afford evidence that improper purposes are playing a role").

Other redistricting cases have confirmed this principle. In Texas v. United States, 887 F. Supp. 2d 133, 165 (D.D.C. 2012),[9] cited by the trial court, a three-judge federal district court panel stated that its "skepticism about the legislative process that created [a challenged district] [wa]s further fueled by an email sent between staff members on the eve of the Senate Redistricting Committee's markup of the proposed map." See also Smith v. Beasley, 946 F. Supp. 1174, 1210 (D.S.C. 1996) (stating that "the evidence [wa]s clear that the Reapportionment Subcommittee delegated to its staff . . . the responsibility of drawing the district lines," and subsequently evaluating the actions of those staff members). In other words, the federal district court looked to the actions of legislative staff members directly involved in the redistricting process to assist in evaluating whether the Legislature was acting with improper intent. Whether the actions of individual legislators or staffers ultimately signify constitutionally improper intent—as the trial court concluded in this case, despite finding the professional staff to be

---

9. The federal district court's opinion in Texas was subsequently vacated on other grounds by the United States Supreme Court after that Court issued its recent decision in Shelby County, Alabama v. Holder, 133 S. Ct. 2612 (2013), holding a portion of the Voting Rights Act unconstitutional. See Texas v. United States, 133 S. Ct. 2885 (2013).

credible—is a separate question from whether their intent is relevant, in the first place, to evaluating the intent of the Legislature in drawing the redistricting plan.

In support of its contrary argument that "[c]ourts across the country . . . refuse to impute the personal motivations of individual legislators to the legislative body as a collective whole," the Legislature offers a catalogue of citations to cases from other jurisdictions. But, as the challengers have pointed out, these cases and the arguments made by the Legislature in this case closely mirror the exact cases and arguments this Court distinguished and rejected for the same basic principle in Apportionment IV.

In that case, this Court specifically stated that "this case is completely distinguishable from the various circuit court orders and cases outside the reapportionment context from other jurisdictions cited by the Legislature that have quashed subpoenas of legislators or legislative staff members where the testimony of an individual member of the Legislature was not directly relevant to any issue in the case." Apportionment IV, 132 So. 3d at 150. Indeed, in Apportionment IV, we determined that the actions of the individual legislators and legislative staff members involved in the drawing of the redistricting plan were directly relevant to assessing whether the plan itself was drawn with improper intent. See id. at 137 ("[T]he issue presented to the Court is whether Florida state legislators and legislative staff members have an absolute privilege against testifying as to issues

directly relevant to whether the Legislature drew the 2012 congressional apportionment plan with unconstitutional partisan or discriminatory 'intent.' ").

Accordingly, we hold that the trial court correctly framed the "intent" inquiry and reject the Legislature's assertion that the finding of unconstitutional intent could not be ascribed to the Legislature as a whole. Having reached the conclusion that the trial court did not err in evaluating the actions of legislators and legislative staff members in finding unconstitutional "intent," as prohibited by article III, section 20, we turn next to the legal sufficiency of the trial court's finding.

## B. LEGAL SUFFICIENCY OF UNCONSTITUTIONAL INTENT

Our review of the trial court's finding of unconstitutional intent in the congressional redistricting plan takes place against the backdrop of the trial court's specific finding that the Legislature "systematically deleted almost all of their e-mails and other documentation relating to redistricting." The Legislature did so despite knowledge that litigation over the constitutionality of its redistricting plan was inevitable.

In fact, as far back as 2008, the Legislature argued to this Court that "litigation challenging reapportionment under the new standards" would increase as a result of the Fair Districts Amendment. See Advisory Op. to Att'y Gen. re Standards for Establishing Legislative Dist. Boundaries, 2 So. 3d 161, 165 (Fla.

2009).  And, the Legislature informed the trial court in this case that litigation "was 'imminent' long before the days preceding the filing of" the challengers' lawsuit. From "start to finish," the Legislature asserted, the 2012 redistricting process, "more than any other, was conducted in an atmosphere charged with litigation."

To be sure, the Legislature did preserve some records related to redistricting—documents showing, for instance, the time and location of public meetings or other generally benign details of the process.  But the Legislature saved virtually no communications among legislators and staff and none of the communications—which, as a result of this case, we now know to have occurred—involving the outside political consultants.

The Legislature had no specific policy requiring it to preserve communications regarding redistricting, even though it knew litigation was certain to occur, and admits that its record-retention policies applied in the same manner to redistricting as they applied to all types of legislative business.  The House's policy, for example, specified that "records that are no longer needed for any purpose and that do not have sufficient administrative, legal, or fiscal significance to warrant their retention shall be disposed of systematically."  Fla. H.R. Rule 14.2(b) (2010-2012).

To the extent the Legislature argues that it had no reason to know it needed to preserve these records because it could not have anticipated this Court's

decision in Apportionment IV rejecting its broad claim of legislative privilege over communications related to redistricting, the Legislature had, according to testimony at trial, determined as early as January 2011 that no privilege would apply to any of its communications with outside political consultants.  In other words, the Legislature clearly knew that communications between, for instance, Speaker Cannon and consultant Reichelderfer would not be privileged, that they would be sought in litigation, and that litigation was certain to occur.  Yet, Speaker Cannon did not preserve these records—and the only reason we now know these communications occurred is because records were produced during the litigation by Reichelderfer.  The same is true of non-public draft redistricting maps sent to Reichelderfer by legislative staffer Kirk Pepper, using a personal e-mail account and a since-deleted "Dropbox" account.

The trial court stated that there was "no legal duty on the part of the Legislature to preserve these records, but you have to wonder why they didn't," given that litigation was certain to occur.  Although the Legislature's failure to preserve records apparently did not violate a specific rule of legislative procedure regarding records retention—even though at least some of these records likely did have sufficient legal significance to have warranted their retention—Florida courts have, in any event, found a duty to preserve evidence in other circumstances when a party should reasonably foresee litigation.  See Am. Hospitality Mgmt. Co. of

<u>Minn. v. Hettiger</u>, 904 So. 2d 547, 549 (Fla. 4th DCA 2005) (noting holdings that "a defendant could be charged with a duty to preserve evidence where it could reasonably have foreseen the claim"). And this Court, in rejecting the Legislature's broad claim of legislative privilege in <u>Apportionment IV</u>, clearly held that the "purpose behind the voters' enactment of the article III, section 20(a), standards will be undermined" if "the Legislature alone is responsible for determining what aspects of the reapportionment process are shielded from discovery." 132 So. 3d at 149.

Even in the absence of a legal duty, though, the spoliation of evidence results in an adverse inference against the party that discarded or destroyed the evidence. As this Court explained in <u>Martino v. Wal-Mart Stores, Inc.</u>, 908 So. 2d 342, 346 (Fla. 2005), Florida courts may impose sanctions, including striking pleadings, against a party that intentionally lost, misplaced, or destroyed evidence, and a jury could infer under such circumstances that the evidence would have contained indications of liability. If the evidence was negligently destroyed, a rebuttable presumption of liability may arise. <u>Id.</u> at 347. In other words, as recognized by the Fourth District Court of Appeal, "an adverse inference may arise in any situation where potentially self-damaging evidence is in the possession of a party and that party either loses or destroys the evidence." <u>Golden Yachts, Inc. v. Hall</u>, 920 So. 2d 777, 781 (Fla. 4th DCA 2006) (quoting <u>Martino v. Wal-Mart</u>

Stores, Inc., 835 So. 2d 1251, 1257 (Fla. 4th DCA 2003), approved, 908 So. 2d 342); see also Nationwide Lift Trucks, Inc. v. Smith, 832 So. 2d 824, 826 (Fla. 4th DCA 2002) (stating that "[c]ases in which evidence has been destroyed, either inadvertently or intentionally, are discovery violations" that may be subject to sanctions).

The trial court was, therefore, justified in drawing an adverse inference against the Legislature in adjudicating the challengers' claim of unconstitutional partisan intent. And we too must consider the Legislature's "systematic[] delet[ion]" of redistricting records in evaluating whether the trial court's finding is supported by competent, substantial evidence.

Turning to the merits of the trial court's finding, we have little trouble concluding that competent, substantial evidence of unconstitutional intent exists in the record. The Legislature asserts that the trial court did not find improper intent in the plan as a whole and, in particular, contends that there was no collaboration between partisan operatives and the Legislature in drawing the congressional redistricting plan. While acknowledging that partisan operatives "sought to influence the redistricting process," the Legislature states that "at no time did the Legislature participate in their efforts." If features from the operative-created maps made it into the enacted map, the Legislature says, it is simply because those features were obvious or the similarities "superficial," and not because the

operatives' "frenetic efforts to make themselves relevant" were successful.  In other words, the Legislature argues that it "did not conspire with the operatives, despite the operatives' efforts."

We reject the Legislature's attempt to water down the trial court's findings and the inferences the trial court drew from the circumstantial evidence presented by pointing to an alleged lack of connection between the "parallel" process and the Legislature.  The trial court found that it was "convince[d]" by the "circumstantial evidence introduced at trial" that the political operatives "obtain[ed] the necessary cooperation and collaboration" from the Legislature to ensure that the "redistricting process and the resulting map" were "taint[ed]" with "improper partisan intent."  Indeed, the trial court specifically found that the operatives "were successful in their efforts to influence the redistricting process and the congressional plan under review."

Nevertheless, the Legislature asserts that any conclusion that the whole plan was motivated by partisan intent "assumes the complicity of professional staff," which is an "assumption" it claims the trial court rejected.  While the trial court did find the professional staff to be "credible" and not to have been "part of the conspiracy," the trial court immediately dismissed the Legislature's argument about the effect of the staff having been insulated from the improper intent—which it called the "most compelling evidence in support" of the Legislature's defense—

by stating that the "political operatives managed to find other avenues, other ways to infiltrate and influence the Legislature, to obtain the necessary cooperation and collaboration" to "taint the redistricting process and the resulting map with improper partisan intent." And while the trial court made no explicit credibility determinations regarding any of the legislators who testified, the trial court did specifically reject the innocuous explanations provided by former Speaker Cannon and his staffer, Pepper, for their communications with the political consultants.

There is also no doubt that the trial court's finding of unconstitutional intent pertained to the "process" of redistricting and the "enacted map" as a whole—to use the trial court's own words—rather than solely to the two specifically invalidated districts as the Legislature contends. In finding "too much circumstantial evidence" to reach any conclusion other than that the "redistricting process" and the "resulting map" were "taint[ed]" by "improper partisan intent," the trial court pointed specifically to the following evidence: the Legislature's destruction of "almost all" e-mails and "other documentation relating to redistricting"; early meetings between legislative leaders and staff with political consultants regarding the "redistricting process"; and the "continued involvement" of political consultants in the "redistricting process." None of this evidence relied on by the trial court was district-specific. The dissent's contrary interpretation of

the trial court's finding of unconstitutional intent renders meaningless the trial court's extensive discussion of—and critical findings related to—this evidence.

We also reject the Legislature's suggestion that the trial court's determination, in its order approving the remedial redistricting plan, that the Legislature had corrected the identified deficiencies in the map is dispositive in evaluating the scope of its finding of unconstitutional intent. Instead, as detailed in the next sections, the trial court's decision to approve the Legislature's remedial redistricting plan flowed from the legal errors made in its original judgment.

Accordingly, for all these reasons, we affirm the trial court's finding of unconstitutional intent. We turn next to the trial court's two legal errors, which significantly affected its determination of the proper effect of its finding that the Legislature violated the Florida Constitution.

## IV. TRIAL COURT'S FIRST LEGAL ERROR: FAILING TO PROPERLY ANALYZE THE CHALLENGE TO THE PLAN "AS A WHOLE"

The first legal error committed by the trial court was its determination that there was no distinction between a challenge to the redistricting plan "as a whole" and a challenge to individual districts. This error led to the trial court's failure to give any independent legal significance to its finding of unconstitutional intent when examining the challenges to individual districts.

Specifically, the evidence presented and considered by the trial court— evidence that actually led the trial court to find the existence of constitutionally

improper partisan intent—included evidence pertaining both to the plan "as a whole" and to "specific districts." Indeed, the trial court explicitly noted this, stating that "[o]ne of [the challengers'] claims is that the entire redistricting process was infected by improper intent." (Emphasis supplied.)

Yet, despite its findings that partisan political consultants had "made a mockery" of the process and "managed to taint the redistricting process and the resulting map with improper partisan intent," the trial court rejected the challengers' distinction between their challenge to improper intent in the redistricting plan "as a whole"—a challenge, in effect, to the map that was produced from the process—and their challenge to "individual districts," stating as follows:

> [The challengers] distinguish between their challenge to the redistricting plan as a whole, as being drawn with the intent generally to favor the Republican Party, and their challenge to several individual districts, as being specifically drawn with such intent. I find this to be a false dichotomy, a distinction without difference. The redistricting plan is the result of a single act of legislation. If one or more districts do not meet constitutional muster, then the entire act is unconstitutional. The districts are part of an integrated indivisible whole. So in that sense, if there is a problem with a part of the map, there is a problem with the entire plan. [FN 5]
>> [FN 5] This is consistent with the approach taken by [this] Court in Apportionment I. The Court invalidated the entire Senate plan but gave specific instructions as to which districts required corrective action. Id. at 684-686. That does not mean, however, that portions of the map not affected by those individual districts found to be improperly drawn would need to be changed in a redrawn map, even if a general intent to favor or disfavor a political party or incumbents was proven. What

> would be the point if the other districts are otherwise in compliance? Such a remedy would go far beyond correcting the effect of such noncompliance, but rather would require a useless act that would encourage continued litigation. Therefore, I have focused on those portions of the map that I find are in need of corrective action in order to bring the entire plan into compliance with the constitution.

(Emphasis supplied.)

The dissent asserts that "[a]t no point does the trial court indicate that it would permit some level of unconstitutional intent in the drawing of any district." Dissenting op. at 114. But the trial court specifically concluded that districts could be "in compliance" with the constitutional standards "even if a general intent to favor or disfavor a political party or incumbents was proven." This statement clearly indicates that the trial court considered a general improper intent to lack any independent legal significance unless it was accompanied by another constitutional violation, which is an interpretation that simply does not square with the Florida Constitution or this Court's precedent.

This Court has held that "the Florida Constitution prohibits drawing a plan" with improper intent. Apportionment I, 83 So. 3d at 617. This Court has also held that "there is no acceptable level of improper intent." Id. And, this Court has held that the "intent" standard "applies to . . . the apportionment plan as a whole." Id. Accordingly, under these holdings, the trial court's "general" finding of improper intent in the "process" must have some independent legal significance.

- 58 -

The trial court, however, failed to give effect to that finding of improper

intent, in part because it never separately considered the challenge to the plan as a

whole and, critically, never gave any weight to the general improper intent in

analyzing the individual district challenges.  The challengers correctly note that the

trial court's finding of improper intent was based extensively on the existence of a

"different, separate process that was undertaken contrary to the [Legislature's

public] transparent [redistricting] effort in an attempt to favor a political party or an

incumbent."  Apportionment IV, 132 So. 3d at 149.  And, as this Court stated in

Apportionment IV, the existence of such a "parallel" process is "important

evidence in support of the claim that the Legislature thwarted the constitutional

mandate."  Id.

In error, the trial court gave no legal weight to the existence of this separate

process.  The trial court's decision to invalidate District 5 was supported by

numerous factors distinct from the "parallel" process, including that the district as

enacted was "not compact," was "bizarrely shaped," and did not "follow traditional

political boundaries as it winds from Jacksonville to Orlando," narrowing at one

point to the width of a highway.  The trial court found improper intent to benefit

the Republican Party as to District 5 based on "the decision to increase the district

to majority BVAP, which was accomplished in large part by creating [a] finger-

like appendage jutting into District 7."  Then, the trial court simply "buttressed"

this "inference" of improper intent, based on the existence of the "oddly shaped appendage[]," through "the evidence of improper intent in the redistricting process generally, and as specifically related to the drawing of District 5," but did not independently rely on the "general" improper intent in any legally significant way.

In other words, aside from referencing the increase in the BVAP of District 5 over 50% during a non-public meeting at the end of the redistricting process, the trial court's decision to invalidate District 5 was based solely on blatant tier-two violations. While this Court had to resort to evaluating tier-two violations as a means to infer improper intent when considering the challenges to the Senate and House maps in Apportionment I, as we emphasized at that time, we were constrained because we had no factual record and no direct evidence of improper intent. Exactly the opposite was true in this case.

The trial court's decision to invalidate District 10 is analogous. Noting an "odd-shaped appendage which wraps under and around District 5, running between District 5 and 9," the trial court stated that the challengers had "shown that the district could be drawn in a more compact fashion, avoiding this appendage." The trial court's conclusion that District 10 "was drawn to benefit the Republican Party and the incumbent" was "based in part on the inference that the Florida Supreme Court suggested [in Apportionment I] could be drawn from oddly shaped appendages that had no legal justification"—an "inference" that, as with District 5,

- 60 -

was simply "buttressed by the general evidence of improper intent" in the process and by objective indicators relied on by this Court in Apportionment I.

In rejecting challenges to seven other individual districts, the trial court never referred to the "general evidence of improper intent" that it found to exist in the "process." Rejecting the challenge to Districts 13 and 14, in the Tampa Bay area, the trial court stated that, "[u]nlike Districts 5 and 10, there are no flagrant tier-two deviations" from which the trial court could "infer" improper intent. "[U]nlike changes made to District 5 by the [legislative] leaders during conference committee"—the "evidence of partisan intent specifically related to District 5," where the House agreed with the Senate's request to push the BVAP over 50%— the trial court determined that it could not conclude, "on partisan effect alone," that certain decisions were made in drawing Districts 13 and 14 "with the intent to benefit the Republican Party or the incumbent member of Congress."

Likewise rejecting the challenge to Districts 21 and 22, the trial court concluded that the challengers had "not met their burden of showing unnecessary deviation from tier-two requirements," nor had they "shown that improper intent led to the adoption of Districts 21 and 22." Similarly, with respect to Districts 25, 26, and 27, the trial court determined that the challengers had "not proved invalidity" because the "totality of the evidence" did not establish that the "configuration" of these districts "was based on unlawful partisan intent." At no

point in addressing the validity of any of these districts—in which the trial court rejected the challengers' contention that the districts were drawn with improper partisan intent—did the trial court address any effect of its findings regarding how the "process" had been "taint[ed]" with "improper partisan intent."

In determining that there was no distinction between a challenge to the "whole map" and a challenge to individual districts, the trial court relied on this Court's prior decision to invalidate the entire state Senate plan in Apportionment I. Citing this Court's decision as support, the trial court stated that this Court "invalidated the entire Senate plan but gave specific instructions as to which districts required corrective action."

The trial court was correct that this Court invalidated the whole Senate plan, to the extent that it determined the plan did "not pass constitutional muster" for the purposes of this Court's article III, section 16, declaratory judgment review. Apportionment I, 83 So. 3d at 683. But, unlike here, this Court in Apportionment I did not find a general improper intent in the state Senate plan, aside from the district numbering system that was manipulated to favor incumbents. Nor could we have, based on the nature of the limited record before us.

In Apportionment I, we expressed our conclusion regarding the Senate plan as follows:

> We have held that Senate Districts 1, 3, 6, 9, 10, 29, 30, and 34 are constitutionally invalid. The Legislature should remedy the

constitutional problems with respect to these districts, redrawing these districts and any affected districts in accordance with the standards as defined by this Court, and should conduct the appropriate functional analysis to ensure compliance with the Florida minority voting protection provision as well as the tier-two standards of equal population, compactness, and utilization of existing political and geographical boundaries. As to the City of Lakeland, the Legislature should determine whether it is feasible to utilize the municipal boundaries of Lakeland after applying the standards as defined by this Court. In redrawing the apportionment plan, the Legislature is by no means required to adopt the Coalition's alternative Senate plan. Finally, we have held that the numbering scheme of the Senate plan is invalid. Accordingly, the Legislature should renumber the districts in an incumbent-neutral manner.

Id. at 686.

In other words, this Court identified very specific deficiencies in the Senate plan—eight individual districts that were invalid, the failure to conduct a functional analysis, and the district numbering scheme. This Court did not conclude that the whole plan was unconstitutional because of improper intent in the whole plan, and this Court did not analyze—and could not have analyzed—the plan in that manner. Therefore, in relying on Apportionment I in this way, the trial court failed to give any actual effect to its finding in this case that the "whole plan" challenge had been proven through the direct and circumstantial evidence of improper partisan intent presented at trial.

Accordingly, for all these reasons, we conclude that the trial court erred in failing to recognize any distinction between a challenge to the redistricting plan "as a whole" and a challenge to individual districts. This error significantly affected

- 63 -

the trial court's determination of the proper scope and legal effect of its finding of unconstitutional intent, particularly with regard to its analysis of the challenges to individual districts, and ultimately contributed to its decision to approve a remedy that was effectively no different than the remedy if there had been no finding of unconstitutional intent.

## V.  TRIAL COURT'S SECOND LEGAL ERROR: APPLYING A DEFERENTIAL STANDARD OF REVIEW

The trial court's error in failing to properly analyze the challenge to the plan "as a whole" was compounded by its error in the deferential standard of review it applied after finding the existence of unconstitutional intent.  Certainly, we recognize the difficult task the trial court faced, considering numerous issues of first impression and attempting to be faithful to this Court's redistricting decisions. And we commend the trial court for the superb and professional manner in which it handled this difficult litigation.

But, we conclude nevertheless that the trial court failed to recognize the critical differences between this Court's "facial" review of the state legislative redistricting plans in Apportionment I and the nature of the fact-based claims presented in this case.  This legal error in the standard of review, as with the legal error in not recognizing the independent significance of the challenge to the plan "as a whole," led to the trial court's failure to give any independent legal significance to its finding of unconstitutional intent when examining the challenges

to individual districts. Once the trial court found unconstitutional intent, there was no longer any basis to apply a deferential standard of review; instead, the trial court should have shifted the burden to the Legislature to justify its decisions in drawing the congressional district lines.

The trial court's error as to the standard of review can be traced to its analysis in evaluating the challengers' claims, which it set forth as follows:

> It seems that the more reliable focus in such an inquiry would be on what was actually produced by the Legislature, the enacted map. Specifically, an analysis of the extent to which the plan does or does not comply with tier two requirements is a good place to start. Can one draw a map that meets tier-two requirements but nonetheless favors a political party or an incumbent? Sure, but it is more difficult.
>     Furthermore, a failure to comply with tier-two requirements not only supports an inference of improper intent, it is an independent ground for finding a map unconstitutional. See Apportionment I, 83 So. 3d [at] 640-641. Additional direct and circumstantial evidence of intent may serve to strengthen or weaken this inference of improper intent. Therefore, I first examine the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, then consider any additional evidence that supports the inference that such districts are also in violation of tier-one requirements.

(Emphasis supplied.) In other words, the trial court began by asking whether there was any tier-two violation—whether the district was compact, and whether it followed existing political and geographical boundaries where feasible. Then, the trial court considered the direct and circumstantial evidence of tier-one improper intent only as "additional evidence" to "strengthen or weaken" an "inference of improper intent" that was identifiable from tier-two deficiencies. The trial court

- 65 -

did so despite finding that the direct and circumstantial evidence itself had established a violation of the tier-one constitutional standards.

Although the trial court relied on Apportionment I as support for the standard of review it applied, the standard from that case—a facial review based on purely objective, undisputed evidence in the limited record before the Court—does not directly translate to this one—a fact-intensive challenge based on direct and circumstantial evidence developed during an adversarial trial. Discerning which aspects of the standard set forth in Apportionment I apply and which do not is thus of critical importance.

In Apportionment I, this Court rejected the arguments of the Attorney General and the House of Representatives "that a challenger must prove facial invalidity beyond a reasonable doubt," as is generally considered to be the standard applied to a typical lawsuit challenging the constitutionality of a legislative enactment outside the context of redistricting. 83 So. 3d at 607. This Court considered the "beyond a reasonable doubt" standard to be both "a departure from [its] precedent in legislative apportionment jurisprudence" and "ill-suited" to the nature of its review. Id. "Unlike a legislative act promulgated separate and apart from an express constitutional mandate," this Court stated, "the Legislature adopts a joint resolution of legislative apportionment solely pursuant to the 'instructions'

of the citizens as expressed in specific requirements of the Florida Constitution governing this process." Id. at 607-08.

Although the legislative redistricting plan comes before this Court "with an initial presumption of validity," this Court explained that "the operation of this Court's process in apportionment cases is far different than the Court's review of ordinary legislative acts," including "a commensurate difference in [its] obligations." Id. at 606. Noting that the "new requirements" of the Fair Districts Amendment "dramatically alter[ed] the landscape with respect to redistricting," this Court held that its scope of review had "plainly increased, requiring a commensurately more expanded judicial analysis of legislative compliance." Id. at 607. As this Court would later reason, "the framers and voters" of the Fair Districts Amendment "clearly desired more judicial scrutiny" of the Legislature's decisions in redistricting. Fla. House of Representatives v. League of Women Voters of Fla. (Apportionment III), 118 So. 3d 198, 205 (Fla. 2013).

"It is this Court's duty, given to it by the citizens of Florida, to enforce adherence to the constitutional requirements and to declare a redistricting plan that does not comply with those standards constitutionally invalid." Apportionment I, 83 So. 3d at 607. However, this Court acknowledged in the context of its review in Apportionment I that it would "defer to the Legislature's decision to draw a district in a certain way, so long as that decision does not violate the constitutional

requirements." Id. at 608. This Court emphasized that its "responsibility [wa]s limited to ensuring compliance with constitutional requirements." Id. "[E]ndeavoring to be respectful to the critically important role of the Legislature," this Court stated that its duty was "not to select the best plan, but rather to decide whether the one adopted by the legislature is valid." Id. (quoting In re Apportionment Law—1992, 597 So. 2d at 285).

Echoing this Court's language in Apportionment I, the trial court determined—based on "the nature of the legislation and the nature of what is reviewed"—that it should apply the same standard to the challenge presented in this case. Therefore, reciting the principles from Apportionment I, the trial court set forth the standard for its review as follows:

> I will therefore, in this case, apply the standard of review articulated in Apportionment I, deferring to the Legislature's decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements, with an understanding of my limited role in this process and the important role of the Legislature. My duty "is not to select the best plan" but to determine whether [the challengers] have proved the plan invalid. Apportionment I, 83 So. 3d 597 at 608.

The trial court then cited this standard, and its deferential review, in rejecting challenges to certain individual districts.

We conclude that the trial court was correct, initially, in rejecting the "beyond a reasonable doubt" standard, as this Court did in Apportionment I. As this Court stated, "[u]nlike a legislative act promulgated separate and apart from an

express constitutional mandate, the Legislature adopts a joint resolution of legislative apportionment solely pursuant to the 'instructions' of the citizens as expressed in specific requirements of the Florida Constitution governing this process." Apportionment I, 83 So. 3d at 607-08. Just as there is a difference in evaluating legislative intent with respect to the specific constitutional mandate outlawing improper partisan intent in redistricting, so too is there "a difference between the Court's role in reviewing a legislative apportionment plan to determine compliance with constitutionally mandated criteria and the Court's role in interpreting statutes." Id. at 607 n.5. The "reason for the different standard," the trial court correctly noted, is that "the inquiry is into the process, the end result, and the motive behind the legislation"—not "a question of searching for a reasonable interpretation of a statute which would make it constitutional."

In this respect, the trial court was right to rely on Apportionment I in concluding that the nature of the legislation and the specific constitutional mandate outlawing partisan political gerrymandering require a different standard of review than applied in traditional cases challenging legislative enactments. Where the trial court erred, however, was in discounting the differences between Apportionment I and this case to conclude that the same standard must apply, even though this case involved direct and circumstantial evidence of tier-one

constitutional violations that this Court had no ability to review in <u>Apportionment I</u>.

As this Court has explained, its review in <u>Apportionment I</u> was quite different than the challenge presented in this case. Unlike the fact-intensive challenge here, in which the parties had an opportunity to present extensive evidence during an adversarial trial pertaining to whether the plan and individual districts were drawn with improper intent, this Court's review in <u>Apportionment I</u> was "a facial review based on objective, undisputed evidence in the limited record before the Court." <u>Apportionment III</u>, 118 So. 3d at 200.

In <u>Apportionment I</u>, 83 So. 3d at 634, this Court looked to objective measures and tier-two requirements—such as the existence of "bizarre shape[s]" and "appendages"—in an effort to discern whether the map was drawn with improper intent. As this Court stated, "in the context of Florida's constitutional provision, a disregard for the constitutional requirements set forth in tier two is indicative of improper intent, which Florida prohibits by absolute terms." <u>Id.</u> at 640.

The evidence of improper intent in this case, to the contrary, involved direct and circumstantial evidence of tier-one violations of the constitutional intent standard. Yet, despite the existence of testimony and fact-based claims regarding improper intent from a voluminous record that extended far beyond the legislative

record to which this Court was constrained in <u>Apportionment I</u>, the trial court still determined that tier-two requirements—compactness and the use of political and geographical boundaries where feasible—were the "more reliable" indicators of improper intent, explaining that "a failure to comply with tier-two requirements" would "support[] an inference of improper intent," and that "[a]dditional direct and circumstantial evidence of intent may serve to strengthen or weaken this inference of improper intent." Based on this assumption, the trial court proceeded to "first examine the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, [and] then consider[ed] any additional evidence that supports the inference that such districts are also in violation of tier-one requirements."

Not surprisingly under this framework of analysis, only where the trial court found a tier-two violation—the appendages in Districts 5 and 10—did the trial court conclude that a district had been drawn with improper intent to favor a political party or incumbent. The independent finding that the "redistricting process" and the "resulting map" were "taint[ed]" with "improper partisan intent" was relegated to "buttress[ing]" the "inference" of improper intent based on the tier-two violation.

We conclude that the trial court erred in focusing first on tier-two violations at the expense of the evidence of tier-one violations—violations it specifically

found based on the evidence presented. The trial court's error was then exacerbated by its decision to apply an unduly deferential standard to its review of the map, even after finding the existence of unconstitutional partisan intent.

Certainly, this Court explained in Apportionment I that the judiciary's role in reviewing an apportionment plan enacted by the Legislature is "not to select the best plan, but rather to decide whether the one adopted by the legislature is valid." Apportionment I, 83 So. 3d at 608 (quoting In re Apportionment Law—1992, 597 So. 2d at 285). At that time, this Court stated the general principle that it would "defer to the Legislature's decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements." Id.

But, in Apportionment I, this Court was conducting a "facial" review of the legislative apportionment plan, without fact-finding, to determine whether any improper intent existed in the plan. Unlike that context, here, the trial court found the existence of improper intent, based on evidence presented during an adversarial trial, yet still applied a deferential standard of review. That was error.

The trial court conducted its review as if it were premature to directly address the impact of the tier-one violations the trial court itself specifically found. In particular, the trial court found that the Legislature had "cooperat[ed]" and "collaborat[ed]" with partisan political operatives to draft an apportionment plan favoring the Republican Party and incumbents—in other words, a finding of a tier-

- 72 -

one constitutional violation.  While the Legislature is generally entitled to deference as a result of its role in the redistricting process, that deference applies only "so long as [its redistricting] decision[s] do[] not violate the constitutional requirements."  Apportionment I, 83 So. 3d at 608.

Once a tier-one violation of the constitutional intent standard is found, there is no basis to continue to afford deference to the Legislature.  To do so is to offer a presumption of constitutionality to decisions that have been found to have been influenced by unconstitutional considerations.  The existence of unconstitutional partisan intent is contrary to the very purpose of the Fair Districts Amendment and to this Court's pronouncements regarding the state constitutional prohibition on partisan political gerrymandering.

Accordingly, after reaching the conclusion that the "redistricting process" and the "resulting map" had been "taint[ed]" by unconstitutional intent, the burden should have shifted to the Legislature to justify its decisions, and no deference should have been afforded to the Legislature's decisions regarding the drawing of the districts.  In other contexts, states have placed the burden on their legislatures to justify the validity of a redistricting plan when the plan has "raised sufficient issues" with respect to state constitutional requirements.  In re Legislative Districting of State, 805 A.2d 292, 325 (Md. 2002).

Because there are many ways in which to draw a district that complies with, for example, the constitutional requirement of compactness, which party bears the burden of establishing why a decision was made to accept or reject a particular configuration can ultimately be determinative. This can be seen in reviewing the seven maps initially released to the public by the House.

All of these maps were considered by the Legislature to be maps that complied with the tier-two constitutional standards. But, in one of the maps, designated as H000C9001, there were as few as 14 Republican districts based on 2008 presidential election data and 15 Republican districts based on 2012 presidential data. In the map chosen by the House to move forward in the process, designated as H000C9011, there were 16 Republican districts under both the 2012 and 2008 presidential results. And, after additional revisions, the Legislature's enacted map performed with 17 Republican districts under the 2008 data and 16 using the 2012 data—actually more favorable to Republicans than the performance of the admittedly gerrymandered 2002 districts under the same data.[10] This consistent improvement in the Republican performance of the map—even when

_____

10. The 2002 benchmark plan performed with 15 Republican districts under the 2008 presidential data and 14 Republican districts under the 2012 data, though there were only twenty-five total districts in that map, as compared to twenty-seven total districts in the 2012 map after Florida gained two districts based on the results of the 2010 Census.

comparing maps the Legislature itself produced and considered tier-two compliant—reveals that there are many ways to draw constitutionally compliant districts that may have different political implications.

Since the trial court found that the Legislature's intent was to draw a plan that benefitted the Republican Party, the burden should have been placed on the Legislature to demonstrate that its decision to choose one compact district over another compact district, or one tier-two compliant map over another tier-two compliant map, was not motivated by this improper intent. This is particularly true where the challengers presented evidence that the Legislature's choices ultimately benefitted the Republican Party and also showed alternative maps that performed more fairly.[11] Unlike in Apportionment I, where this Court remained deferential to the Legislature's decisions in the absence of a finding of improper intent, there is

_____

11. The Legislature has strongly disputed the relevance of these alternative maps, going so far as to assert that this Court should not consider the alternative maps at all because they were either drawn by partisan operatives aligned with the Democratic Party or of unknown origin. But alternative maps are not on trial themselves, as is the Legislature's map, and they can provide "relevant proof that the Legislature's apportionment plans consist of district configurations that are not explained other than by the Legislature considering impermissible factors, such as intentionally favoring a political party or an incumbent"—as the trial court found the Legislature to have done in this case. Apportionment I, 83 So. 3d at 611. Nevertheless, we have reviewed only the alternative maps actually introduced into evidence during the trial and remedial proceedings, rather than any of the summary-judgment maps, and have relied on those maps only insomuch as they show alternate ways—not necessarily the best or legally required way—to configure the districts.

no longer any basis for this Court to be deferential to the Legislature in fulfilling its own "solemn obligation to ensure that the constitutional rights of its citizens are not violated and that the explicit constitutional mandate to outlaw partisan political gerrymandering . . . in redistricting is effectively enforced." Apportionment IV, 132 So. 3d at 137.

## VI. LEGAL EFFECT OF FINDING UNCONSTITUTIONAL INTENT

Having now concluded that the trial court erred in the standard of review it applied, we proceed to consider the legal effect of the trial court's finding of unconstitutional intent under the appropriate standard. In so doing, we reject the dissent's view that we have "transgressed the boundaries of proper appellate review" and "abandon[ed]" the "restraints of the appellate process." Dissenting op. at 122, 124. The Legislature vigorously defended the challenged districts. Rather than foster additional delay and risk another election under unconstitutional districts, we have all the record evidence necessary to evaluate now whether the Legislature's justifications can withstand legal scrutiny.

## A. DISTRICT 5

We begin with District 5, which has been a focal point of the challenge to the Legislature's redistricting plan. Initially, the trial court invalidated District 5 as "visually not compact, bizarrely shaped," and in contravention of "traditional political boundaries as it winds from Jacksonville to Orlando," narrowing at one

point to the width of a highway.  After the Legislature removed an appendage from Seminole County and widened the district, however, the trial court upheld the remedial version of District 5, concluding that while still "not a model of compactness," the revised district is "much improved."  Deferring to the Legislature, the trial court summarily rejected the challengers' proposed East-West configuration of the district, determining that although this configuration was "somewhat more compliant" with the constitutional standards, there were "legitimate non-partisan policy reasons for preferring a North-South configuration for this district over an East-West configuration."

The trial court did not elaborate as to what any of these "non-partisan policy reasons" were.  The only legal justification offered by the Legislature, with the support of the Florida State Conference of NAACP Branches, for preferring a North-South configuration to an East-West orientation is to comply with the minority voting protection requirements of the Florida Constitution and the federal Voting Rights Act—specifically, that a North-South configuration is necessary to avoid diminishing the ability of black voters to elect a candidate of their choice.

The challengers contend, though, that the North-South configuration of this district is a linchpin to the Legislature's efforts to draw a map that favors the Republican Party.  They allege that the North-South configuration overpacks Democratic-leaning black voters into the district—that is, places more black voters

in the district than is necessary to ensure that they can elect a candidate of choice—thereby diluting the influence of Democratic minorities in surrounding districts. The challengers rely in part on a trilogy of cases in federal court that trace the unique history of this district, culminating in a 2002 decision from a three-judge panel finding that the Legislature's "overriding goal with respect to congressional reapportionment" was to adopt a plan that "would maximize the number of districts likely to perform for Republicans." Martinez, 234 F. Supp. 2d at 1300-01; see also DeGrandy v. Wetherell, 794 F. Supp. 1076, 1087-88, 1090 (N.D. Fla. 1992) (adopting a redistricting plan drawn by an independent expert, which created the predecessor to District 5 as a black majority-minority district); Johnson v. Mortham, 926 F. Supp. 1460, 1466-67, 1472, 1495 (N.D. Fla. 1996) (noting that the prior version of District 5 split every one of the fourteen counties that made up the district, and even split individual precincts, and declaring that the district was "racially gerrymandered" in violation of the Equal Protection Clause).

Even as redrawn by the Legislature and approved by the trial court, District 5 clearly does not strictly adhere to the Florida Constitution's tier-two requirements of compactness and the utilization of political or geographical boundaries where feasible. It splits seven counties and has numerical compactness scores of .127 on the Reock measure and .417 on the Convex Hull measure, where 1 is the best score. The critical determination, then, is whether the North-South

configuration of this district, which extends from Jacksonville to Orlando, is necessary to comply with either the federal Voting Rights Act or the tier-one state constitutional requirement that no district shall be drawn in such a way as to diminish the ability of black voters to elect a representative of their choice—the justifications offered by the Legislature.

Having reviewed the arguments of the parties in detail and studied the unique nature of this district, we conclude that the Legislature has failed to meet its burden to demonstrate that District 5, even as revised, passes constitutional muster. We further conclude that, because the trial court found that District 5 was a key component of the Legislature's unconstitutional intent in the drawing of the congressional redistricting plan, the trial court erred in conducting only a cursory review of the remedial district and deferring to the Legislature's North-South configuration on the basis of unstated "non-partisan policy reasons."

Since the Legislature cannot prove that the North-South configuration is necessary to avoid diminishing the ability of black voters to elect a candidate of their choice, we hold that District 5 must be redrawn in an East-West manner. While the dissent suggests that this holding displaces the Legislature's chosen configuration with a configuration drawn by operatives aligned with the Democratic Party, see dissenting op. at 121, the argument for an East-West orientation of this district is not exclusive to the Democratic Party. In fact, an

East-West orientation is the only alternative option, and one that the Legislature's own map drawers—insulated, the dissent itself states, from partisan influence—considered during the redistricting process.

We reach our conclusion as to the continued unconstitutionality of District 5 for several reasons. First, the Legislature's configuration was entitled to no deference in light of the trial court's finding of unconstitutional intent. The trial court clearly found that the Legislature's intent in drawing the congressional redistricting plan generally, and District 5 specifically, was to benefit the Republican Party. The Legislature's configuration also had the effect of benefitting the long-time incumbent of the district, Congresswoman Corrine Brown, who previously joined with leading Republicans in actively opposing the Fair Districts Amendment and redistricting reform. See Brown, 668 F.3d 1271. Indeed, the remedial version of District 5 still retains approximately 80% of its 2002 benchmark—a redistricting map that was admittedly gerrymandered to favor the Republican Party and incumbents. See Martinez, 234 F. Supp. 2d at 1340.

Retaining the same basic shape, while merely tweaking a few aspects of the district, does not erase its history or undo the improper intent that the trial court found. The trial court's decision to defer to the Legislature's configuration is contrary to the proper standard that should have applied—shifting the burden to the

Legislature to justify its enacted configuration—particularly where the trial court itself continued to acknowledge that the district is "not a model of compactness."

We conclude that the Legislature cannot justify its enacted configuration. Despite the Legislature's repeated contentions that a North-South orientation of the district is the only option and is essential to avoid diminishing the ability of black voters to elect a candidate of their choice, there is simply insufficient evidence to support that assertion. Indeed, legislative staffer Alex Kelly initially drew an East-West version of the district, with a BVAP of 44.96%, and concluded that such a configuration would be constitutionally compliant. The Legislature relies on the trial court's finding that Kelly was straightforward and credible elsewhere, but offers no persuasive explanation as to why this version of District 5 was rejected or why Kelly's assessment in this circumstance was incorrect.

During the trial, the Legislature argued that it had increased the BVAP of District 5 over 50%—a decision made during a non-public meeting at the end of the redistricting process—in order to prevent vote dilution and avoid retrogression. The trial court specifically found that argument to be "not supported by the evidence" and there to have been no showing that a majority-minority district was "legally necessary."

After redrawing the district, the BVAP of remedial District 5 is 48.11%. The Legislature continues to argue that any additional diminishment in the BVAP

would prevent black voters from electing a candidate of their choice. But neither the evidence, nor the case law, bears this out.

As of 1996, following the decision in Johnson that required the predecessor district to be redrawn, the predecessor to District 5 had a total black population of 47.0% and a total BVAP of 42.7%. Martinez, 234 F. Supp. 2d at 1308. By 2000, the benchmark district had a total black population of 50.8% and a total BVAP of 46.7%. Id. The district performed for the black candidate of choice in every election from 1992 through 2000. Id.

In 2002, the total black population of the district was 51.4%. Id. at 1307. The total BVAP was 46.9%. Id. The federal court in Martinez determined that the BVAP of 46.9% "will afford black voters a reasonable opportunity to elect candidates of choice and probably will in fact perform for black candidates of choice." Id. The actual election results show this to be true—the district has continued to perform for the black candidate of choice in every election from 2000 through the present.

The challengers' proposed East-West configuration of the district has a BVAP of 45.12%—higher than the BVAP in the initial draft district drawn by Alex Kelly. This is well within the range of the 42.7%, 46.7%, and 46.9% BVAP percentages that were addressed by the federal court in Martinez and considered to be sufficient to "afford black voters a reasonable opportunity to elect candidates of

choice" and to "in fact perform for black candidates of choice."[12]  Id.  "This is so

in part because," the federal court in Martinez stated,

> blacks constitute 61.3% of registered Democrats in [the predecessor to
> District 5], and Democrats constitute 63.8% of registered voters.
> Republicans constitute only 22.7% of registered voters.  Actual voting
> also is strongly Democratic; in the 2000 presidential election, voters
> in [the predecessor to District 5] voted 63.7% for Mr. Gore and 34.2%
> for Mr. Bush.  The black candidate of choice is likely to win a
> contested Democratic primary, and the Democratic nominee is likely
> to win the general election.

Id. at 1308.

The same logic applies to an East-West configuration of the district.  Black

voters constitute 66.1% of registered Democrats under this configuration, and

Democrats constitute 61.1% of registered voters.  Republicans, by contrast,

constitute only 23.0% of registered voters.  This compares very favorably to the

same respective numbers in the 2002 district upheld by the federal court in

Martinez.

---

12.  Although the dissent states that our review of minority voting strength as to the East-West configuration of District 5 ultimately amounts to "we know retrogression when we see it," dissenting op. at 121, we clearly rely on long-standing precedent applied by the three-judge federal district court panel in Martinez—the last time this exact district was challenged.  Our conclusion that a BVAP of 45.12% does not diminish the ability of black voters to elect a candidate of choice—a BVAP percentage squarely within the range of prior BVAP percentages that precedent has established not to diminish the ability of black voters to elect a candidate of choice—is hardly subjective or arbitrary.

Thus, in an East-West orientation of the district, the black candidate of choice is still likely to win a contested Democratic primary, since black voters constitute 66.1% of registered Democrats. And the Democratic candidate is still likely to win the general election, since Democratic voters outnumber Republicans 61.1% to 23.0%. In other words, just as noted in Martinez as a basis for concluding that the prior version of District 5 afforded black voters a reasonable opportunity to elect a candidate of choice, "[t]he black candidate of choice is likely to win a contested Democratic primary, and the Democratic nominee is likely to win the general election."[13] Martinez, 234 F. Supp. 2d at 1308.

The Legislature's contrary argument rests entirely on the premise that the BVAP of the district cannot be decreased from 48.11% to 45.12%. Of course, the trial court already rejected the Legislature's argument, based on the same asserted interest in protecting black voters, that the BVAP needed to be over 50%, and in urging this Court to uphold the revised district, the Legislature has now tacitly conceded that 48.11% is sufficient.

_____

13. Contrary to the dissent's accusation that we fail to apply any objective standard to our retrogression review of the minority voting strength of an East-West district, see dissenting op. at 120-21, our analysis is consistent with the standard set forth by this Court in Apportionment I: "To undertake a retrogression evaluation requires an inquiry into whether a district is likely to perform for minority candidates of choice." 83 So. 3d at 625. This is precisely what we have done with respect to a proposed East-West orientation of District 5.

But, beyond that, the United States Supreme Court has recently articulated—in a case with a similar claim of overpacking black voters to maintain the continued political dominance of the Republican Party in surrounding districts—that the BVAP itself cannot be viewed in a vacuum.  In Alabama Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1272 (2015), the Supreme Court emphasized that it is the "ability to elect a preferred candidate of choice," not "a particular numerical minority percentage," that is the pertinent point of reference.

The language of the Voting Rights Act that protects against adopting a redistricting plan that "has the purpose of or will have the effect of diminishing the ability of [the minority group] to elect their preferred candidates of choice"—language incorporated into our tier-one state constitutional standards—"does not require maintaining the same population percentages."  Id. at 1272-73.  Instead, the Supreme Court has told us, this requirement "is satisfied if minority voters retain the ability to elect their preferred candidates."  Id. at 1273.  Providing an example, the Supreme Court stated that "it would seem highly unlikely that a redistricting plan that, while increasing the numerical size of the district, reduced the percentage of the black population from, say, 70% to 65% would have a significant impact on the black voters' ability to elect their preferred candidate."  Id.

Accordingly, we reject the Legislature's argument that an East-West version of the district would diminish the ability of black voters to elect a candidate of their

choice. We also reject the dissent's contention that an East-West district causes the redistricting map to become significantly less compact. See dissenting op. at 118-20. There is no doubt, as noted by the dissent, that the East-West orientation is longer, with a correspondingly greater perimeter and area. But length is just one factor to consider in evaluating compactness.

As this Court stated in Apportionment I, "the object of the compactness criterion is that a district should not yield 'bizarre designs.' " 83 So. 3d at 634. And as the Supreme Court of Washington has recognized, in a decision cited favorably by this Court in Apportionment I, "the phrase 'as compact as possible' does not mean 'as small in size as possible,' but rather 'as regular in shape as possible.' " Kilbury v. Franklin Cnty. ex rel. Bd. of Cnty. Comm'rs, 90 P.3d 1071, 1077 (Wash. 2004).

There is no doubt that an East-West version of District 5 is visually less "unusual" and "bizarre" than the meandering North-South version enacted by the Legislature. Apportionment I, 83 So. 3d at 634. There is also no doubt that the numerical compactness scores actually favor the East-West orientation: the different configurations have essentially the same Reock score (.12 for a proposed East-West version of the district, and .13 for the Legislature's North-South, where 1 is the most compact), while an East-West district fares significantly better on the Convex Hull measure (.71 for the East-West as compared to .42 for the North-

South, where 1 is again the most compact). Further, an East-West orientation allows for fewer incorporated city and county splits than the Legislature's North-South district—another consideration in determining tier-two compliance.

The reality is that neither the North-South nor the East-West version of the district is a "model of compactness," as the trial court stated. Other factors account for this phenomenon, "including geography and abiding by other constitutional requirements such as ensuring that the apportionment plan does not deny the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice." Id. at 635. And while the dissent cherry-picks a favorable statistic to highlight the supposed decrease in the compactness of District 2 under an East-West version of District 5, see dissenting op. at 120, the challengers have demonstrated that the decrease in the compactness of District 2 is an outlier; in fact, as few as four and as many as seven other districts can be drawn in a more compact manner by drawing District 5 from East to West.

The bottom line is that none of the Legislature's justifications for its gerrymandered version of District 5, and none of its complaints about an alternative East-West configuration, can withstand legal scrutiny. Because the trial court erred in deferring to the Legislature's enacted North-South configuration, and

because the Legislature cannot justify this configuration, District 5 must be redrawn in an East-West orientation.

## B. DISTRICTS 13 & 14

We turn next to Districts 13 and 14, in the Tampa Bay area, which the challengers contended were drawn in violation of the constitutional requirements. In addition to relying on the trial court's finding that the entire map was tainted by unconstitutional intent, the challengers asserted specifically that the Legislature's configuration of Districts 13 and 14 mirrored the configuration known to have been favored by political operatives, in which District 14 was drawn to cross Tampa Bay from Hillsborough County, splitting Pinellas County and the City of St. Petersburg to move a portion of the black population from District 13 into District 14. In support, the challengers pointed to an e-mail communication from consultant Frank Terraferma to consultant Rich Heffley and an employee of the Republican Party of Florida, which described this region as "far from perfect" in a draft map where District 14 did not cross Tampa Bay.

The enacted configuration of these two districts, which crossed Tampa Bay, added more Democratic voters to an already safely Democratic District 14, while

ensuring that District 13 was more favorable to the Republican Party.[14]  The

challengers thus contended that the Legislature's configuration of these districts

was directly connected to the trial court's finding that the enacted map was

unconstitutionally drawn to favor the Republican Party.

The trial court denied the challenge to these districts, reasoning that there

were "no flagrant tier-two deviations from which" to "infer unlawful intent."  The

trial court stated that it "simply" could not "conclude, on partisan effect alone, that

the decision to incorporate portions of South St. Petersburg into District 14 was

done with the intent to benefit the Republican Party or the incumbent member of

Congress."

We conclude that the trial court erred in rejecting the challenge to these

districts.  The trial court erroneously required a "flagrant tier-two deviation" in

order to "infer unlawful intent," rather than viewing the configuration of these

districts through the lens of the direct and circumstantial evidence of improper

intent presented at trial.  Once the trial court found unconstitutional intent, the

Legislature's enacted configuration was no longer entitled to deference, and it

---

14.  Indeed, although District 13 still leans Democratic under the elections data relied on by the parties, it actually elected Republican Representative David Jolly over Democrat Alex Sink in a close election in 2014.

becomes the Legislature's burden to justify its decision to draw the districts in a certain way.

The Legislature's asserted justification for picking up voters from Pinellas County in District 14 was to increase minority voting strength in that district, which the Legislature considered to be preferable—though not required—from a state constitutional tier-one and federal Voting Rights Act perspective. The trial court did not, however, make any findings that it was necessary to add black voters from Pinellas County to District 14 in order to avoid diminishing the ability of black voters to elect a representative of their choice.[15]

During trial, the challengers showed that it is possible not to cross Tampa Bay and still maintain tier-two compliance. In fact, as the charts below indicate,[16] following the county boundary significantly increases the numerical compactness scores of District 13, although it does cause a decrease in the scores of surrounding districts.

---

15. District 14 was, prior to 2012, and still is, under the 2012 map, represented by Kathy Castor, a white Democratic congresswoman.

16. We use graphical depictions of maps that were included in the challengers' brief because those maps show the particular areas of concern. The Legislature did not contest the accuracy of these graphics. In any event, we include them only as visual aids and have, in our analysis, relied solely on the data and maps introduced into evidence during the trial.



| | Reock Score[17] | | Convex Hull Score[18] | |
|---|---|---|---|---|
| | **Enacted Plan (H000C9047)** | **Romo Alternative (Romo A)** | **Enacted Plan (H000C9047)** | **Romo Alternative (Romo A)** |
| CD12 | 0.40 | 0.38 | 0.81 | 0.79 |
| CD13 | 0.46 | 0.57 | 0.82 | 0.91 |
| CD14 | 0.36 | 0.28 | 0.69 | 0.60 |
| CD15 | 0.44 | 0.33 | 0.75 | 0.67 |
| CD16 | 0.42 | 0.32 | 0.81 | 0.80 |
| CD17 | 0.64 | 0.39 | 0.83 | 0.68 |
| **AVG.** | **0.45** | **0.38** | **0.79** | **0.74** |

---

17.  The Reock, or circle-dispersion, method of quantifying compactness "measures the ratio between the area of the district and the area of the smallest circle that can fit around the district." Apportionment I, 83 So. 3d at 635. "This measure ranges from 0 to 1, with a score of 1 representing the highest level of compactness as to its scale." Id.

18.  The Area/Convex Hull method, which "measures the ratio between the area of the district and the area of the minimum convex bounding polygon that can enclose the district," also ranges from 0 to 1, "with a score of 1 representing the highest level of compactness." Apportionment I, 83 So. 3d at 635. "A circle, square, or any other shape with only convex angles has a score of 1" under this measure. Id.

In rejecting the challenge to these districts, the trial court emphasized the decrease in the overall compactness scores in the region, ultimately determining that the Legislature "was not required to make this tradeoff in compactness to avoid splitting Pinellas County." However, as this Court has recognized, following county lines may result in a reduction in compactness scores. See Apportionment I, 83 So. 3d at 635 (explaining that the compactness of the districts "cannot be considered in isolation" because other factors influence a district's compactness, including the "Legislature's desire to follow political or geographical boundaries or to keep municipalities wholly intact").

The trial court's decision to defer to the Legislature's configuration was contrary to the proper standard that should have applied once the trial court found that the Legislature's intent in drawing the congressional redistricting plan was to benefit the Republican Party. Because the Legislature cannot justify its enacted configuration of these districts based on race—the only justification that was offered—the trial court should have invalidated these districts. Accordingly, Districts 13 and 14 must be redrawn to avoid crossing Tampa Bay.

## C. DISTRICTS 26 & 27

The challengers also mounted an individual attack against the validity of Districts 26 and 27, claiming that the enacted configuration of these two districts needlessly divided the City of Homestead to Republican gain—turning one

Republican district and one Democratic district into two Republican-leaning districts.[19]  In support, the challengers relied on the general evidence of improper intent in the plan as a whole, as well as specifically on an e-mail chain between consultants Heffley, Terraferma, and Reichelderfer that took place after the Senate released a draft map that did not split Homestead.  In this e-mail chain, the operatives stated that the configuration of these districts was "pretty weak" and that the House "need[ed] to fix" it.  The Senate's draft version, not splitting Homestead, is shown on the left below, with the enacted map on the right.



The trial court denied the challenge to these two districts, stating that any tier-two differences between the enacted map and an alternative map introduced

---

19.  The two districts are actually represented by members of the Republican Party.  The performance data relied on by the parties shows that these two districts are Republican under the 2008 presidential and 2010 gubernatorial elections but Democratic under the 2012 presidential election.

into evidence during trial by the challengers were de minimis since the enacted and alternative plans split about the same number of counties and cities in the region. The trial court stated that it would have been "selecting a plan that [it] found subjectively better rather than determining if [the challengers] have proved the enacted plan invalid," if it were to invalidate the enacted configuration of these districts "based on the objective tier-two evidence" presented. The trial court also summarily concluded that it did not find the enacted configuration to have been "based on unlawful partisan intent."

We conclude that the trial court erred in rejecting the challenge to these districts. Based on the trial court's finding of unconstitutional intent to benefit the Republican Party, the burden should have shifted to the Legislature to justify its configuration of these districts. Thus, instead of deferring to the Legislature's configuration and refraining from "selecting a plan [it] found subjectively better," the trial court should have required the Legislature to demonstrate that the decision to split Homestead between Districts 25 and 26 was not done to benefit the Republican Party. Because the Legislature's asserted justification for its configuration of these districts—to protect minority voting rights—simply cannot be justified, these districts must be redrawn to avoid splitting Homestead.

### D. DISTRICT 25

Along with the individual challenge to Districts 26 and 27 based on the split of Homestead, the challengers also argued that nearby District 25 needlessly divided Hendry County, in violation of the constitutional requirements. The trial court summarily rejected this challenge, considering it in conjunction with the challenge to Districts 26 and 27 and concluding simply that the challengers had not proved invalidity because they had not demonstrated more than "de minimis" tier-two deficiencies.

This was error. Having found improper intent in the adoption of the redistricting plan, the trial court should not have deferred to the Legislature's configuration but should have, instead, shifted the burden to the Legislature to justify its decision to divide Hendry County.



The decision to adopt a configuration of District 25 that split Hendry County—as the Senate's map had done but the House's had not—was made in a non-public meeting at the end of the redistricting process. There is thus no record

from the time this decision was made to explain why the Legislature chose the Senate's configuration of this district over the House's, even though the Senate's configuration rendered the district less numerically compact while splitting a county boundary and without improving the compactness of the adjacent district, District 20.

The Legislature's asserted justification at trial and on appeal in this Court for splitting Hendry County is chiefly based on concerns related to preclearance requirements under Section 5 of the Voting Rights Act, since Hendry County was a "covered" jurisdiction to which Section 5 applied—that is, a county for which the state had to obtain federal permission prior to enacting any law related to voting in that county. The Legislature argues that, if it had placed Hendry County entirely within District 25, the Department of Justice would have denied preclearance.

We reject the Legislature's justification for its decision to split Hendry County for at least two reasons. First, the House itself had drawn District 25 with Hendry County almost entirely included in the district, and the House considered its map to be constitutionally compliant. The Legislature's concerns about preclearance thus appear to be post-hoc rationalizations for the enacted configuration.

Second, to the extent preclearance is offered as a justification, preclearance concerns are no longer applicable after the United States Supreme Court's decision

in <u>Shelby County v. Holder</u>, 133 S. Ct. 2612 (2013). In that case, the Supreme Court invalidated the "coverage formula" in Section 4 of the Voting Rights Act, thereby effectively invalidating the preclearance process established by Section 5 of the Act unless and until Congress creates another formula. <u>Id.</u> at 2631. Although the Legislature could not have anticipated the Supreme Court's decision at the time of the 2012 redistricting, Hendry County was not subject to preclearance at the time the Legislature enacted the remedial plan it now urges this Court to approve. In any event, we conclude that the Legislature has not demonstrated that keeping Hendry County whole would diminish the ability of black voters to elect a candidate of choice or cause any other tier-one minority voting protection concerns.

Accordingly, based on its error in the standard of review, the trial court should not have deferred to the Legislature's enacted configuration, and that chosen configuration cannot be justified. District 25 must be redrawn to avoid splitting Hendry County.

### E.  DISTRICTS 21 & 22

Finally, the challengers individually attacked the validity of Districts 21 and 22, contending that these districts could have been drawn in a more constitutionally compliant manner by "stacking" them on top of each other, in a horizontal configuration, rather than configuring the districts to run vertically, parallel to each

other along the Atlantic coast.  Below, the enacted vertical configuration is shown

on the left, whereas the "stacked" alternative configuration is shown on the right.



Again applying a deferential standard of review, the trial court rejected this

challenge, concluding that the challengers had not "met their burden of showing

unnecessary deviation from tier-two requirements given the various tradeoffs

required to draw compact districts in the region as a whole."  The trial court also

stated that the challengers had not "shown that improper intent led to the adoption

of Districts 21 and 22."

However, as with the other individual district challenges, the trial court

applied the incorrect standard.  Based on its finding of unconstitutional intent, the

trial court should not have deferred to the Legislature's enacted configuration of

these districts, but should have instead shifted the burden to the Legislature to justify its decision to draw the districts in this manner.

We conclude that the Legislature has not done so. At trial, the House's chief map drawer, Alex Kelly, testified that the "stacked," horizontal configuration represented "an opportunity to improve" the map. According to Kelly, this configuration would have been more compact and would have broken fewer political boundaries, and it could have been accomplished without violating any tier-one minority voting protection requirements. During a non-public meeting at the end of the redistricting process, Kelly presented this alternative configuration of the districts, but the Senate ultimately determined, without explanation, to reject this approach.

Because the Legislature has not justified its enacted configuration of these districts, we conclude that the districts must be redrawn. We do not, however, instruct that the Legislature must necessarily redraw the districts in a "stacked," horizontal configuration. Indeed, the challengers have conceded that a vertical configuration could perhaps pass constitutional muster, and their alternative maps introduced at trial did, in fact, configure these districts in a vertical manner. Accordingly, we leave it for the Legislature to determine how to redraw these two districts, with the understanding that tier-two compliance could be improved and,

given the shift in the burden, that the Legislature must be able to justify its redrawn configuration of these districts.

## VII. REMEDY

We now turn to the remedy. The specifically challenged districts notwithstanding, the challengers suggest that a broader remedy is required and urge this Court to invalidate the whole map and either redraw it ourselves or order the trial court to redraw it, perhaps with the assistance of an appointed expert. The Legislature counters that this Court lacks the authority to do so, because a congressional redistricting plan may be enacted only by a state legislature pursuant to article I, section 4, clause 1, of the United States Constitution, which vests exclusive authority to regulate the time, place, and manner of congressional elections in state legislatures, subject only to oversight by Congress. Although we reject the Legislature's argument that this Court has no authority to adopt a plan, if necessary, we decline the invitation to do so at this time.

The Colorado Supreme Court has explained that state courts are empowered to enact constitutional redistricting plans for the United States Congress "when the legislature fails to do so." People ex rel. Salazar v. Davidson, 79 P.3d 1221, 1232 (Colo. 2003). The Colorado high court has stated that state courts "have the authority to evaluate the constitutionality of redistricting laws and to enact their own redistricting plans when a state legislature fails to replace unconstitutional

districts with valid ones." Id. "In such a case," the Colorado Supreme Court has reasoned, "a court cannot be characterized as 'usurping' the legislature's authority; rather, the court order fulfills the state's obligation to provide constitutional districts for congressional elections in the absence of legislative action." Id.

We agree, but we have determined that in this case the Legislature has not failed to conform to a ruling from this Court requiring it to adopt constitutionally compliant congressional districts, and, in fact, swiftly enacted a remedial redistricting plan in response to the trial court's judgment. We thus conclude that the appropriate remedy at this juncture is to require the Legislature to redraw the map, based on the directions set forth by this Court.

The Legislature need not, in addition, redraw the entire map. Although we have struggled with this issue, particularly in light of the admittedly gerrymandered 2002 map that was used as a baseline for the current districts, we have ultimately determined that requiring the entire map to be redrawn is not the remedy commensurate with the constitutional violations found in this case. Further, we note that the challengers did not allege, as a separate claim, that the Legislature's reliance on the 2002 map was a basis for invalidating the whole map, nor did they identify a neutral map that showed how all of the districts could be redrawn in a manner more objectively compliant with the constitutional requirements.

We have, instead, instructed the Legislature on which districts must be redrawn—Districts 5, 13, 14, 21, 22, 25, 26, and 27—and provided precise guidelines as to the deficiencies in these districts. Although we decline to require the whole plan to be redrawn, it follows that all adjacent districts affected by the reconfiguration of the specific districts being redrawn must also be redrawn. We have, in addition, been asked by the challengers to provide specific directives that the Legislature must follow in redrawing the districts.

It is true, as the Legislature argues, that the judiciary is generally "without authority to review the internal workings" of the Legislature. Fla. Senate v. Fla. Pub. Emps. Council 79, AFSCME, 784 So. 2d 404, 409 (Fla. 2001). But it is also true, as this Court has recognized in another of its recent redistricting opinions, that Florida has a "strong public policy, as codified in our state constitution, favoring transparency and public access to the legislative process." Apportionment IV, 132 So. 3d at 144. The Legislature's failure to preserve redistricting records and its decision to make important changes to the map during non-public meetings are factors that caused the trial court, and cause this Court, great concern as to whether the Legislature has complied with the constitutional provision to outlaw partisan political gerrymandering.

This is particularly so given that the Legislature itself proclaimed that it would conduct the most open and transparent redistricting process in the history of

the state, and then made important decisions, affecting numerous districts in the enacted map, outside the purview of public scrutiny. As this Court has previously stated, "[i]f the Legislature alone is responsible for determining what aspects of the reapportionment process are shielded from discovery, the purpose behind the voters' enactment of the article III, section 20(a), standards will be undermined." Id. at 149.

While the congressional redistricting plan is somewhat unique in that it required compromise between the two legislative chambers—unlike the state House and Senate maps that were drawn solely within each respective chamber—a redistricting plan enacted by the Legislature is also unique as compared to other types of legislation, in that it involves a specific "constitutional restraint on the Legislature's actions." Id. at 147. The dissent's claim that there is nothing "unique" about the challenge in this case, dissenting op. at 127, is unavailing—and belied by its own admonitions about how this Court's alleged errors are particularly grave in the context of redistricting.

In typical cases challenging the constitutionality of a legislative enactment, the relevant inquiry is whether the enacted legislation violates some individual right or contravenes some prohibition on the type of law the Legislature is empowered to enact. The traditional constitutional analysis of enacted legislation does not involve, as it does here, "a specific constitutional direction to the

Legislature, as to what it can and cannot do with respect to drafting legislative reapportionment plans." Apportionment IV, 132 So. 3d at 147. Simply put, this case does not pit this Court versus the Legislature, but instead implicates this Court's responsibility to vindicate "the essential right of our citizens to have a fair opportunity to select those who will represent them." Id. at 148.

We therefore set forth the following guidelines and parameters, which we urge the Legislature to consider in adopting a redrawn map that is devoid of partisan intent. First, in order to avoid the problems apparent in this case as a result of many critical decisions on where to draw the lines having been made outside of public view, we encourage the Legislature to conduct all meetings in which it makes decisions on the new map in public and to record any non-public meetings for preservation. As we stated in Apportionment IV, "one of our state constitutional values is a strong and well-established public policy of transparency and public access to the legislative process." Id. at 146. This transparency is critical in light of both the purpose of the Fair Districts Amendment to outlaw partisan manipulation in the redistricting process and the trial court's finding here that "an entirely different, separate process" to favor Republicans and incumbents was undertaken contrary to the Legislature's assertedly transparent redistricting effort. Id. at 149.

Second, the Legislature should provide a mechanism for the challengers and others to submit alternative maps and any testimony regarding those maps for consideration and should allow debate on the merits of the alternative maps. The Legislature should also offer an opportunity for citizens to review and offer feedback regarding any proposed legislative map before the map is finalized.

Third, the Legislature should preserve all e-mails and documents related to the redrawing of the map. In order to avoid additional, protracted discovery and litigation, the Legislature should also provide a copy of those documents to the challengers upon proper request.

Finally, we encourage the Legislature to publicly document the justifications for its chosen configurations. That will assist this Court in fulfilling its own solemn obligation to ensure compliance with the Florida Constitution in this unique context, where the trial court found the Legislature to have violated the constitutional standards during the 2012 redistricting process.

## VIII. THE VOTERS SOUGHT FAIR DISTRICTS

Before we conclude, we observe that this is neither the first, nor likely the last, time this Court must confront a challenge to a redistricting plan enacted by the Legislature. In each case, we have endeavored to give meaning to the intent of the framers and voters who passed the Fair Districts Amendment to outlaw partisan

- 105 -

political gerrymandering—no easy task given how entrenched this practice has been for years in the politics of crafting Florida's district boundaries.

A reader of Justice Canady's dissent in isolation could be forgiven for believing that this Court's decision here amounts to a creative maneuver designed to overstep its proper bounds, done in order to usurp the Legislature's role in the redistricting process. The dissent's attacks on this Court's analysis are extravagant, even when measured against prior dissenting opinions in our recent redistricting cases that have accused this Court of devising "a radical alteration in the operation of the separation of powers." Apportionment IV, 132 So. 3d at 160 (Canady, J., dissenting). The barrage of epithets employed by the dissent includes the following colorful array: "fallacious"; "fabricated"; "extreme distortion"; "revolutionary deformation"; "teeming with judicial overreaching"; "creatively cobbled"; "aggressive invasion"; "aberrant decision"; and "unprecedented incursions."[20] Dissenting op. at 110, 111, 112, 117, 127.

Of course, we categorically reject the dissent's many derisive criticisms. And we point out that the dissent's overblown claims that this Court has violated the separation of powers, and has done away with the presumption of

---

20. Perhaps we should take solace in not being accused of "jiggery-pokery." See King v. Burwell, No. 14-114, 2015 WL 2473448, at *19 (U.S. June 25, 2015) (Scalia, J., dissenting).

- 106 -

constitutionality applied to legislative acts in the redistricting context, are in fact nothing new. In Apportionment I, the dissent repeatedly chastised this Court for "cast[ing] aside the presumption of constitutionality." Apportionment I, 83 So. 3d at 696 (Canady, J., concurring in part and dissenting in part). In Apportionment III, the dissent charged that this Court had "la[id] the groundwork for the unrestrained judicial intrusion" into the redistricting process. Apportionment III, 118 So. 3d at 218 (Canady, J., dissenting) (internal quotation omitted). And in Apportionment IV, the dissent hyperbolically accused this Court of "grievously violat[ing] the constitutional separation of powers." Apportionment IV, 132 So. 3d at 156 (Canady, J., dissenting).

The dissent's position has certainly been consistent. But so too has this Court's. We pointed out in Apportionment I that the Fair Districts Amendment "dramatically alter[ed] the landscape with respect to redistricting," increasing the scope of judicial review and commensurately requiring "more expanded judicial analysis of legislative compliance." Apportionment I, 83 So. 3d at 607. We emphasized in Apportionment III that "the framers and voters clearly desired more judicial scrutiny" of the Legislature's decisions in drawing the state's congressional and legislative districts. Apportionment III, 118 So. 3d at 205. And we reiterated in Apportionment IV that there can hardly be a more compelling interest than the public interest in ensuring that the Legislature does not engage in

unconstitutional partisan political gerrymandering. Apportionment IV, 132 So. 3d at 147-48.

Far from upending the law, then, our legal analysis today adheres to our recent redistricting precedents. The dissent, to the contrary, continues its refusal to acknowledge the import of the Fair Districts Amendment. As Chief Justice Labarga eloquently stated in his concurrence in Apportionment IV, this Court has an "important duty" to "honor and effectuate the intent of the voters in passing Florida's groundbreaking constitutional amendment prohibiting partisan or discriminatory intent in drawing the congressional apportionment plan." 132 So. 3d at 154-55 (Labarga, J., concurring). This is a responsibility we undertake with the utmost of seriousness—not because we seek to dictate a particular result, but because the people of Florida have, through their constitution, entrusted that responsibility to the judiciary.

## IX. CONCLUSION

In conclusion, we affirm the trial court's factual findings and ultimate determination that the redistricting process and resulting map were "taint[ed]" by unconstitutional intent to favor the Republican Party and incumbents. However, we reverse the trial court's order approving the remedial redistricting plan because we conclude that, as a result of legal errors, the trial court failed to give the proper

effect to its finding of unconstitutional intent, which mandated a more meaningful remedy commensurate with the constitutional violations it found.

Through this opinion, we have provided clear guidance as to the specific deficiencies in the districts that the Legislature must redraw—Districts 5, 13, 14, 21, 22, 25, 26, 27, and all other districts affected thereby—and we have urged the Legislature in light of the trial court's findings in this case to consider making all decisions on the redrawn map in public view. We have every confidence that the Legislature, given this guidance, will conduct itself in a manner that will fulfill the purpose of the Fair Districts Amendment, including the need for transparency and neutrality in drawing the state's congressional districts.

As to the remedy, we are aware that this litigation has now spanned more than three years and the qualifying period for the next congressional election of 2016 is not far away. We therefore urge that the redrawing of the map be expedited. We have chosen to relinquish this case to the trial court for a limited period of 100 days from the date of this opinion, therefore retaining jurisdiction, and we anticipate that the trial court can perform an oversight role should any disputes arise.[21] To avoid any further delays, we have also limited the time for

---

21. The specific parameters of the relinquishment and transmission of the record are set forth in a separate order issued by this Court simultaneously with this opinion. Although the dissent criticizes our requirement in that order of dual filings in the trial court and this Court during the relinquishment proceedings, see dissenting op. at 124-25, time is of the essence in bringing finality to the

filing a motion for rehearing or clarification to five days from the date of this

opinion and have limited the time for filing a response to such a motion to three

days from the date the motion is filed.

It is so ordered.

LABARGA, C.J., and QUINCE and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

**On the Court's own motion, any motion for rehearing or clarification shall be
filed no later than 3 p.m. on July 14, 2015.  <u>See</u> Fla. R. App. P. 9.330(a).  Any
response to a motion for rehearing or clarification must be filed no later than
3 p.m. on July 17, 2015.  No reply to the response shall be permitted.**

CANADY, J., dissenting.

The circuit court properly ruled that the appellants failed to establish any

basis for requiring the Legislature to further revise Florida's congressional district

map.  The majority's decision to reverse the circuit court and to invalidate

numerous districts in the remedial congressional district plan adopted by the

Legislature involves an extreme distortion of the appellate process deployed to

effect a serious violation of the separation of powers.  Accordingly, I dissent.

**I.**

---

congressional redistricting plan.  Requiring dual filings during a relinquishment or
other proceeding over which this Court retains jurisdiction is not unusual, and the
dual filings allow this Court to ensure it timely has the complete record so that it
can act expeditiously.

The linchpin of the majority's decision is the assertion that in the final judgment the trial court "concluded that the [congressional redistricting] plan was drawn with improper partisan intent" and that the improper intent affected the entire plan. Majority op. at 39. According to the majority, "the trial court failed to give any actual effect to its finding in this case that the 'whole plan' challenge had been proven through the direct and circumstantial evidence of improper partisan intent presented at trial." Majority op. at 63. In fact, however, the final judgment—a copy of which is appended—contains no finding whatsoever that the Legislature acted with improper intent regarding the entire congressional plan or that the "whole plan" challenge had been proven. The majority fails to identify any such finding in the final judgment. Instead, the majority puts forth a misconstruction of the trial court's ruling based on fragments from the final judgment taken out of context and creatively cobbled together. The trial court refused to draw an inference from the evidence that an improper partisan intent affected the redistricting plan in its entirety. But the majority effectively steps into the role of the trier of fact, independently reweighs the evidence, finds that the evidence supports the inference that the whole plan was affected by an improper partisan intent, imputes that broad finding of unconstitutional intent to the trial court, and then faults the trial court for not acting in accord with that fabricated

finding. The upshot is a virtually revolutionary deformation of the appellate process.

The materials from which the majority fashions its misconstruction of the trial court's ruling are found largely in the trial court's findings regarding a "conspiracy" by certain Republican political consultants "to influence and manipulate the Legislature into a violation of its constitutional duty." Final Judgment at 10. But those materials are misshaped by the majority. When the trial court's ruling is considered in its full context, three essential points are clear in the trial court's findings regarding the consultants' conspiracy.

First, the consultants "managed to taint the redistricting process and the resulting map with improper partisan intent" by finding "ways to infiltrate and influence the Legislature, to obtain the necessary cooperation and collaboration to ensure that their plan was realized, at least in part." Final Judgment at 22 (emphasis added). The trial court unquestionably determined that efforts of the consultants to cause partisan action by the Legislature had some success.

Second, the consultants' conspiracy was not successful in affecting the entire map drawing process. The "taint" of "improper partisan intent" attributable to the activities of the Republican consultants was limited in scope and effect. This is evident from the trial court's crucial finding that "the staff members who did the bulk of the actual map drawing for the Legislature . . . were not a part of the

conspiracy, nor directly aware of it, and that significant efforts were made by them and their bosses to insulate them from direct partisan influence." Final Judgment at 22. The trial court specifically found that the committee staff "were insulated from the political consultants," Final Judgment at 37, and that the "motivation [of the staff] in drawing draft maps for consideration of the Legislature was to produce a final map which would comply with all the requirements of the Fair Districts Amendments, as their superiors had directed them." Final Judgment at 22. This finding is of critical importance because of the pivotal role the committee staff indisputably had in drawing the districts the trial court refused to invalidate.

Third, the trial court found that an improper partisan intent did affect certain districts in the redistricting plan—namely, Districts 5 and 10—where there was evidence that the configuration of the districts was influenced through contact between the Republican consultants and legislative leadership or leadership staff. Thus, based on its consideration of the evidence, the trial court decided that "collaboration and cooperation" between the partisan consultants and decision makers in the Legislature regarding particular districts was the predicate for requiring the redrawing of a district based on a finding of unconstitutional intent.

The majority simply ignores the second of these points and fabricates a broad finding of unconstitutional intent. The majority goes on to fault the trial court for failing "to give any independent legal significance to its finding of

unconstitutional intent when examining the challenges to individual districts,"

majority op. at 56, and to assert that the trial court essentially concluded that some

improper intent is acceptable. See majority op. at 58. Neither criticism of the trial

court's order can withstand analysis. The trial court cannot be faulted for failing to

give independent significance to a factual finding it did not make. The trial court

expressly considered the question of unconstitutional intent in its analysis of the

challenged individual districts. Indeed, the trial court was intently focused on the

factual question of whether improper intent affected the drawing of particular

districts by the Legislature. With respect to two districts, the trial court found that

the districts were drawn with unconstitutional intent in the map initially adopted.

With respect to the other districts, the trial court found that the appellants had

failed to establish that the districts were drawn with unconstitutional intent.

At no point does the trial court indicate that it would permit some level of

unconstitutional intent in the drawing of any district. The assertion to the contrary

is unwarranted. As the final judgment makes plain, the trial court thoughtfully

considered the evidence in determining the extent to which the "secretive shadow

process of map drawing by the political consultants" was in fact successful in

causing the Legislature to act with unconstitutional intent in the drawing of

particular districts. Final Judgment at 11-12. In rejecting the "whole plan"

challenge, the trial court recognized the unremarkable proposition that districts that

were not drawn with an unconstitutional intent and that did not otherwise violate the constitutional standards should not be invalidated. The trial court's ruling on this point is in accord with the basic principle "that the scope of the constitutional violation measures the scope of the remedy." Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 455 (1979).

Although the trial court made no finding of a "general intent" by the Legislature to favor a political party or incumbents, the court reasoned that "even if" such a general intent could be proven it would be insufficient to invalidate a particular district unless it was shown that the improper intent affected the drawing of that district. Attempting to match the scope of the remedy to the scope of the violation, the trial court correctly focused on the "effect of . . . noncompliance" with the Constitution in determining whether districts should be invalidated. Final Judgment at 9.

The majority asserts that "the trial court considered a general improper intent to lack any independent legal significance unless it was accompanied by another constitutional violation." Majority op. at 58. But the trial court's analysis makes clear that it was focused on whether any general improper intent actually affected the drawing of particular districts—not on whether particular districts were affected by the violation of other standards.

The majority's reading of the text of the final judgment on this point imports incoherence into the final judgment. It puts the reference to "general intent" in conflict with the trial court's reiterated conclusion that the districts now invalidated by the majority were not drawn with improper intent. But the text of the final judgment—like any other text—should be read harmoniously. The rule that "the provisions of a text should be interpreted in a way that renders them compatible, not contradictory" is a compelling rule of construction predicated on the reality that "it is invariably true that intelligent drafters do not contradict themselves." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012). There is no basis for concluding here that the trial court engaged in self-contradiction.

## II.

The invalidation of Districts 5, 13, 14, 21, 22, 25, 26, and 27 cannot be reconciled with crucial factual determinations made by the trial court. Indeed, the invalidation of these districts can only be accomplished by setting aside the trial court's rulings regarding not only improper intent but also compactness, retrogression and other constitutional standards. The invalidation of these districts flies in the face of the pivotal role of the committee staff in drawing them and the trial court's express finding that the committee staff were insulated from partisan influence. The trial court's rulings regarding improper intent and retrogression, in

- 116 -

particular, indisputably turn on the question of fact that can only properly be determined by the trier of fact.

In an opinion teeming with judicial overreaching, the invalidation of Remedial District 5 has pride of place. The basis for the majority's decision to require that this district be reoriented from its north-south configuration to an east-west configuration ultimately boils down to this: the north-south configuration must be rejected because that is the configuration chosen by the Legislature and the Legislature's choice is presumed to be unconstitutional. If the Legislature made a choice, we must begin by assuming the choice violated the constitution. This is so even though the configuration chosen by the Legislature was based on a map drawn by committee staff, who were insulated from partisan influence in selecting that configuration. The majority also suggests that the north-south configuration is somehow tainted because "the long-time incumbent of the district, Congresswoman Corrine Brown . . . previously joined the leading Republicans in actively opposing the Fair Districts Amendment and redistricting reform." Majority op. at 80.

Based on this supposed taint and the presumption of unconstitutionality, the majority treats as irrelevant the trial court's ruling that "the Plaintiffs have not offered convincing evidence that an East-West configuration is necessary in order to comply with tier-one and tier-two requirements of Article III, section 20."

Order Approving Remedial Redist. Plan at 3. Under the majority's application of the presumption of unconstitutionality, an alternative suggested by the challengers is virtually guaranteed to trump any choice made by the Legislature. This vividly illustrates just how far the majority has gone in repudiating the principle that a redistricting plan should not be declared unconstitutional "unless it clearly appears beyond all reasonable doubt that, under any rational view that may be taken of the [plan], it is in positive conflict with some identified or designated provision of constitutional law." In re Apportionment Law, 263 So. 2d 797, 805-06 (Fla. 1972) (quoting City of Jacksonville v. Bowden, 64 So. 769, 772 (Fla. 1914)).

The majority fails to consider critical aspects of the alternative suggested by the challengers for Remedial District 5. Most strikingly, the majority ignores the reality that the mandated east-west configuration will result in a district that is significantly less compact than Remedial District 5. In addition, no attention is given to the fact that the creation of the East-West District will cause adjoining District 2 to become significantly less compact.

## Remedial Plan Map



## Romo Map A



As the Legislature points out, the East-West District's length will be 43% greater than the length of Remedial District 5—206 miles rather than 144 miles. The perimeter of the East-West District is 22% larger than Remedial District 5's perimeter, and the area of the East-West District is 93% greater than the area of Remedial District 5. By any reasonable understanding of compactness, this is a dramatic movement toward a less compact district.

|  | **RD 5** | **E-W D** | **Change** |
|---|---|---|---|
| Length (miles) | 144 | 206 | +43% |
| Perimeter (miles) | 583 | 711 | +22% |
| Area (square miles) | 2031 | 3,911 | +93% |

The redrawing of District 2 necessitated by the majority's decision that Remedial District 5 must be replaced by an East-West District will also result in a dramatic movement toward a less compact district. The length of District 2 will be increased by 39% from 167 miles to 232 miles. The district's perimeter will increase by 75% and its area by 30%.

|  | **D2** | **New D2** | **Change** |
|---|---|---|---|
| Length (miles) | 167 | 232 | +39% |
| Perimeter (miles) | 550 | 961 | +75% |
| Area (square miles) | 10,107 | 13,107 | +30% |

The majority's imposition of the East-West District is also predicated on a disregard of the evidence of the potential for retrogression in the East-West District, and the failure to establish any objective standard for prohibited

retrogression.  On the issue of retrogression, the majority dismisses the expert testimony presented by the Legislature and acts on the basis of a very simple and totally subjective rule: we know retrogression when we see it.  The majority's approach regarding the other challenged districts where retrogression was at issue parallels its approach regarding Remedial District 5.

With the invalidation of Remedial District 5 and other challenged districts, the ironic result is that districts drawn by professional committee staff, who were insulated from partisan influence in the drawing of the districts, are effectively displaced by districts drawn—as evidenced by deposition testimony—under the auspices of the National Democratic Redistricting Trust in cooperation with the Democratic Congressional Campaign Committee.  There is something dreadfully wrong with this picture.  As the Legislature argues: "To discard the work product of the Florida Legislature, which the trial court carefully considered and upheld, and substitute the partisan handiwork of the DCCC and the Democratic Trust, would be an indelible stain."  Legislative Parties' Answer Brief at 91.

**III.**

Despite casting its disagreement with the trial court in terms of legal errors, the majority's real disagreement with the trial court is not about questions of law.  It is about questions of fact.  The majority thus reverses the trial court because the trial court failed to invalidate particular districts for being drawn with an

- 121 -

unconstitutional intent when the trial court made the factual determination that those districts were not drawn with an unconstitutional intent. The majority's real problem with the trial court's ruling is that the trial court was unwilling to draw broad factual inferences concerning intent that the majority concludes should have been drawn.

Intent unquestionably is a question of fact. As we explained in Jersey Palm-Gross, Inc. v. Paper, 658 So. 2d 531 (Fla. 1995), "the ultimate arbiter on the issue of intent is the trial court because 'the question of intent is one of fact.' " Id. at 534 (quoting Rebman v. Flagship First Nat'l Bank, 472 So. 2d 1360, 1364 (Fla. 2d DCA 1985)).

It is axiomatic that determining whether a district should be invalidated based on an unconstitutional intent claim turns on the factual question of whether that district was drawn with an unconstitutional intent—a question indisputably within the province of the trier of fact. By imposing its own judgment about the factual inferences to be drawn from the evidence at trial, the majority has transgressed the boundaries of proper appellate review and invaded the province of the trier of fact. Such overreaching by an appellate court would be a grave matter in any context, but it is doubly grave in the context of redistricting litigation, where a coordinate branch of government is a party and the constitutional authority of that branch is at issue. In a context such as this, the court has a special duty to

scrupulously observe the limitations inherent in its function as an appellate court. Unfortunately, the majority has heedlessly cast those limitations aside.

The majority effectively holds that a finding of any unconstitutional intent in the drawing of congressional districts causes a presumption to arise that all the districts in the plan were drawn with an unconstitutional intent. Based on that presumption, the majority places the burden of proof on the Legislature to establish that particular districts were not drawn with an unconstitutional intent. The majority thus creates a general presumption of unconstitutionality based on a specific, narrow constitutional violation. This broad presumption of unconstitutionality untethers the remedy for violating the Constitution from proven specific violations requiring specific remedies. It transgresses the self-evident principle that "the scope of the constitutional violation measures the scope of the remedy." Penick, 443 U.S. at 455. This, needless to say, shatters the shell of the presumption of constitutionality that was left by this court's recent redistricting decisions. But the majority reaches even further.

**IV.**

Having invaded the province of the trier of fact to find the factual basis for triggering the newly created presumption of unconstitutionality, the majority continues its march to dominate the redistricting process and finishes the job—at least for now—by making the factual determinations that the Legislature did not

prove a lack of improper intent in the drawing of the specifically challenged districts. Marching forward, the majority eviscerates numerous factual determinations made by the trial court in its evaluation of the individual district challenges.

Under the well-established framework for appellate review, if an appellate court determines that the trier of fact has placed the burden of proof on the wrong party, the case should be remanded to the trier of fact to reevaluate the evidence in light of the correct legal rule regarding the burden of proof. The weighing of the evidence under the applicable burden of proof is the function of the trier of fact. That function should not be usurped by an appellate court. The Supreme Court has recognized as "elementary" that " 'fact finding is the basic responsibility of [trial] courts, rather than appellate courts' " and "where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." Pullman-Standard v. Swint, 456 U.S. 273, 291-92 (1982) (quoting DeMarco v. United States, 415 U.S. 449, 450 n. (1974)). Proceedings by an appellate court contrary to these elementary principles are "incredible." Id. at 293.

The majority caps off its abandonment of the restraints of the appellate process by retaining jurisdiction after deciding this case, dictating the details of the proceedings in the trial court, and presuming to require that all filings submitted in

the trial court shall "simultaneously be submitted to this court." This retention of jurisdiction and exercise of control of the proceedings in the trial court further vividly demonstrates the majority's aggressive determination to exercise full dominion over the redistricting process. Unlike our review of the legislative redistricting plan—over which we have original review jurisdiction under article III, section 16—our review of this case involving congressional redistricting is based on our jurisdiction to review trial court judgments that are certified by a district court under article V, section 3(b)(5). Once we have decided this case, there is no reason—other than the majority's determination to guarantee that it has the last word—that the case should not proceed like any other case that is reversed and remanded to a trial court after we have exercised our jurisdiction over a trial court judgment certified to us by a district court. If a party believes that an error occurs in the proceedings on remand, that party may file an appeal in the district court. The district court can then either decide the case or certify it to this court for decision. That is the way such cases proceed in the ordinary course. But here the ordinary course of judicial proceeding is once again cast aside by the majority without a shred of justification.

## V.

The damage done by this decision to the structure of the appellate process is exceeded only by the damage done to the constitutional separation of powers.

Injury to the separation of powers in this case takes two forms. First, the majority effectively supplants the substantive constitutional power of the Legislature to draw congressional districts. As I have explained, the majority does this by reviewing the redistricting plan in a way that is inconsistent in multiple ways with the proper exercise of judicial power. Second, the majority invades the internal workings of the Legislature by effectively dictating how the Legislature must conduct its business in connection with the adoption of the revised congressional redistricting plan that the majority has mandated. The majority thus sets forth certain "guidelines and parameters" concerning the process for adopting a revised congressional district map. None of these "guidelines and parameters" have any basis in law. All of the subjects addressed by the "guidelines and parameters" are covered by existing law, but the majority imposes requirements that indisputably go beyond the clear requirements of the governing law.

The majority's "guidelines and parameters" for the conduct of legislative business run headlong into our prior recognition of the danger "that the control or influence by one branch of another branch's internal operating procedures could interfere with the independence of the second branch and possibly place the enforcing branch in a superior position." Locke v. Hawkes, 595 So. 2d 32, 36 (Fla. 1992). Short shrift is given to the rule that "[i]t is a legislative prerogative to make, interpret and enforce its own procedural rules and the judiciary cannot

compel the legislature to exercise a purely legislative prerogative." Moffitt v. Willis, 459 So. 2d 1018, 1022 (Fla. 1984). In all the annals of constitutional government, this Court's aggressive invasion of the internal workings of the legislative branch is without precedent. The only case authority that can be cited to support the depredations here visited on the independence of the legislative branch is this Court's recent aberrant decision requiring members of the Legislature to submit to interrogations concerning their legislative activities. But the invasion of the legislative sphere made by the Court's prior ruling is outstripped by today's ruling.

In attempting to justify these unprecedented incursions into the constitutional sphere of the Legislature, the majority offers the singularly unconvincing reason that "a redistricting plan enacted by the Legislature is . . . unique as compared to other types of legislation, in that it involves a specific 'constitutional restraint on the Legislature's actions.' " Majority op. at 103. This is fallacious. In every single case challenging the constitutionality of a law the question at issue is whether the law transgresses a constitutional restraint on the Legislature. There is nothing "unique" about the challenge brought in this case that justifies transgressing the separation of powers. It is "unique" only because the majority has chosen to treat it as "unique" to justify a "unique" exercise of judicial power.

All of the "parameters and guidelines" constitute unwarranted interference with the operation of the Legislature within its own constitutional sphere. The most egregious of the "safeguards" set forth by the majority is the admonition that "the Legislature should provide a mechanism for the challengers and others to submit alternative maps and any testimony regarding those maps for consideration and should allow debate on the merits of the alternative maps" and should "offer an opportunity for citizens to review and offer feedback regarding any proposed legislative map before the map is finalized." Majority op. at 105. This tramples on the institutional independence and integrity of the Legislature by inserting the challengers and others outside the Legislature into the very heart of the legislative process.

The challengers and others interested in redistricting have the benefit, of course, of the constitutional right granted to the people of Florida "to petition for redress of grievances." Art. I, § 5, Fla. Const. They thus have the right to communicate with members of the Legislature to make their views known and to criticize legislative proposals. But the majority opinion clearly contemplates a "mechanism" that goes far beyond permitting the exercise of this constitutional right. The Legislature debates and gives formal consideration only to proposals that are submitted—in the form of bills or resolutions and amendments thereto—by members of the Legislature. The filing of bills, resolutions and amendments in the

Legislature is the exclusive constitutional prerogative of elected members of the Legislature. And no person who is not a member of the Legislature has standing in the Legislature to participate in legislative debate, submit proposals that must be debated or to formally "review" proposals under consideration by the Legislature before they are adopted. In ignoring these elemental features of the legislative process, the majority betrays either a lack of knowledge or a lack of regard for the integrity of the core function of a coordinate branch of government.

## VI.

This decision causes serious damage to our constitutional structure. The proper functioning of the judicial process is deformed and the separation of powers is breached in an unprecedented manner. Since 2012, this Court's decisions concerning the redistricting process have been characterized by a repeated rewriting of the rules. The foundation for all that followed was the effective abrogation of our precedents that clothed a redistricting plan with a presumption of constitutionality. The Fair Districts Amendments—which said not a word about the alteration of the exercise of judicial power—could not bear the weight of that jettisoning of the presumption of constitutionality. And the Fair Districts Amendments certainly cannot bear the weight of today's decision, which abandons the well-established boundary between the trier of fact and a reviewing appellate

court and transgresses the independence of the core function of the legislative branch in conducting the legislative process. I dissent.

POLSTON, J., concurs.

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA

RENE ROMO, et al,                                    CASE NO: 2012-CA-412

       Plaintiffs,

vs.

KEN DETZNER and PAM BONDI,

       Defendants.

_____/

THE LEAGUE OF WOMEN VOTERS                           CASE NO: 2012-CA-490
OF FLORIDA, et al,

       Plaintiffs,

vs.

KEN DETZNER, et al,

       Defendants.

_____/

## FINAL JUDGMENT

This case is before me following a lengthy bench trial. Plaintiffs claim that the congressional redistricting plan adopted by the Legislature violates Article III, Section 20 of the Florida Constitution. For the reasons set forth below, I agree, finding that districts 5 and 10 were drawn in contravention of the constitutional mandates of Article III, Section 20, thus making the redistricting map unconstitutional as drawn.

## INTRODUCTION

President George Washington, in his farewell address of 1796, warned the new nation of the dangers of political parties.

"However combinations or associations of the above description may now and then answer popular ends, they are likely in the course of time and things, to become potent engines, by which cunning, ambitious, and unprincipled men will be enabled to subvert the power of the

1

people and to usurp for themselves the reins of government, destroying afterwards the very engines which have lifted them to unjust dominion....Without looking forward to an extremity of this kind (which nevertheless ought not to be entirely out of sight), the common and continual mischiefs of the spirit of party are sufficient to make it the interest and duty of a wise people to discourage and restrain it."

His countrymen did not heed Washington's warning and quickly divided themselves into opposing political factions. Though the names have changed over the years, the two major political parties have been battling each other for control over our nation's government ever since. To many, it seems that Washington's fears have been realized. Certain in the rightness of their cause, of the superiority of their ideas and their members, they consider those in the opposing camp to be not only wrong, but a threat to the very foundations of our country. Any idea of the other party is to be opposed fervently. They must win elections and gain or remain in power because, to the partisans, their party's interest is synonymous with the country's interest. In short, winning is everything.

One of the ways in which political parties seek to gain or maintain an advantage over the other is through the redistricting process. Every ten years, based on new census data, congressional seats are reapportioned among the states based upon shifting population figures. To many citizens this process is of mild interest, but to the political parties it is a high stakes proposition, a zero sum game in which one party wins and the other loses – for years to come. Subtle shifts in a district boundary line can make the difference between a district that is "safe" for a political party or one that is "competitive" between the two. It can make a big difference in the ability to recruit candidates for particular districts, the amount of time, energy and resources

2

necessary to give a party's candidate a real chance of success, and ultimately, whether the party can maintain a majority of seats in congress.

Historically, the political party in control of the state legislature has been able to draw the new districts in a manner that protects their party and its incumbents. Voter populations are shifted and clustered based upon how they are likely to vote. The result has often been maps with districts that have unusual boundaries and bizarre shapes, as if some abstract artist had been given free rein. This practice has come to be called political gerrymandering and has been criticized as allowing, in effect, the representatives to choose their voters instead of vice versa.

In 2010, the voters of Florida passed two amendments to the Florida Constitution, commonly referred to as the Fair Districts Amendments, aimed at eliminating such political gerrymandering. These amendments are now codified in the Constitution as Article III Section 20, pertaining to congressional redistricting and Article III Section 21, pertaining to state legislative redistricting. These amendments significantly decrease the Legislature's discretion in drawing district boundaries. Specifically forbidden is the drawing of a redistricting plan with the intent to favor or disfavor a political party or incumbent. Section 20 reads as follows:

> Standards for establishing congressional district boundaries.—In establishing congressional district boundaries:
>
> (a)No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
>
> (b)Unless compliance with the standards in this subsection conflicts with the standards in subsection 1(a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c)The order in which the standards within subsections 1(a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

Art. III, § 20, Fla. Const.

Subsection (a) contains tier-one requirements which must be followed. In addition to prohibiting intent to favor or disfavor a political party or incumbent, this subsection contains two distinct protections for racial and language minorities. The first, which prohibits districts which are drawn with "the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process," is similar to Section II to of the Voting Rights Act. Commonly referred to as the "vote dilution" provision, this section requires majority minority districts where certain preconditions are met. The second minority protection prohibits a plan or district from "diminish[ing] their ability to elect representatives of their choice." Commonly referred to as "retrogression," this clause tracks Section 5 of the Voting Rights Act and prohibits backsliding in the ability of minority groups to elected candidates of their choice.[1]

Subsection (b) contains provisions requiring compactness and the following of political and geographic boundaries, where feasible.[2] These traditional redistricting principles, tier-two requirements, must be followed unless doing so would conflict with tier-one requirements.

More than one witness during trial explained their opposition to the passage of these amendments by opining that "you can't take politics out of politics" or that the amendments would be "impossible to implement." Perhaps, but they are now a part of our organic law and I am bound to interpret and apply them as best I can in order to give effect to will of the voters as so expressed. See *Re: Senate Joint Resolution of Legislative Apportionment 1176, 83 So. 3d*

---

[1] The contiguity requirement is not at issue in this case.
[2] The equal population requirement is not at issue in this case.

*597*, 597 (Fla. 2012).[3] Any act of legislation that is in conflict with the organic law of the constitution is not a valid law. This is a fundamental principle of our political and legal system.

This is a case of first impression interpreting Article III Section 20, dealing with congressional re-districting. The Florida Supreme Court, however, has interpreted the analogue provision in Article III Section 21, which applies to state legislative plans. *See Apportionment I, 83 So. 3d 597*. This lengthy and comprehensive opinion interprets key terms and explains how the various criteria are to be analyzed in reviewing a redistricting plan for constitutionality. It therefore provides me with a detailed road map for reviewing the congressional plan challenged by Plaintiffs.

### STANDARD OF REVIEW

A law passed by the legislature is entitled to a presumption of constitutionality. The burden to show otherwise is on those who challenge the law, and that burden is generally said to be beyond a reasonable doubt. This is, in fact, the standard I applied when considering motions for summary judgment earlier in this case. The Plaintiffs ask that I reconsider this decision in light of the Florida Supreme Court's holding to the contrary in *Apportionment I*, and its subsequent language in *League of Women Voters of Fla. v. Fla. House of Representatives*, 132 So. 3d 135 (Fla. 2013).

In *Apportionment I*, the Florida Supreme Court specifically rejected the argument that those who challenge redistricting plans must prove facial invalidity beyond a reasonable doubt. It stated that the plans still come to the Court "with an initial presumption of validity"... and that the review of the plans would be done "with deference to the role of the Legislature in apportionment..." but stated that its

---

[3] Hereafter *Apportionment I.*

constitutionally required independent review brought with it a lesser degree of deference than would be appropriate with other legislation. *Id.* at 606-607.

The question is whether this different standard of review is a consequence of the nature of the act reviewed (a redistricting plan), the nature of the new criteria required by the Fair District Amendments (the expanded scope of review), or the specific constitutional mandate that the State House and Senate plans be reviewed by the Florida Supreme Court irrespective of a specific challenge (the procedural process of obtaining review). It was this latter factor, the constitutional requirement of an independent review, which I felt distinguished this case from *Apportionment I* and thus required the traditional standard of review. Upon reflection, however, I'm not convinced that the different procedural process requires a different standard of review.

It is true that the constitutional mandate for review by the Florida Supreme Court is unique. But should the procedural manner in which a plan is brought before the court for review make a difference in the standard applied in that review? The other two factors noted by the Supreme Court in *Apportionment I*, the nature of the legislation and the criteria to be applied, are the same in this case. The rights protected are just the same and just as important when redistricting occurs for Congress as it is when it occurs for the State House and Senate. Should the voters be entitled to less constitutional protection when the redistricting is for the former rather than the latter? Should actions on the part of the legislature in the redistricting process be deemed in violation of the constitution in one instance but not the other?

I think not, and now conclude that it is the nature of the legislation and the nature of what is reviewed that requires a different standard of review. In *Apportionment I,* the Florida Supreme Court observed:

> We conclude that the beyond a reasonable doubt standard is ill-suited for an original proceeding before this Court in which we are constitutionally obligated to enter a declaratory judgment on the validity of the legislative plans. Unlike a legislative act promulgated separate and apart from an express constitutional mandate, the Legislature adopts a joint resolution of legislative apportionment solely pursuant to the "instructions" of the citizens as expressed in specific requirements of the Florida Constitution governing this process.

*Apportionment I,* 83 So. 3d 597 at 607-608;

> There is a difference between the Court's role in reviewing a legislative apportionment plan to determine compliance with constitutionally mandated criteria and the Court's role in interpreting statutes; this Court has stated its responsibility in construing statutes differently. For example, in *Tyne v. Time Warner Entertainment,* 901 So. 2d 802, 810 (Fla. 2006), in upholding a statute as constitutional, the Court stated that it had "an obligation to give a statute a constitutional construction where such a construction is possible." This Court has stated that it is
>> "committed to the fundamental principle that it has the duty if reasonably possible, and consistent with constitutional rights, to resolve doubts as to the validity of a statute in favor of its constitutional validity and to construe a statute, if reasonabl[y] possible, in such a manner as to support its constitutionality -- to adopt a reasonable interpretation of a statute which removes it farthest from constitutional infirmity."

*Apportionment I,* 83 So. 3d at 607, n. 5 (quoting *Corn v. State,* 332 So. 2d 4, 8 (Fla. 1976)).

As this language suggests, the reason for the different standard is because apportionment plans cannot be interpreted. The lines are where they are. It is not a question of searching for a reasonable interpretation of a statute which would

7
-137-

make it constitutional. Rather, the inquiry is into the process, the end result, and the motive behind the legislation.

I will therefore, in this case, apply the standard of review articulated in *Apportionment I*, deferring to the Legislature's decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements, with an understanding of my limited role in this process and the important role of the Legislature. My duty "is not to select the best plan" but to determine whether Plaintiffs have proved the plan invalid. *Apportionment I, 83 So. 3d 597 at 608.*[4]

## CHALLENGE TO PLAN AS A WHOLE VERUS A CHALLENGE TO INDIVIDUAL DISTRICTS

Plaintiffs distinguish between their challenge to the redistricting plan as a whole, as being drawn with the intent generally to favor the Republican Party, and their challenge to several individual districts, as being specifically drawn with such intent. I find this to be a false dichotomy, a distinction without difference. The redistricting plan is the result of a single act of legislation. If one or more districts do not meet constitutional muster, then the entire act is unconstitutional. The districts are part of an integrated indivisible whole. So in that sense, if there is a problem with a part of the map, there is a problem with the entire plan.[5]

---

[4] As a practical matter, it may make little difference as most of the material facts are not in dispute. Rather, the parties differ as to what inferences and legal conclusions may be properly drawn from those facts. Nor do I interpret *Apportionment I* as significantly reducing the burden on the Plaintiffs to demonstrate the lack of compliance with constitutional requirements. It remains a high burden.

[5] This is consistent with the approach taken by the Court in *Apportionment I.* The Court invalidated the entire Senate plan but gave specific instructions as to which districts *required* corrective action. *Id.* at 684-686.

8

That does not mean, however, that portions of the map not affected by those individual districts found to be improperly drawn would need to be changed in a redrawn map, even if a general intent to favor or disfavor a political party or incumbents was proven. What would be the point if the other districts are otherwise in compliance? Such a remedy would go far beyond correcting the effect of such noncompliance, but rather would require a useless act that would encourage continued litigation. Therefore, I have focused on those portions of the map that I find are in need of corrective action in order to bring the entire plan into compliance with the constitution.

## EVIDENCE RECEIVED UNDER SEAL OR IN CLOSED PROCEEDINGS

A portion of the trial was closed to the public and certain exhibits entered under seal, pursuant to an order of the Florida Supreme Court. Whether this evidence will ever be made public awaits determination by that court of the correctness of my ruling that the associational privilege of the non-parties from whom the evidence was obtained should yield to the interest in disclosure.[6] For purposes of such review, I will briefly explain how I weighed and balanced the appropriate factors and why I tipped the scales in favor of disclosure. Rather than file a partially redacted order, any reference to such evidence here will be general in nature so as not to reveal the specific information contained in the exhibits and testimony.

As noted in my previous Orders, I found that the non-parties, the political consultants, had cognizable First Amendment Rights in the documents and testimony sought by the Plaintiffs in this case.[7] The privilege is not absolute, however, and I had to weigh and balance the competing interests to determine whether that privilege should yield in favor of disclosure.

---

[6] The 1st DCA has withdrawn its order reversing my ruling and passed the matter to the Supreme Court. Members of the original panel have set forth in their dissents their reasons for the initial reversal order which I hope to address here.

[7] I did not find that a trade secret privilege applied.

Specifically, I considered the factors set forth in *Perry v. Schwarzenegger*, 591 F. 3rd 1147 (9th Circ. 2010) and determined that the privilege should yield. In the interest of time, I did not elaborate in detail my reasons for that conclusion, announced in open court. I thought it important that the parties know what could and could not be used at trial and that the non-parties have time to obtain a stay if further review was deemed appropriate by the appellate court. The reasons I decided that the associational privilege should yield are as follows:

The case before me of is of the highest importance, going, as it does, to the very foundation of our representative democracy. "Indeed, as [this Court] succinctly stated, it is "difficult to imagine a more compelling, competing government interest" than the interest represented by the challengers' article III, section 20(a), claims." League of Women Voters, 132 So. 3d 135, 147.

The required disclosure was narrowly tailored and limited. Out of approximately 1800 pages of documents, I required the disclosure of less than a third of those. The disclosure was only to the Plaintiffs' attorneys with instructions that they not disclose it to third parties other than staff or retained experts, including to their own clients. I felt that the Plaintiffs' attorneys were in the best position to determine which of these documents were most probative of their claims. As it turned out, they actually offered as evidence only a very small portion of those documents as exhibits.

The documents for which the political consultants claimed privilege evidenced a conspiracy to influence and manipulate the Legislature into a violation of its constitutional duty set forth in Article 3, Section 20 of the Florida Constitution. That was, at least, a reasonable conclusion to be drawn from this and other evidence made available to me in the case to that point. As such, I viewed any chilling effect the release of these documents might have on such

10

behavior in the future to be not such a bad thing, and the danger to the legitimate exercise of First Amendment rights rather slight.

Some of the communications, and a good deal of the map work product of the non-party political consultants, were transmitted to persons outside of their group, and made very public by submission to the legislature. If this did not constitute an outright waiver of the privilege as to these items, it lessened the strength of a legitimate claim to its protection.

Unlike the politically hot button issue of homosexual marriage, present in *Perry*, the underlying subject matter here was redistricting. Although political partisans are no doubt deeply interested in the process, the redistricting process does not address controversial issues of social and moral values that divide the population. It does not arouse the type of intense passions that might justify a real fear of physical danger or mass public reprisals against the members if the information was made public.

The evidence was highly relevant and not available from other sources. When I considered this factor, I tried my best to look at it from the perspective of the judge rather than the ultimate fact finder, the two roles I play in a non jury trial. One of the principal theories of the Plaintiffs in this case was that legislative staff and leaders collaborated with these political consultants to produce a redistricting map that violated the constitution by favoring the Republican Party and its incumbents.

While it is true that the documents claimed as privileged contain no glaring "smoking gun" in terms of direct communications between the consultants and specific staff or legislators, that does not mean they are not highly relevant. Under their theory of the case, it was essential for the Plaintiffs to first prove that there was a secretive shadow process of map drawing by the

political consultants which found its way into the enacted congressional map before they could prove the second prong -- the connection of this process to the Legislature.

Nor was this evidence available from other sources. Yes, the Plaintiffs engaged in extensive discovery and obtained e-mails and other documentation which they argued was compelling evidence in support of their claim. But the Plaintiffs' advocacy on this point should not be confused with the reality of what they actually had – which were bits and pieces of information which they sought to weave into a narrative consistent with their theory. The legislature had, in fact, destroyed e-mails and other evidence of communication regarding the redistricting process and so had many of the non-party political consultants.

Throughout the discovery process, these political consultants maintained that they were told by legislative leaders that they could not "have a seat at the table" in the drawing of the redistricting maps, and that they abided by that admonition. They denied having any input in the Legislative map drawing efforts or otherwise trying to influence how the maps were drawn. They denied that they submitted maps in the public submission process for redistricting. Any map drawing on their part was described as a hobby, something for personal use only, an exercise done to see what could be done on a map and to anticipate what the Legislature might produce.

What this additional evidence gave the Plaintiffs was the ability to confront these denials, to lay bear not only the fact that some of these consultants were submitting maps to the legislature, but to show how extensive and organized that effort was, and what lengths they went to in order to conceal what they were doing. Notably, even in the face of this evidence, the non-party witnesses at trial did their best to evade answering direct questions on the subject, often using semantic distinctions to avoid admitting what they had done.

12

At the time I considered the issue, the Plaintiffs did have some evidence that suggested otherwise but, considering the high burden on them to prove their case, I couldn't say that it would have been enough, or that this additional evidence wouldn't be crucial to the case. After all, I had not heard all of the evidence nor had the opportunity to view it in context. Now that I have, I can say that the evidence filed under seal was very helpful to me in evaluating whether Plaintiffs had proved that first prong of their theory.

Moroever, as noted above, without sufficient proof of this secret, organized campaign to subvert the supposedly open and transparent redistricting process, the question of whether the Plaintiffs could sufficiently tie the Legislature to that effort becomes moot. To conclude that this evidence was not highly relevant to this central issue of legislative intent would have been to pre-judge the case and determine ahead of time that the Plaintiffs would not be able to prove that connection. This I was not prepared to do.

For all of these reasons, I tipped the scales in favor of the First Amendment privileges of the non-parties yielding to the need and interest of disclosure in this particular case.

## DETERMING LEGISLATIVE INTENT GENERALLY

One of Plaintiffs' claims is that the entire redistricting process was infected by improper intent. Specifically, they argue that, despite the Legislature's assertion that its redistricting process was open, transparent and non-partisan, a secret, highly partisan map drawing campaign was being conducted in the shadows that was intended to, and did, favor the Republican Party and its incumbents.

The first question in evaluating this claim is to ask, whose intent? The language in Section 20 prohibits a map being "drawn" to favor or disfavor a political party or an incumbent, not "adopted" or "enacted." Yet, the challenge is to an act passed by the Legislature, a collective

13

body. When I asked the attorneys at the beginning of trial about this issue, I posed the hypothetical of a staff member charged with actually drawing the map, who did so with the intent to favor a political party, but hid this intent from other staff and members of the Legislature. Both sides agreed that it is the Legislature's intent that is at issue, not the staff member. Plaintiffs' attorneys conceded that, without more, this would be insufficient to show improper intent as contemplated by Article III, Section 20 -- though they assert that the evidence indeed shows more.

There are some real problems in trying to make such a determination of legislative intent in this case. First, when we speak of legislative intent generally, we are concerned with trying to ascertain the meaning of language used in the enacted law. The goal is to interpret the language so as to give it the effect intended. In such a situation, we look to such things as the common meaning of the words used, legislative history, staff reports, statement of legislative intent in the enactment clause, transcripts of committee hearings, and statements made on the floor of the House and Senate. Some legal scholars suggest that one can never determine legislative intent from such sources, or indeed at all.[8]

This problem is exacerbated in a case like the one before me. Here, we are looking at something entirely different. See, e.g., *League of Women Voters of Fla. v. Fla. House of Representatives*[9], 132 So. 3d 135, 150 (Fla. 2013) ("In this context, however, the 'intent' standard in the specific constitutional mandate of article III section 20(a), is entirely different

---

[8] "Anyway, it is utterly impossible to discern what the Members of Congress intended except to the extent that intent is manifested in the only remnant of 'history' that bears the unanimous endorsement of the majority in each House: the text of the enrolled bill that became law." *Graham County Soil & Water Conservation Dist. v. United States ex. rel. Wilson*, 559 US 280, 302 (2010) (Scalia, J., concurring).

[9] *Apportionment IV*

than a traditional lawsuit that seeks to determine legislative intent through statutory construction."). It is not the meaning of the words used in the legislation that must be interpreted. We can see clearly where the lines are drawn on the map. Rather, the question is what was the motive in drawing these lines.

In this inquiry, it is extremely unlikely that the bill's sponsor would stand up on the floor of the House or Senate and advise his or her colleagues that the intent of the legislation is to favor the Republican Party. Nor would you expect such comments at committee meetings, or anywhere else in public for that matter. Even if a legislator expressed such intent on the floor, can we assume that all of his or her colleagues were convinced and so motivated in their votes?

Do we look to evidence of improper intent of the leaders? If so, how many other legislators, if any, would need to be "in on it" in order to find it sufficient proof of the body's intent? What if legislative leaders and staff knew that partisan groups or individuals were drawing maps with intent to favor a political party and submitting them to the Legislature through third persons in order to conceal the identity of the map drawer, but they didn't inform legislative members of this? On the flip side, if leaders took reasonable precautions to insulate the staff map drawers from partisan influence, should we conclude that the Legislature therefore had no improper partisan intent in adopting the map? How does that inform us as to what was motivating the members of the legislature?

Certainly, the actions and statements of legislators and staff, especially those directly involved in the map drawing process would be relevant on the issue of intent. As the Florida Supreme Court has explained,

> the communications of individual legislators or legislative staff members, if part of a broader process to develop portions of the map, could directly relate to whether the plan as a whole or any specific districts were drawn with unconstitutional intent.... [I]f evidence exists to demonstrate that

15

there was an entirely different, separate process that was undertaken contrary to the transparent [redistricting] effort in an attempt to favor a political party or an incumbent in violation of the Florida Constitution, clearly that would be important evidence in support of the claim that the Legislature thwarted the constitutional mandate.

*Apportionment IV*, 132 So. 3d at 149-150. *See also, e.g., Easley v. Cromartie*, 532 U.S. 234, 254 (2001) (finding "some support" for district court's conclusion that racial considerations predominated in drawing of district boundaries in email sent from legislative staff member to two senators); *Texas v. United States*, 887 F. Supp. 2d 133, 165 (D.D.C. 2012) (noting that an "email sent between staff members on the eve of the Senate Redistricting Committee's markup of the proposed plan" fueled the court's "skepticism about the legislative process that created" a challenged district).

It is very difficult, however, to know when such evidence establishes not just individual intent or motive, but the intent or motive of the collective body. It seems that the more reliable focus in such an inquiry would be on what was actually produced by the Legislature, the enacted map. Specifically, an analysis of the extent to which the plan does or does not comply with tier two requirements is a good place to start. Can one draw a map that meets tier-two requirements but nonetheless favors a political party or an incumbent? Sure, but it is more difficult.

Furthermore, a failure to comply with tier-two requirements not only supports an inference of improper intent, it is an independent ground for finding a map unconstitutional. *See Apportionment I, 83 So. 3d 597* 640-641. Additional direct and circumstantial evidence of intent may serve to strengthen or weaken this inference of improper intent. Therefore, I first examine the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, then consider any additional evidence that supports the inference that such districts are also in violation of tier-one requirements.

16

## SPECIFICALLY CHALLENGED DISTRICTS

The tier-two standards at issue in this case are compactness and the requirement that districts follow geographic and political boundaries where feasible. Because Florida and many of its counties are cities are not perfectly square or round, there is often tension between these two requirements.

An evaluation as to compactness "begins by looking at the shape of a district." *Apportionment I, 83 So. 3d 597,* 634 (internal quotation marks and citation omitted). A district "should not have an unusual shape, a bizarre design, or an unnecessary appendage unless it is necessary to comply with some other requirement." *Id.*; *see also Id.* at 636 (emphasizing that "non-compact and 'bizarrely shaped districts' require close examination"). Districts "containing . . . finger-like extensions, narrow and bizarrely shaped tentacles, and hook-like shapes . . . are constitutionally suspect and often indicative of racial and partisan gerrymandering." *Id.* at 638 (internal quotation marks and alteration omitted). Thus, for example, the Florida Supreme Court struck down several Florida Senate districts in the Initial 2012 Senate Plan in part because those districts had "visually bizarre and unusual shapes." *Id.*

The compactness review should also utilize "quantitative geometric measures of compactness" derived from "commonly used redistricting software." *Id.* at 635. For example, the Florida Supreme Court has relied on the Reock method and the Area/Convex Hull method to assess compactness of voting districts. *See Id.* The Reock method "measures the ratio between the area of the district and the area of the smallest circle that can fit around the district." *Id.* The Area/Convex Hull method "measures the ratio between the area of the district and the area of the minimum convex bounding polygon that can enclose the district." *Apportionment I, 83 So. 3d 597, 635.*

Tier-two mandates also direct the Legislature to draw districts utilizing existing political and geographical boundaries where feasible. Political boundaries include "cities and counties," *Id.* at 637, while geographical boundaries include "rivers, railways, interstates and state roads," *Id.* at 638. This requirement is more flexible than the compactness requirement. But "the choice of boundaries" is not "left entirely to the discretion of the Legislature," *Id.* at 637, and it may not use any boundary (e.g., a "creek or minor road") that suits its purposes, *Id.* at 638. In addition, although no priority of importance is given to either, the requirement to use existing boundaries contains the modifier, "where feasible."

## A. Congressional District 5

Congressional District 5 does not adhere to the tier-two standards in Article III Section 20. It is visually not compact, bizarrely shaped, and does not follow traditional political boundaries as it winds from Jacksonville to Orlando. At one point, District 5 narrows to the width of Highway 17. The district has a Reock score of only 0.09. Enacted District 5 has majority black voting age population (BVAP), but the benchmark districting was only a plurality BVAP district. The Defendants' argument that the vote dilution provision of Article III Section 20 and Section 2 of the Voting Rights Act required a majority BVAP district and that this configuration was necessary to achieve that end, is not supported by the evidence.

Plaintiffs have shown that a more tier-two compliant district could have been drawn that would not have been retrogressive. The plans proposed by the House of Representatives prior to conference committee plan 9047 being adopted were all more compact and split fewer counties. While not model tier-two compliant districts, these iterations did avoid the narrow appendage jutting from the body of the district into Seminole County. Such appendages are particularly suspect of prohibited intent to benefit a political party or incumbent. Furthermore, the House's

18

various iterations achieved a BVAP of between 47 and 48 percent. The House's chief map drawer, Alex Kelly, testified that he performed a functional analysis on these iterations, and that this level of minority population would not have been retrogressive. Indeed, this is higher than the BVAP of benchmark district when it was enacted.

The vote dilution provisions in Article III, Section 20 and in the Voting Rights Act do not require the creation of a majority-minority district wherever possible, but only where certain conditions—conditions first announced in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)—are satisfied. First, three preconditions must be present: (i) the minority population is sufficiently large and geographically compact to be a majority of the voting-age population; (ii) the minority population is politically cohesive; and (iii) the majority population votes sufficiently as a bloc to enable it usually to defeat the candidates preferred by minorities. *Apportionment I*, 83 So. 3d at 622 (citing *Gingles*, 478 U.S. at 50-51).

The Legislature made no effort during the redistricting process to determine if the *Gingles* preconditions existed for this district, nor does the evidence introduced at trial demonstrate that they exist now. The minority population is not sufficiently large and geographically compact to constitute a majority of the voting age population. To achieve a BVAP over 50%, the district connects two far flung urban populations in a winding district which picks up rural black population centers along the way. The *Gingles* compactness inquiry certainly is focused on more than just district lines. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006). But it also doesn't ignore such lines. *See Id.* District 5 is simply not compact for the purpose of the *Gingles* analysis.

Nor does the evidence prove the third precondition. There is no dispute that there is racially polarized voting in Northeast Florida. However, Defendants have not shown that this

19

polarization is legally significant. Because "the extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Thornburg v. Gingles*, 478 U.S. at 50. The evidence is undisputed that the benchmark district, which was never majority-minority, elected an African-American to Congress during its entire existence. Additionally, analysis by Dr. Brunell, an expert retained by the House, suggested that there would be a 50/50 ability to elect a minority candidate of choice with a BVAP as low as 43.6 %. Thus, the evidence does not establish that the majority population votes sufficiently as a bloc to enable it usually to defeat the candidates preferred by minorities.

I also find that the decision to increase the district to majority BVAP, which was accomplished in large part by creating the finger-like appendage jutting into District 7 and Seminole County, was done with the intent of benefiting the Republican Party. I reach this conclusion based in part on the inference that the Florida Supreme Court suggested could be drawn from oddly shaped appendages that had no legal justification. *See Apportionment I*, 83 So. 3d at 618 ("W]here the shape of a district in relation to the demographics is so highly irregular and without justification that it cannot be rationally understood as anything other than an effort to favor or disfavor a political party, improper intent may be inferred"). This inference is also buttressed by the evidence of improper intent in the redistricting process generally, and as specifically related to the drawing of District 5, the most significant of which I will outline now.

### 1. In General

Plaintiffs' theory of the case regarding improper intent is that Republican leadership in the House and the Senate, their key staff members, and a small group of Republican political

20

consultants conspired to avoid the effective application of the Fair District Amendments to the redistricting process and thereby successfully fashioned a congressional map that favors the Republican Party and its incumbents. The strategy they came up with, according to the Plaintiffs, was to present to the public a redistricting process that was transparent and open to the public, and free from partisan influences, but to hide from the public another secretive process. In this secretive process, the political consultants would make suggestions and submit their own partisan maps to the Legislature through that public process, but conceal their actions by using proxies, third persons who would be viewed as "concerned citizens," to speak at public forums from scripts written by the consultants and to submit proposed maps in their names to the Legislature, which were drawn by the consultants.

What is clear to me from the evidence, as described in more detail below, is that this group of Republican political consultants or operatives[10] did in fact conspire to manipulate and influence the redistricting process. They accomplished this by writing scripts for and organizing groups of people to attend the public hearings to advocate for adoption of certain components or characteristics in the maps, and by submitting maps and partial maps through the public process, all with the intention of obtaining enacted maps for the State House and Senate and for Congress that would favor the Republican Party.

They made a mockery of the Legislature's proclaimed transparent and open process of redistricting by doing all of this in the shadow of that process, utilizing the access it gave them to the decision makers, but going to great lengths to conceal from the public their plan and their participation in it. They were successful in their efforts to influence the redistricting process and the congressional plan under review here. And they might have successfully concealed their

---

[10] Although one of this group took umbrage at the term operative, another self-described himself as such. I will use the terms interchangeably to refer to the same group.

scheme and their actions from the public had it not been for the Plaintiffs' determined efforts to uncover it in this case.

The closer question is whether the Legislature in general, or the leadership and staff principally involved in drawing the maps, knowingly joined in this plan, or were duped by the operatives in the same way as the general public. The Defendants argue that if such a conspiracy existed, there is no proof that anyone in the Legislature was a part of it. If portions of the operatives' maps found their way into the enacted maps, they say, it was not because leadership or staff were told or knew they came from this group, but rather because the staff, unaware of their origins, saw the proposals as improving the draft maps they were working on.

The most compelling evidence in support of this contention of the Defendants is the testimony of the staff members who did the bulk of the actual map drawing for the Legislature. I had the ability to judge the demeanor of Alex Kelly, John Guthrie and Jason Poreda at trial and found each to be frank, straightforward and credible. I conclude that they were not a part of the conspiracy, nor directly aware of it, and that significant efforts were made by them and their bosses to insulate them from direct partisan influence. I accept that their motivation in drawing draft maps for consideration of the Legislature was to produce a final map which would comply with all the requirements of the Fair District Amendments, as their superiors had directed them.

That being said, the circumstantial evidence introduced at trial convinces me that the political operatives managed to find other avenues, other ways to infiltrate and influence the Legislature, to obtain the necessary cooperation and collaboration to ensure that their plan was realized, at least in part. They managed to taint the redistricting process and the resulting map with improper partisan intent. There is just too much circumstantial evidence of it, too many coincidences, for me to conclude otherwise.

22

### a. Destruction of Records

The Legislative Defendants argue that despite the extensive discovery conducted by the Plaintiffs, there is a paucity of documentary evidence that ties the activities of the operatives with a single legislator so as to prove improper legislative intent. I note, however, that the Legislators and the political operatives systematically deleted almost all of their e-mails and other documentation relating to redistricting. There was no legal duty on the part of the Legislature to preserve these records, but you have to wonder why they didn't. Litigation over their plans was "a moral certainty," as their lawyers put it earlier in this case, and intent would be a key issue in any challenge.

### b. Early Meetings of Legislative Leaders and Staff with Political Consultants

In December of 2010 and January of 2011, Legislative leaders, staff members and attorneys met with a group of Republican political consultants to discuss the upcoming 2012 redistricting process. The attendees for one or both included Senator Gaetz, Representative Weatherford, legislative staff members Alex Kelly, Chris Clark and John Guthrie, counsel for the House and Senate, Richard Heffley, Marc Reichelderfer, Patrick Bainter, Benjamin Ginsberg, Joel Springer, Andrew Palmer, and Frank Terraferma.

Clark was the chief legislative aide for Gaetz during the 2012 Redistricting Process and Guthrie was the Senate staff member in charge of map drawing. Heffley was a political consultant who has worked with a number of Republican legislators and candidates, including Gaetz. He was, at the time, under contract with The Republican Party of Florida (RPOF) to provide unspecified services relating to redistricting. Reichelderfer was a political consultant who had worked with a number of Republican legislators and candidates, including Speaker Dean Cannon. Bainter was a political consultant who had worked with a number of Republican

23

legislators and candidates, including Representative Daniel Webster. Bainter was the owner of Data Targeting, Inc. ("Data Targeting"), a political consulting and polling firm located in Gainesville, Florida. Ginsberg was an attorney based in Washington, D.C., recognized in the area of redistricting and had represented the National Republican Party in redistricting matters. He also either was or came to be counsel for Heffley, Reichelderfer and Terraferma. Springer was employed by the RPOF as director of Senate campaigns. Palmer was employed by the RPOF as director of House campaigns. Terraferma was a political consultant who worked with a number of Republican legislators and candidates, including Weatherford.

The meetings were not open to the public, and there is no written record of what was discussed at either meeting. No one who testified at trial about them seemed to be able to remember much about what was discussed, though all seemed to agree that the political consultants were told that they would not have a "seat at the table" in the redistricting process. No one clearly articulated what that meant exactly, but there was testimony that they were told that they could still participate in redistricting through the public process "just like any other citizen." One witness testified that the participants discussed whether a privilege could be identified to prevent disclosure of redistricting-related communications among political consultants, legislators, and legislative staff members, and concluded that no privilege would apply.

Reichelderfer prepared a memorandum following the December, 2010 meeting that included the following notations: "What is our best operational theory of the language in [Amendments] 5 and 6 related to retrogression of minority districts?"; "Central FL Hispanic seats? Pros and Cons"; "Evolution of maps – Should they start less compliant and evolve through the process – or – should the first map be as near as compliant as possible and change very little?

Or other recommendations?"; "Communications with outside non-lawyers – how can we make that work?"

There is nothing necessarily sinister about such meetings. Most of the attendees were friends or professional colleagues and perhaps it could be considered a courtesy extended. But it doesn't look good if you are promoting openness, transparency and neutrality in the redistricting process. There was really no reason to convene two meetings just to tell active political partisans of the Republican Party that they would not "have a seat at the table." A letter or e-mail would suffice, or some general public announcement as to what the protocol would be going forward.

And there are a few curious things about these meetings and their connection to subsequent events that are troubling. First, this was a highly partisan group and all the political consultants were very interested in the redistricting process. It is inconceivable to me that, if as testified to, they were advised that they could participate in the public process "just like any other citizen," they would not have done so. How could these political consultants, who were intensely interested in the process, whose jobs or livelihoods were tied into protecting their clients' and their party's interests with respect to redistricting, not take the opportunity to submit proposed maps through the public portal, to attend at least some of the public hearings and speak out?

The reality, and the irony, is that there would be absolutely nothing wrong about the attendees at those meetings submitting proposed maps or partial maps. The difference is, if done in the open, then those reviewing the submissions could take into account the source in evaluating whether it was neutral or whether it might tend to favor or disfavor a political party or an incumbent. One of the political consultants lamented that if he had submitted maps in his own name, he would probably have come under attack, accused of trying to favor his party or its

incumbents. Well, of course his submission might be closely scrutinized, in the same way that a proposed map submitted by the Florida Democratic Party might be taken with a grain of salt. That's how it should be if one is concerned about improper partisan intent influencing the drawing of the map.

Regardless, given the circumstances, it's hard to imagine that the legislative leaders and staffers would not have expected active participation in the public redistricting process by those political consultants at the meetings. And when the process was under way and maps were being submitted by members of the public, and public hearings were being held, and these political consultants were not in attendance, and none of the maps coming from the public had any of their names on them, I would think that the staff and legislative leaders would find it extremely strange, that they might even ask why not. But they didn't.

One of the things that the Defendants tout as showing that there was no improper partisan intent in the drafting of the maps is to point to the fact that as things progressed, each succeeding map that was drawn was an improvement over the one before it in terms of compactness, leaving cities and counties intact and following geographical boundaries. Coincidentally, though, that corresponds with a strategy suggested from Reichelderfer's notes, i.e., start with less compliant maps and work toward a more compliant map.

The Defendants also tout the opportunity for the public to have input by submitting proposed maps or partial maps, and by attending public hearings which were held throughout the state. And, the Defendants point out, all of this was open, transparent and on the record. Although that sounds like a good idea -- who can argue that openness and transparency are not good things when it comes to government -- it provided the means by which partisan maps, secretly drawn and submitted by political operatives, could be incorporated into the enacted map

26
-156-

with no one in the general public the wiser. Staff members were encouraged to consider maps submitted by the public and if they contained concepts or configurations that made the draft map "better," to incorporate them.

Paid political operatives aside, when you think about it, anybody who would go to all the trouble of drawing a map and presenting it to the legislature for consideration is probably more likely to be motivated by personal or party politics than by an altruistic desire to draw the most constitutionally compliant map possible, free of any partisan intent. And if so, relying upon publicly submitted maps may not be the best way to protect against partisan influence.

If you choose, however, to accept and perhaps rely upon publicly submitted maps, it seems to me that you should have a way to address the possible, nay probable, partisan intent of the drafters of at least some of those maps. The Legislature's answer was apparently to ignore it. Both the Senate and the House leadership instructed their staff not to consider the potential political performance of any district drawn (except in the House as to districts involving tier one minority issues), nor were they to concern themselves with the origins or the author of any publicly submitted map.

This seems on its face a neutral approach, and I appreciate the dilemma that arises: If I start evaluating a proposed map for political performance because of suspicion that it is the result of improper partisan intent, and make "corrections," haven't I now altered the map with the intent to favor or disfavor a political party? While I appreciate this concern, I don't know that it is a satisfactory answer to say that, as long as the improper intent behind a submitted map did not originate with me, and I am not expressly told about it, I don't have to worry about it. Turning a blind eye to the probability of improper intent in these maps is not the same as neutrality.

Perhaps it would be best to have it out on the table for all to see and evaluate. Considering political performance is not the same as intending to favor or disfavor a political party or incumbent, and an open process would assist in evaluating which was in play in a particular situation. And in truth, every single legislator or senator could very easily determine on their own the potential political performance of any district on a proposed map and vote on it accordingly. Any interested citizen could access such information and advise their representative of his or her concerns or feelings about a particular district. You might insulate the staffers from political consultants and partisan influences but you can't insulate the entire Legislature.

### c. Continued Involvement of the Political Consultants in the Redistricting Process

On June 1, 2011, Senator Gaetz sent an email to legislators providing information about upcoming public hearings about the redistricting process. The metadata for the email reveals that a "blind copy" of it was sent to Heffley and Terraferma. At trial, Senator Gaetz had no explanation for why this was done, pointing out only that the information in the e-mail was public information and that he wasn't sure someone else in his office had not sent it out under his name. Again, there would be absolutely nothing wrong with sending this information to Heffley and Terraferma, but why secretly send a blind copy? And if Senator Gaetz did not send it out, someone in his office was keeping these operatives in the loop.

Two of the consultants, Reichelderfer and Hefley, were directly involved in the redistricting process, acting as go betweens for leadership of the two chambers regarding the redistricting process. This was purportedly because of a lack of a good working relationship between the Speaker of the House and the President of the Senate. Yet, by all accounts, the actual staff members of each chamber who were working on the maps got along well with each

other, as did the chairmen of the redistricting committees. Regardless, in their insider roles, Hefley and Reichelderer did not have to speak directly to staff map drawers, or even leadership, to infect and manipulate the map drawing and adoption process.

As noted above, the House and Senate destroyed most e-mails and other records of communications concerning the redistricting process, as did the political consultants. What was recovered, however, allowed the Plaintiffs to show that Kirk Pepper, Deputy Chief of Staff to then Speaker Dean Cannon, was regularly sending to Reichelderfer copies of various draft maps of the Legislature well before they were disclosed to the public.

The Defendants acknowledge that this was improper, but say it is not evidence of improper intent on the part of the Legislature because: 1) It was done without permission from his boss; 2) It was not done for the purpose of influencing the actual drafting of the maps; 3) Pepper had no map drawing responsibilities and gave no directions on how the maps should be drawn; and 4) He was simply trying to give his friend, Reichelderfer, a heads up on what to expect so that he could get ahead of his competition and better advise his clients.

Pepper and Reichelderfer apparently did communicate about the political performance of the maps, however, as evidenced by a series of e-mails between the two. For example, on November 27, 2011, right after receiving an early unpublished copy of the Senate's first draft congressional map from Pepper, Reichelderfer advised Pepper that the district of Representative Daniel Webster was "a bit messed up," and Pepper responded by inquiring "performance or geography?" Mr. Pepper testified that, though it may seem that they were discussing political performance, his reply to his friend was actually a signal reminding him that they should not discuss such things. Perhaps, but that is a very unusual and illogical interpretation.

In an email exchange with Reichelderfer, Representative Cannon commented that "we are in fine shape" as long as "the Senate accommodates the concerns that you [Reichelderfer] and Rich [Heffley] identified in the map that they put out tomorrow." The Defendants explained this exchange by saying that the concerns referred to was the general concern by the House that the Senate map would be so far different than the House map that it would make reconciliation of the two maps difficult. Again, perhaps, but this seems a stretch given the language used.

In October of 2011, Frank Terraferma e-mailed Chairman Weatherford reporting that Pepper was at the Republican Party of Florida huddled on a computer with Rich Hefley and working on "congressional redistricting if I had to guess." Now, it's certainly possible that Terraferma was mistaken or simply speculating without any basis, as was suggested at trial, but one has to wonder why he would make this assumption if Pepper really had nothing to do with the redistricting process. Maybe not officially, but as noted above, he was heavily involved in helping his friend, Reichelderfer with inside information. From November 2011 until January 2012, Pepper transmitted at least 24 draft maps to Reichelderfer. In most cases, Pepper provided the draft maps to Reichelderfer before their release to the public. In many cases, Pepper provided Reichelderfer with draft maps that were never released to the public.

Reichelderfer made a number of modifications to these and other maps that he received from Pepper. Some of those revisions combine a District 5 with a Black VAP of over 50% and a Hispanic VAP of District 9 over 40%. (*Compare* CP Ex. 885 *with* CP Ex. 1050). As a result of such changes, the performance of Districts 5, 7, 9, and 10 went from being four Democratic performing or leaning seats in early maps such as H000C9001 to two Democratic and two Republican performing seats in the enacted map, H000C9047 based on the results of the 2008

presidential election.[11] Indeed, many of the maps and partial maps the consultants focused on seemed to be in the Central Florida area, which coincidentally were the areas in the enacted map I have found to be problematic.

### d. Prior Finding of Partisan Intent in State Senate Plan

The Florida Supreme Court found improper partisan intent present in the State Senate Map. The same process and the same people were involved in drafting the congressional map. It seems unlikely that the same taint would not affect that map as well. There is a difference in that the former was drawn without any input from the House and the latter the result of a collaborative effort. I note, however, that my concerns with Districts 5 and 10 involve changes to the House's map in deference to the Senate. The problems that I find in Districts 5 and 10 were not present, at least to the same degree, in the House version.

### 2. Evidence of Partisan Intent Specifically Related to District 5

The decision to change District 5 to make it a majority BVAP was made at a non-public meeting attended by Alex Kelly and John Guthrie, the chief map drawers for the House and Senate respectively, and Will Weatherford and Don Gaetz, chairmen of the redistricting committees in their respective chambers. They had been given direction before the meeting from their respective chamber leaders, Speaker of the House Dean Cannon and Senate President, Mike Haridopolis. Notably, Alex Kelly testified that Speaker Cannon told him that the Senate would likely request to push District 5 over 50% BVAP and that they should be prepared to accede to that request. Speaker Weatherford[12] testified that the House only went along with this request because the Senate made a "compelling" argument for it, but he could not remember the substance of the argument. The reason given at trial for this change was that the District was

---

[11] Demographic, election, and compactness data are derived from Joint Exhibit 1, unless otherwise stated.
[12] Then Chairman Weatherford

31

very close to 50% BVAP and that it seemed prudent to avoid a possible VRA suit by bumping it up enough to create a majority-minority district. That justification is not compelling, without some showing that it was legally necessary to create a majority-minority district.

The changes also increased the Republican performance of neighboring District 7.[13] In the version of District 7 House Plan 9043, Alex Sink (D) would have received 48.5% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 50.5% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 39.7% of the two-party vote in the 2006 gubernatorial election. In the enacted version of District 7, Alex Sink (D) would have received 47.5% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 49.6% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 39.0% of the two-party vote in the 2006 gubernatorial election. The change resulted in a decrease in registered Democrats in District 7 from 36.0% to 35.0% based on 2010 general election data.

Based on the above, I find that Plaintiffs have proved that District 5 unnecessarily subjugates tier-two principals of compactness. They have also proved portions of District 5 were drawn to benefit the Republican Party, in violation of tier-one. Accordingly, District 5 is invalid and must be redrawn. Any surrounding districts affect by such a change must likewise be redrawn.

### Congressional District 10

District 10 is overall fairly compact. It has a Reock Score of .39 and a Convex Hull Score of .73. However, there is an odd-shaped appendage which wraps under and around District 5, running between District 5 and 9. Such appendages render a district not compact

---

[13] The increased Republican performance is admittedly marginal, particularly when comparing enacted CD 7 with the analogue district in Senate map 9014. However, close political races are almost always won or lost on the margins.

pursuant to tier-two standards and should be avoided unless necessary to comply with tier-one requirements. *See Apportionment I,* 83 So. 3d at 634 ("Compact districts should not have an unusual shape, a bizarre design, or an unnecessary appendage unless it is necessary to comply with some other requirement"). Plaintiffs have shown that the district could be drawn in a more compact fashion, avoiding this appendage. Plaintiffs adduced multiple iterations emanating from the House redistricting suite which did not contain this appendage and were otherwise more compact. Indeed these iterations were more compact in Central Florida generally, as the chart below will show.

*Central Florida Regional Compactness Chart*

|  | CONGRESSIONAL PLAN | | HOUSE PLAN 9043 | |
|---|---|---|---|---|
|  | Reock | Convex Hull | Reock | Convex Hull |
| CD5 | 0.09 | 0.29 | 0.10 | 0.35 |
| CD7 | 0.60 | 0.77 | 0.67 | 0.86 |
| CD8 | 0.34 | 0.76 | 0.32 | 0.73 |
| CD9 | 0.48 | 0.80 | 0.66 | 0.90 |
| CD10 | 0.39 | 0.73 | 0.42 | 0.83 |
| CD15 | 0.44 | 0.75 | 0.60 | 0.81 |
| CD17 | 0.67 | 0.82 | 0.64 | 0.83 |
| AVG. | 0.43 | 0.70 | **0.49** | **0.76** |

The *Central Florida Regional Compactness Chart* lists compactness scores for all districts included in Orange, Osceola, and Polk Counties.

Defendants contend that this appendage, and the configuration of Central Florida generally, is necessary to achieve tier-one minority protection in both Districts 5 and 9. Because the appendage is highly populated and white majority, they argue that placing its population in either of those districts would have impermissibly lowered the minority VAP. I cannot agree.

While the creation of a Hispanic influence district in CD 9 may be a legitimate goal, there is no evidence before me to suggest that it was entitled to tier-one protection. There was no Hispanic opportunity district in Central Florida under the benchmark plan. There was no evidence that a district without the appendage would lead to retrogression elsewhere. Indeed

33

House plan 9043 had a non-retrogressive BVAP of 48.03% in CD 5 and a HVAP of 39.59% in CD 9.[14] Nor is District 9 entitled to vote-dilution protection. There was no evidence to suggest that a Hispanic majority district could be created in Central Florida. Defendants cannot justify deviation from a tier-two *constitutional requirement* because of a desire to create a Hispanic influence district.

I also find that District 10 was drawn to benefit the Republican Party and the incumbent. I reach this conclusion based in part on the inference that the Florida Supreme Court suggested could be drawn from oddly shaped appendages that had no legal justification. *See Apportionment I*, 83 So. 3d at 618. This inference is also buttressed by the general evidence of improper intent outlined above in my analysis of District 5 and the following evidence related specifically to the drawing of District 10.

The appendage benefited the incumbent Representative Webster by returning to District 10 territory that was part of his benchmark District 8 and improved the Republican performance of District 10 in two out of the three elections relied upon by the Florida Supreme Court in *Apportionment I*. In the version of District 10 in H000C9043, Alex Sink (D) would have taken 44.9% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 48.0% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 39.0% of the two-party vote in the 2006 gubernatorial election. In the enacted version of District 10, Alex Sink (D) would have received 45.6% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 47.6% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 38.9% of the two-

---

[14] It is true that CD 9 in plan 9043 did not keep Osceola County whole. The goal of keeping cities and counties whole is laudable and required where "feasible." Compactness on the other hand has no such modifier in its constitutional prescription, "suggesting that in balancing this criterion with compactness, more flexibility is permitted." *Id.* at 636.

34

party vote in the 2006 gubernatorial election. In addition, the change lowered the number of registered Democrats in District 10 from 37.2% in H000C9043 to 36.8% in H000C9047 based on 2010 general election data.

Dr. Ansolabehere also testified that the changes between House plan 9043 and adopted plan 9047 altered the boundaries of that district primarily by moving 80,000 voting age people out of District 10 into District 9, while moving 71,000 voting age people out of District 9 to District 10. Dr. Ansolabehere testified that these changes were not necessary to make District 9 a minority-performing district, because without them District 9 was already a minority-performing district, and the populations that were shifted were majority white populations. As a result of this appendage, the decrease in Democratic registration in District 10 and corresponding increase in Democratic registration in the already comfortably Democratic District 9 were of significant Republican benefit for a competitive district such as District 10.

Plaintiffs have proved that District 10 unnecessarily subjugates tier-two principles of compactness. They have also proved portions of District 10 were drawn to benefit the Republican Party, in violation of tier-one. Accordingly, District 10 is invalid and must be redrawn, as must the surrounding districts affected by such change.

### Districts 13 & 14

Plaintiffs claim that Districts 13 and 14 are unconstitutional because they violate the tier-two standard, requiring that, where feasible, districts should utilize existing political and geographic boundaries. Plaintiffs point to District 14, which reaches across Tampa Bay to take in a portion of South St. Petersburg, splitting the city of St. Petersburg and Pinellas County. Plaintiffs suggest that this configuration is not justified by any tier-one consideration. They

35

suggest that it is indicative of improper intent to benefit the Republican Party and the incumbent, the late Republican Congressman Bill Young.

The benchmark predecessor to District 14 (District 11 in 2002) had a BVAP population of 26.78% and a HVAP of 25.84%. As adopted, Congressional District 14 has a BVAP of 25.63% and a HVAP of 25.61%. Romo Plaintiff's proposed maps A and B have a BVAP of 21.73% and a HVAP of 26.91%

Plaintiffs have not proved tier-two deviations. While the Romo Plaintiffs' proposed map does increase the compactness of District 13, it causes District 14 to become less compact under both Reock and Convex Hull measurements. On a regional level, the Romo proposed map causes every district which touched District 13 and 14 to become less compact than the adopted plan, 9047. As the chart below shows, the Romo maps would decrease the compactness in five of the six districts, while increasing the compactness in only one. The legislature was not required to make this tradeoff in compactness to avoid splitting Pinellas County.

### Tampa Bay Regional Compactness Chart

|  | Reock Score | | Convex Hull Score | |
|------|-------------------|------------|-------------------|------------|
|  | Congressional Plan | Romo Maps | Congressional Plan | Romo Maps |
| CD12 | 0.40 | 0.38 | 0.81 | 0.79 |
| CD13 | 0.46 | 0.57 | 0.82 | 0.91 |
| CD14 | 0.36 | 0.28 | 0.69 | 0.60 |
| CD15 | 0.44 | 0.33 | 0.75 | 0.67 |
| CD16 | 0.42 | 0.32 | 0.81 | 0.80 |
| CD17 | 0.67 | 0.39 | 0.82 | 0.68 |
| AVG. | **0.46** | 0.38 | **0.78** | 0.74 |

The Tampa Bay Regional Compactness Chart lists compactness scores for all which include portions of Hillsborough, Pasco, Pinellas, and Manatee Counties the adopted plan.

Nor have Plaintiffs proved that the decision to include portions of Pinellas County in District 14 was the result of partisan mal-intent to benefit the Republican Party. Unlike Districts 5 and 10, there are no flagrant tier-two deviations from which I can infer unlawful intent. The

decision to have District 14 invade Pinellas County was made early in the process by the professional staff, as most if not all of the iterations emanating from both houses broke into Pinellas County. Thus, unlike changes made to District 5 by the leaders during conference committee, this decision was made by the Staff whom I have found were insulated from the political consultants. I simply cannot conclude, on partisan effect alone, that the decision to incorporate portions of South St. Petersburg into District 14 was done with the intent to benefit the Republican Party or the incumbant member of Congress.

### Districts 21 & 22

Plaintiffs contend that Districts 21 and 22 are invalid. They point to testimony from Alex Kelly along with redistricting iterations emanating from the House redistricting suite. They suggest it was possible to draw Districts 21 and 22 stacked on top of each other north to south rather than in the adopted configuration with the districts running parallel to each other down the coast. This configuration could have avoided county and city splits. Plaintiffs contend that failure to adopt this configuration was an unnecessary deviation from tier-two requirements and evidenced an intent to benefit the incumbents in that area.

Plaintiffs have not met their burden of proving unnecessary deviation from tier-two requirements. The iteration Plaintiffs point to might be more compliant with tier-two in a vacuum, but they have not shown that it could be achieved without violating tier-one requirements for minority protection in neighboring District 20.[15] Alex Kelly did testify that this configuration could be accomplished without retrogression. However, the inquiry does not end there because the benchmark district was a majority black district. CP 905, which was discussed extensively at trial, does not attain majority BVAP status in District 20. There was no testimony at trial about District 20 and whether it met the *Gingles* preconditions such that it was protected

---

[15] The Romo Plaintiffs' proposed map adopts the same general configuration as the Legislature's enacted map.

under the vote dilution provisions of Section 2 of the VRA. Because District 20 was a majority black district in the benchmark, I am reluctant to invalidate the Legislature's plan absent a showing that more tier-two compliant districts could be drawn while not violating either tier-one requirement regarding racial minority protection. *See Apportionment I*, 83 So. 3d 597, 641 ("If an alternative plan can achieve the same constitutional objectives that prevent vote dilution and retrogression . . . without subordinating one standard to another demonstrates that it was not necessary for the Legislature to subordinate a standard in its plan").

Plaintiffs did produce a couple of draft iterations that achieved majority black status for District 20.[16] However, after visually examining these districts I don't find sufficient tier-two improvements to justify invalidating the Legislature's product.[17] These districts have a more irregular boundary in Hendry County, compared to the enacted plan. Additionally, the stacked configuration of Districts 21 and 22 causes both districts to be deeply invaded by tentacles reaching from District 20. In enacted plan 9047, District 21 has no such appendage invading it and is quite visually compact. Furthermore, these iterations cause District 23 to become more visually non-compact, creating two distinct areas, joined by a narrower section.

Plaintiffs have not met their burden of showing unnecessary deviation from tier-two requirements given the various tradeoffs required to draw compact districts in the region as a whole. Nor have they shown that improper intent led to the adoption of Districts 21 and 22. My "duty 'is not to select the best plan, but rather to decide whether the one adopted by the legislature is valid.'" *Apportionment I*, 83 So. 3d at 608 (quoting *In re Apportionment Law—1992*, 597 So. 2d at 285).

---

[16] CP 909; CP913.

[17] Plaintiffs did not provide compactness scores for these districts, so my analysis is limited to the ocular test.

## Districts 25, 26, & 27

Plaintiffs contend that these districts are invalid because the Legislature unnecessarily split Hendry County between two districts and unnecessarily split the city of Homestead. They also contend that the configuration was done to benefit the Republican Party.

Plaintiffs have not proved invalidity. A regional view of South Florida shows that any tier-two differences between the enacted map and Romo Plaintiffs' maps are *de minimis.* Indeed the enacted plan splits the same number of counties, while splitting one less city. Were I to invalidate the enacted plan based on the objective tier-two evidence before me, I would be selecting a plan I found subjectively better rather than determining if Plaintiffs have proved the enacted plan invalid. *Id.* Nor do I find based on the totality of the evidence that this configuration was based on unlawful partisan intent. Moreover, I credit the testimony of Professor Moreno that Romo A & B could have a retrogressive effect on the Hispanic majority districts in South Florida.

*South Florida Regional Compactness Chart*

| | CONGRESSIONAL PLAN | | ROMO A & B | |
| | Reock | Convex Hull | Reock | Convex Hull |
|---|---|---|---|---|
| CD18 | 0.50 | 0.82 | 0.42 | 0.77 |
| CD20 | 0.48 | 0.74 | 0.49 | 0.75 |
| CD21 | 0.28 | 0.60 | 0.28 | 0.62 |
| CD22 | 0.18 | 0.61 | 0.22 | 0.53 |
| CD23 | 0.27 | 0.57 | 0.28 | 0.56 |
| CD24 | 0.38 | 0.73 | 0.37 | 0.76 |
| CD25 | 0.40 | 0.73 | 0.42 | 0.65 |
| CD26 | 0.18 | 0.46 | 0.17 | 0.49 |
| CD27 | 0.46 | 0.81 | 0.59 | 0.84 |
| AVG. | 0.35 | **0.67** | **0.36** | 0.66 |

The *South Florida Regional Compactness Chart* contains compactness scores for all districts included in Palm Beach, Broward, Miami-Dade, and Monroe Counties.

### South Florida Regional County and City Split Chart

|  | CONGRESSIONAL PLAN | ROMO A & B |
|---|---|---|
| Split Counties | 5 | 5 |
| Counties Splits | 19 | **18** |
| Split Cities | **18** | 19 |
| City Splits | 45 | **42** |

This table uses the same 9 districts included in the South Florida Regional Compactness Table. [18]

## CONCLUSION

As I find the Legislature's remaining affirmative defenses to be without merit, I find the

Congressional Redistricting plan adopted by the Legislature to be constitutionally invalid.

---

[18] The specific counties and cities split are as follows:

Congressional Plan Split Counties by District
Broward- 20, 21, 22, 23, 24, 25
Collier- 19, 25
Hendry- 20, 25
Miami-Dade- 23, 24, 25, 26, 27
Palm Beach- 18, 20, 21, 22

Romo A & B Split Counties By District
Broward- 20, 21, 22, 23, 24
Collier- 19, 25
Miami-Dade- 23, 24, 25, 26, 27
Palm Beach- 18, 20, 21, 22
St. Lucie- 8, 18

Congressional Plan Split Cities by District
Boynton Beach- 20, 22
Deerfield Beach- 20, 21, 22
Fort Lauderdale- 20, 22, 23
Hialeah- 25, 27
Homestead, 26, 27
Lake Worth- 20, 22
Lantana- 20, 22
Margate- 20, 21
Miami- 24, 27
Miramar- 24, 25
Oakland Park- 20, 22
Pembroke Pines- 23, 24, 25
Plantation- 20, 22, 23
Pompano Beach- 20, 21, 22
Riviera Beach- 18, 20, 22
Royal Palm Beach- 18, 20, 21
Sunrise- 20, 22, 23
West Palm Beach- 18, 20, 22

Romo A & B Split Cities by District
Coconut Creek- 20, 21
Deerfield Beach- 20, 21, 22
Fort Lauderdale- 20, 22, 23
Hallandale Beach- 23, 24
Hollywood- 23, 24
Margate- 20, 21
Miami- 24, 27
Miramar- 20, 24
North Miami- 23, 24
Oakland Park- 20, 22
Pembroke Pines- 23,24
Plantation- 20,22
Pompano Beach- 20,21,22
Port St. Lucie- 8,18
Riviera Beach- 18, 20
North Miami Beach- 23, 24
Sunrise- 20, 22, 23
Tamarac- 20, 21
West Palm Beach- 18, 20

40

Specifically, Districts 5 and 10 were drawn in contravention of Article III Section 20 of the Florida Constitution. They will need to be withdrawn, as will any other districts affected thereby. All additional challenges to the plan are rejected. Jurisdiction is reserved to consider any pending or post-judgment motions, and to enter such further orders as may be necessary to effectuate this judgment or to otherwise fashion an appropriate equitable remedy.

DONE AND ORDERED in Chambers at Tallahassee, Leon County, Florida, this _____ day of July, 2014.

TERRY P. LEWIS
Circuit Judge

Copies to:

All Counsel of Record

41
-171-

Certified Judgments of Trial Courts in and for Leon County – Terry Powell Lewis, Judge - Case Nos. 372012CA000412XXXXXX and 372012CA000490XXXXXX - An Appeal from the District Court of Appeal, First District, Case No. 1D14-3953

John Stewart Mills, Andrew David Manko, and Courtney Rebecca Brewer of The Mills Firm, P.A., Tallahassee, Florida; David B. King, Thomas Alan Zehnder, Frederick Stanton Wermuth, and Vincent Falcone, III of King, Blackwell, Zehnder & Wermuth, P.A., Orlando, Florida; Adam Michael Schachter and Gerald Edward Greenberg of Gelber Schachter & Greenberg, P.A., Miami, Florida; Mark Herron and Robert J. Telfer, III of Messer Caparello, P.A., Tallahassee, Florida; and John M. Devaney and Marc Erik Elias of Perkins Coie LLP, Washington, District of Columbia;

 for Appellants/Cross-Appellees

J. Andrew Atkinson, General Counsel, Florida Department of State, Tallahassee, Florida; Raoul G. Cantero, III, Jason Nelson Zakia, and Jesse Luke Green of White & Case LLP, Miami, Florida; George T. Levesque, General Counsel, The Florida Senate, Tallahassee, Florida; Allison J. Riggs and George Edward Eppsteiner, Southern Coalition for Social Justice, Durham, North Carolina; Nancy Gbana Abudu, American Civil Liberties Union of Florida Foundation, Miami, Florida; Matthew Joseph Carson, General Counsel, The Florida House of Representatives, Tallahassee, Florida; and Charles Talley Wells of Gray Robinson P.A., Orlando, Florida, and Jason Lawrence Unger, Andre Velosy Bardos, and George N. Meros, Jr. of Gray Robinson, P.A., Tallahassee, Florida,

 for Appellees/Cross-Appellants

Martha Angela Pardo, Associate Counsel, LatinoJustice PRLDEF, Orlando, Florida,

 for Amici Curiae LatinoJustice PRLDEF, Florida New Majority, and Mi Familia Vota